1 | STEVEN T. GUBNER – Bar No. 156593
JASON B. KOMORSKY – Bar No. 155677
2 | SUSAN K. SEFLIN – Bar No. 213865
JESSICA L. BAGDANOV – Bar No. 281020
3 | BG LAW LLP
21650 Oxnard Street, Suite 500
4 | Woodland Hills, CA 91367
Telephone:  (818) 827-9000
5 | Facsimile:  (818) 827-9099
Email:       sgubner@bg.law
6 |            jkomorsky@bg.law
             sseflin@bg.law
7 |            jbagdanov@bg.law

8 | Attorneys for David Seror, Chapter 7 Trustee

9 | **UNITED STATES BANKRUPTCY COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 | **SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| 12  In re | Case No. 1:12-bk-10986-MB |
| 13  ALLANA BARONI, | Chapter 7 |
| 14                       Debtor. | **TRUSTEE'S SUPPLEMENTAL OPPOSITION TO:** |
| 15 | |
| 16 | **MOTION OF DEBTOR ALLANA BARONI, MOVING THE BANKRUPTCY COURT FOR AN ORDER REMOVING CHAPTER 7 TRUSTEE DAVID SEROR FOR CAUSE, PURSUANT TO 11 U.S.C. § 324(b); AND MOVING COURT TO MAKE CRIMINAL REFERRALS OF WELLS FARGO BANK, OF BANK'S ATTORNEY BERNARD KORNBERG, AND OF SEROR; SUPPLEMENTAL DECLARATION OF DAVID SEROR** |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | Hearing: |
| 24 | Date:  February 8, 2022 |
| 25 | Time: 10:00 a.m. Place: Courtroom 303 Via ZoomGov |
| 26 | |
| 27 | |
| 28 | |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ....................................................................................... 1

II.   THERE ARE NO FACTS TO SUPPORT THE REMOVAL OF THE TRUSTEE OR
      ANY CRIMINAL REFERRAL ...................................................................... 4

      A.    The Alleged "Illegal" Ex Parte Appearance and Claimed "Lies" Relating
            Thereto............................................................................................ 4

      B.    Alleged Misstatements to the Court by the Trustee and His Counsel.................... 6

      C.    The Allegation that the Trustee Took Any Action Prior to Entry of an Order....... 9

      D.    The Trustee's Alleged Poor Listing Strategy ......................................................12

      E.    The Trustee's Alleged Misconduct in "Driving the Hesses to Vacate the
            Carmel Property" and Causing the Loss of Rental Income.................................13

      F.    The Trustee Allegedly Overpaid for Roof Replacement.....................................16

      G.    The Allegation that the Trustee Allowed Insurance to Lapse .............................17

      H.    The Allegation that the Trustee Improperly Paid Bank and Technology Fees
            and Violated Trust Procedures.................................................................19

      I.    The Allegation that the Trustee Committed Knowing Misconduct with
            Respect to the Motion to Compromise Wells Fargo's Proof of Claim ................19

III.  CONCLUSION ...........................................................................................22

SUPPLEMENTAL DECLARATION OF DAVID SEROR ......................................................24

# TABLE OF AUTHORITIES

Page

## CASES

*In re Botany Industries, Inc.,*
 463 F. Supp. 793 (E.D. Penn. 1978) ....................................................................3, 13, 21

*In re Hunanyan,*
 631 B.R. 902 (Bankr. C.D. Cal. 2021) ..........................................................................10

*In re Narumanchi,*
 471 B.R. 35 (D. Conn. 2012) ......................................................................................1, 2

*In re Valentine,*
 196 B.R. 386 (Bankr. E.D. Mich. 1996) .......................................................................... 1

*In re Weinstein,*
 227 B.R. 284 (9th Cir. BAP 1998) .................................................................................20

## STATUTES

11 U.S.C.,
 Section 363(b)(1) ....................................................................................................13, 14

18 U.S.C.,
 Section 3057(a) .........................................................................................................1, 3

## RULES

Local Bankruptcy Rule for the Central District of California,
 Rule 9011-3(c) ...............................................................................................................22

Local Bankruptcy Rule for the Central District of California,
 Rule 2070-1 (a) ................................................................................................................ 9

United States Bankruptcy Court for the Central District of California,
 General Order 11-02 ("General Order 11-02") .............................................................19

2734433

David Seror, Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of Allana Baroni (the "Debtor"), hereby submits this supplemental brief opposing (the "Supplemental Opposition") the *Motion of Debtor Allana Baroni, Moving the Bankruptcy Court for an Order Removing Chapter 7 Trustee David Seror for Cause, Pursuant to 11 U.S.C. § 324(b); and Moving Court to Make Criminal Referrals of Wells Fargo Bank, of Bank's Attorney Bernard Kornberg, and of Seror, as Specified in the Attached Notice of Motion and Motion* [Doc. #1378] (the "Motion" or "Motion to Remove"), filed by the Debtor. In support of this Supplemental Opposition, the Trustee respectfully represents as follows:

## I.    INTRODUCTION

The Debtor and her counsel have hurled scurrilous, unsubstantiated and false claims against the Trustee, the Trustee's counsel, a creditor of the bankruptcy estate, and that creditor's attorney. In lieu of evidence supporting any of their alleged "facts" (of which there is none), the Debtor's original submission consisted of bald allegations of "illegality" in a declaration filed by the Debtor's counsel, which averments lacked foundation or personal knowledge, which had no basis in fact, and which were contradicted by the record. Accordingly, the Trustee sought to strike the declaration of Debtor's counsel, Kathleen March, and renews his request here and asks that the Court take up this issue at the beginning of the hearing. The Debtor's declaration fared no better. As pointed out in the Trustee's first opposition [Doc. 1392] (the "Opposition") and as discussed below, the Debtor's declaration also contains no facts, let alone facts to support the relief the Debtor seeks here[1] assuming, in the first instance, the Debtor has standing to seek a criminal referral of the Trustee or any creditor. See 18 U.S.C. § 3057(a).[2] Worse, the Debtor and her counsel ignore both the Debtor's

---

[1]  Not surprisingly, and notwithstanding the Debtor's Motion claiming to have evidence against the Trustee and others accused by the Debtor of malfeasance, the Debtor—after filing the instant Motion—sought to conduct scorched earth discovery to uncover the very evidence the Debtor should have had when she initiated the Motion. The Debtor's attempt to seek discovery was denied at the hearing [Hearing Transcript from December 8, 2021; 73:10-22 and 75:21-25] and again by the Court's amended scheduling order [Doc. 1417].

[2]  Courts interpreting this section have noted that it does not vest standing in a debtor or creditor to seek a criminal referral. *See In re Narumanchi*, 471 B.R. 35, 44 (D. Conn. 2012) (noting a debtor's concession that Section 3057 does not provide debtor with the right to make a criminal referral and noting at least one other court that found that creditors have no such standing) citing *In re Valentine*, 196 B.R. 386, 387 (Bankr. E.D. Mich. 1996). Nevertheless, the Trustee and his counsel believe their

own "illegal" conduct which precipitated certain events and the fact that each of these alleged events were known to the Court, addressed and previously rejected.  The Debtor attempted to bolster her position with an after-the-fact declaration from one of the former tenants of the Carmel property, April Hess.  That tenant's allegations are unsupported by any contemporaneous evidence and, in fact, entirely inconsistent with the facts.  For example, the tenant claims to have been evicted.  But, the tenant provides no evidence of any notice to evict let alone any actual eviction; rather, upon being informed by the Trustee that he intended to sell the property, the tenants voluntarily chose to vacate the property.  *See*, Exhibit 4 to the Declaration of David Seror ("Seror Decl.") attached to the Opposition.

Indeed, the tenants filed a complaint with the United States Trustee making eight allegations relating to the Carmel property, including the claim of eviction and all other matters submitted in her declaration on this Motion.  Each and every one of those allegations was investigated and found to be meritless by the UST—and those findings were provided to Ms. Hess ***four months before*** she submitted her declaration.  Thus, Ms. Hess knew at the time she submitted her declaration that her allegations had been thoroughly vetted and rejected by the UST, which concluded as follows:

> ***Our review of this matter indicates that the Chapter 7 Trustee has administered the bankruptcy case of Allana Baroni in a manner consistent with the Bankruptcy Code.  We found no evidence of misconduct related to the Chapter 7 Trustee's actions relating to his administration of the Carmel Property.***

Supplemental Declaration of David Seror ("Supp. Seror Decl.") annexed to this Supplemental Opposition, **Exhibit 1** (attaching a true and correct copy of a July 7, 2021 letter to April and Hans Hess from Peter C. Anderson), at p. 5 (emphasis added); *see also id.* at p. 3 (finding that "the Chapter 7 Trustee did not evict you").

---

conduct to be appropriate at all times.  Given that this Court presided over the very actions the Debtor claims to warrant criminal referral, the Court is in the best position to conclude that no "reasonable grounds existed for a belief that a violation of the bankruptcy laws had occurred." *Narumanchi*, 471 B.R. at 44.

2734433

Stripped of counsel's and the Debtor's conclusory and ill-founded invective and lies (including those submitted by Hess), there is no "there" there. The Debtor makes allegations of "illegality," which in fact are not "illegalities" as a matter of law and many of which are merely rehashing of the Debtor's arguments that she previously made and that were rejected by this Court and the Bankruptcy Appellate Panel ("BAP"). The most egregious of the Debtor's fact-less claims is that the Trustee, his counsel, creditor Wells Fargo and its counsel, conspired to allow a fraudulent proof of claim. The Debtor makes this allegation—sans evidence—notwithstanding that Wells Fargo's claim and the Debtor's objection thereto were fully vetted before this Court and the BAP and the Debtor previously made these same arguments (which would render her current attack subject to res judicata and collateral estoppel). *See In re Botany Industries, Inc.*, 463 F. Supp. 793, 795 (E.D. Penn. 1978) (finding res judicata and collateral estoppel barred debtor's fraud claim seeking removal of trustee and referral for criminal prosecution where the debtor already had a full and fair opportunity to be heard).

The Trustee believes that his Opposition provided the Court with a roadmap demonstrating that at all times the Trustee has acted reasonably and that none of the allegations made by the Debtor, her new counsel, or the tenant survive scrutiny. The UST concurs. Suppl. Seror Decl., Exhibit 1. The Trustee's actions have all been taken in the light of day, subject to review by this Court, the District Court, the BAP, and the UST. The Debtor has identified no "reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed" [18 U.S.C. § 3057(a)], while ignoring the fact that this bankruptcy was converted from chapter 11 to chapter 7 and a Trustee appointed in direct response to the Debtor's ongoing bad acts—which malfeasance the Debtor continues to this day.

For the Court's convenience, the Trustee in supplementing his Opposition has created a chart that (i) identifies the allegation made by the Debtor and her counsel, (ii) identifies the lack of evidence to support such allegations, (iii) identifies the Trustee's position, and (iv) identifies the facts to support the Trustee's position. The Trustee believes that this chart will, as the Trustee's

3

2734433

1   original Opposition did, demonstrate that neither the Debtor nor her counsel had a reasonable basis

2   nor provided reasonable grounds for any of the relief sought in the Motion.

3   **II.      THERE ARE NO FACTS TO SUPPORT THE REMOVAL OF THE TRUSTEE OR**

4   **ANY CRIMINAL REFERRAL**

5       **A.      The Alleged "Illegal" Ex Parte Appearance and Claimed "Lies" Relating
        Thereto**

6

| Debtor's Allegation/Evidence | Trustee's Position/What Actually Happened |
|---|---|
| "Seror's attorney Bagdanov … made a completely illegal ex parte appearance before the Court, and LIED TO THE COURT about Baroni, during that ex parte appearance". Motion to Remove, p.6, ll. 13-28 | The "ex parte" was not "completely illegal," which is simply a label used by Debtor's counsel.  Ms. Bagdanov truthfully advised the Court of what transpired consistent with instruction from the United States Marshals Service and, as reflected in the transcript of proceedings and the United States Marshals' report, the Debtor's conduct violated the law— i.e., was illegal. |
| **Purported Evidence**: "Bagdanov advised the Court that while she was in the middle of a heated argument with several parties in an unrelated bankruptcy case, Baroni took out her cell phone and began filming video of the argument." *Notice of Ex Parte Communication and Order Settling Deadline for Any Responses Thereto* [Doc. 1118] (the "Ex Parte Notice"). The Debtor also cites to the video recording of the Court hallways she obtained through a FOIA request. | **Actual Evidence**: There is no dispute that Ms. Baroni did in fact take out her cell phone and film on court property.  In fact, the United States Marshals Service "Court Facility Incident Report", attached as an exhibit to the Trustee's *Notice of Filing of Incident Report* [Doc. #1126] ("Notice of Incident Report") executed by two United States Marshals on February 7, 2020, states as follows: "On the above date and time, a disruptive incident occurred in the main lobby on the third floor ... ... During the above situation, I noticed a subject (female, later identified as Baroni, Allana) filming the encounter with her cell phone.  The attorney (sic) also noticed that she (Baroni) was filming and was visibly upset. I attempted to contact Ms. Baroni re: the policy on filming in the building.  However, she made her way downstairs and out of the building before I could do so." *See* Notice of Incident Report, Doc. #1126. |
| **Purported Evidence:** ¶14 of Declaration of Allana Baroni annexed to the Motion to Remove (the "Baroni Decl."): "The posted signs ONLY | **Actual Evidence:** *See*, Rules and Regulations Governing Conduct on Federal Property, 41 CFR 102-74.420.  Assuming the Debtor is in fact a |

| | |
|---|---|
| prohibit taking photos/videos inside courtrooms, when court is in session.  I am a writer, and I have a first amendment right to video a distraught debtor in the common area outside the Courtrooms.  There were no signs stating that taking photos or video in the common area outside courtrooms is prohibited." | journalist, in order to video record she needed the "permission of the occupying agency concerned" prior to video recording anything on the third floor of the Bankruptcy Court. She has not provided this Court with any evidence that she obtained permission to record on the third floor.<br><br>*See also,* Transcript attached as Exhibit A to the Baroni Decl. ("Ex Parte Transcript"), p. 93: "Ms. Bagdanov: I'm concerned about her taking videos in a courthouse, I'm concerned that there have been --<br>The Court: Which does violate court rules."<br><br>*See also* Notice of Incident Report filled out by US Marshal: "I attempted to contact Ms. Baroni re: the policy on filming in the building."<br><br>*See also,* ¶14 of the Declaration of David Seror annexed to the Opposition [Doc. 1392] (the "Seror Decl.")  The Debtor filed complaints against Ms. Bagdanov and Mr. Seror with the state bar, the state bar investigated the matter, and the state bar resolved the matter in Ms. Bagdanov's and Mr. Seror's favor, finding that the matter did not warrant any further action and the matter was closed. |
| ¶15 of the Baroni Decl. states that "The ex parte hearing Transcript, Exhibit A hereto, establishes that Bagdanov compounded her misconduct during the ex parte appearance, by making **false statements** about me and my husband, which were not in any way related to the common area incident."<br><br>The alleged false statement is from the Ex Parte Transcript, p. 6, lines 17-20 ("Ms. Bagdanov: There have been issues this week that I will not get into because they are not before, you with some harassment of the trustee's broker on one of the properties by her family members." ¶20 of the Baroni Declaration." | The Trustee's broker, employed to sell the Carmel Property, made multiple complaints to the Trustee and his counsel regarding the Debtor's husband's attempts to interfere with the sale of the Carmel Property and indicating she was afraid.  *See,* email from James Baroni to Heidi Robinson, and Ms. Seflin's reply thereto, attached as Exhibit G to the Baroni Decl. |
| ¶12 of Baroni Decl.: "There was no emergency of any kind to justify an ex parte appearance before Judge Barash, or before any Judge." | *See,* Ex Parte Transcript, p.7, ll. 10-11 where Ms. Bagdanov states that "I'm here because the marshals asked me to talk to you about it." |

2734433

As the above chart reflects, the "illegal" conduct was that of the Debtor filming at the Court without permission. Not only do the Debtor and her counsel fail to identify a single "lie" told by the Trustee's counsel, the United States Marshal's report is consistent with the representations made by counsel. The Trustee's counsel, at the urging of the United States Marshals, advised the Court of what had transpired. Neither the Debtor nor Debtor's counsel dispute or refute this fact. Thus, there is no evidence to support the Debtor and her counsel's bald allegations of illegality or lying—and the only evidence before the Court demonstrates the opposite.

Moreover, neither the Debtor nor her counsel claim that this isolated incident precipitated by the Debtor's illegal conduct in the first instance evidences any violation under chapter 9 of Title 18 of the United States Code (the "Penal Code") or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans by the Trustee or his counsel or even rises to the level of requiring the removal of the Trustee.

In point of fact, the Court provided notice of the *ex parte* communication, posted the transcript and invited the Debtor to be heard on the issue. At that time, the Debtor filed a brief claiming that the Trustee's counsel had lied. But, as reflected in the United States Marshal's report it was the Debtor in her brief, not the Trustee's counsel who sought to mislead the Court.

Finally, the Debtor cannot claim that this one-off event in any way impacted or affected the Court's deliberation on the substance of any issues before the Court in this bankruptcy proceeding. To the contrary, the transcript reflects that there was no discussion of the merits of the ongoing bankruptcy or any matters therein, and the Court already had issued an oral ruling on all pending matters.

### B. Alleged Misstatements to the Court by the Trustee and His Counsel

| Debtor's Allegation/Evidence | Trustee's Position/What Actually Happened |
|---|---|
| "Seror made false statements to the Court in pleadings filed by Seror's own law firm, which Seror is responsible, pleadings containing Seror declarations"  Motion to Remove, p. 10, ll. 16-28. | Neither the Trustee nor his counsel have made false statements to the Court in pleadings or otherwise.  In fact, the Court made specific findings that the representations made were true. |
| **Purported False Statement/Evidence**: Exhibit B to Doc. #1003, which is an email sent on July 2, 2019 from Susan Seflin to | **Actual Evidence**: *See,* Exhibit B to Doc. #1003, pp. Exhibit B_002-003. Ms. Seflin included case cites in support of her belief that |

| | |
|---|---|
| Matt Resnik.  The Debtor alleges that Ms. Seflin's statement that the Debtor materially defaulted under her plan when she sold the Henderson Property (while the motion to convert was pending) and before creditors were paid in full. | the Debtor did in fact default under her plan by selling the Henderson Property and failing to pay creditors under her plan. *See also*, Matt Resnick's response thereto, in which he states, "Thank you for your email. You certainly have made some interesting arguments." *See* Doc. #1003 at p. Exhibit B_001. |
| **Purported False Statement/Evidence**: Doc. #991, p. 4:25 The Trustee's statement in an introduction to the Turnover Motion that "To the best of the Trustee's knowledge, no Secured Creditor has yet received the treatment that the Plan provided for it even though at least one of them now has a final, non-appealable order allowing its claim." | **Actual Evidence:** *See,* Doc. #1144 - *Findings of Fact and Conclusions of Law Regarding Order Denying Debtor's Motion to Dismiss Chapter 7 Case* (the "MTD Findings"), ¶M, ll. 6-10: <br><br> The Court found the following: "With respect to the Debtor's argument that all creditors required to be paid under the Plan have been paid under the Plan, the Court did not find the Debtor's evidence credible, specifically the declarations of the Debtor filed in support of the Motion to Dismiss [Doc. #989] and the Declaration of Allana Baroni re Supplement to Amended Rule 1019 Report [Doc. #1042], as well as the statements and arguments made in the moving papers themselves .... Thus, the record before the Court does not establish that all payments required to be made under the Plan have, in fact, been made." <br><br> MTD Findings ¶N, p.7:27-28 to 8:1-3: "Additionally, BONYM provided evidence in support of its motion to convert the case to chapter 7, that its claim became due and payable upon denial of certiorari from the U.S. Supreme Court on October 9, 2018, yet the Debtor failed to make any payments as required under the Plan.  Thus the Debtor's statement that she made all required Plan payments is not credible." (citations omitted). |
| **Purported False Statement/Evidence:** Doc. #991, ¶13, p.14:22-25 - Seror's statement in his declaration dated June 26, 2019 that "On June 19, 2019, the Debtor turned over $533,307.62 in funds to me that she alleges were segregated under the Plan for the Disputed Secured Creditors.  I did not receive an accounting with respect to these funds." | **Actual Evidence:** The Debtor's statement is not an accounting. An accounting is a detailed written statement/ledger of all amounts paid, dates paid, remaining balance owed, etc.  The Trustee's statement was true. |

2734433

| | |
|---|---|
| Baroni alleges that the Trustee's statement above is false because of the following statement contained in her Motion to Dismiss [Doc. #991] filed at 6:40 p.m. on June 25, 2019: "Pursuant to the Plan, the Debtor paid $4,083.33 for 60 months and $4,583.33 thereafter into one account, and $3,339.58 for first 60 months and $3,839.58 thereafter into the other." | |
| **Purported False Statement/Evidence:** The Debtor alleges this statement in the Trustee's opposition [Doc. #1003] to the Motion to Dismiss is false: "To the best of the Trustee's knowledge, the Debtor has failed to pay … all amounts owed to the Class 6 secured creditor [Carmel property] including claim amount of at least $2 million]." | **Actual Evidence:** This statement is true.  To this date, other than the amount turned over by the Trustee to Nationstar on behalf of its claim, Nationstar has not received any money on behalf of its Class 6 claim. The Debtor rented the Carmel Property for years and actually received rent on it and yet failed to ever pay Nationstar one dollar for the Class 6 claim. *E.g., Findings of Fact and Conclusions of Law Regarding Order Denying Debtor's Motion to Dismiss Chapter 7 Case,* Doc. 1144, paragraph 4 ("The Debtor has not demonstrated that all creditors have been paid who were entitled to be paid under the Plan, or that there are only a few unsecured creditors left in the case, whom she could pay in full upon dismissal."). |

The accusations made by the Debtor and her counsel are not simply unsupported but demonstrably false.  Indeed, certain of the statements were supported by Court findings or were not statements at all but arguments supported by case authority.  There is no credible evidence in the record that any statement by the Trustee to the Court was either false or inaccurate.

There is, however, ample evidence that both the Debtor and Hess knowingly have misrepresented the facts to this Court including, for example, Hess's false claim that he was evicted or that he was bullied.  *See* Supp. Seror Decl., **Exhibit 1**.

2734433

1

**C.     The Allegation that the Trustee Took Any Action Prior to Entry of an Order**

2

| Debtor's Allegation/Evidence | Trustee's Position/What Actually Happened |
|---|---|
| "Before Seror obtained an order authorizing Seror to operate Baroni's properties and before Seror received an order authorizing Seror to employ a real estate agent (Thunderbird Real Estate / Heidi Robinson_ to show and sell the Baronis' Carmel property, Seror and Robinson were each making demands on the Hesses when Seror had no authorization from the Court to operate, or sell, the Baronis' Carmel house, in which the Hess family were long term tenants." Motion to Remove, p.13:7-12. | Upon the Trustee's appointment, he made demand for turnover of property of the estate from the Debtor - who alleged that the assets from her chapter 11 case that were dealt with in her plan were not property of the bankruptcy estate. Consequently, the Trustee filed his Turnover Motion [Doc. #991] on June 26, 2019, which was entered on an interim basis on August 30, 2019 [Doc. #1057] (the "Interim Turnover Order"). Pursuant to the Interim Turnover Order, the Court found that the Carmel Property was property of the bankruptcy estate and that all rents and proceeds derived therefrom from the conversion date are property of the estate. Upon entry of the Interim Turnover Order and the finding that the Carmel Property was property of the estate, the Debtor was immediately divested of all authority to operate the Carmel Property (and prior to that order he had no ability to operate the Carmel Property because he did not have control and possession of it). Section 721 of the Bankruptcy Code states that "the court may authorize the Trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate." |
| **Purported Evidence**: Baroni Declaration generally (no specific citation), and ¶ 12 of the Declaration of April Hess annexed to the Motion to Remove (the "Hess Declaration"), which states "We were unaware, at the time that all the foregoing was going on, that Seror was not authorized by the Court to operate the property, or to make demands on us, before December 9, 2019, because the Bankruptcy Court did not enter an Order authorizing Seror to operate any of Baroni's properties, until December 9, 2019." | **Actual Evidence**: Local Bankruptcy Rule 2070-1 (a) specifically provides that "For a period not exceeding 30 days from the date of the trustee's appointment, a trustee may operate the business of a chapter 7 debtor and pay any actual and necessary expenses … without a court order." (emphasis added). Local Bankruptcy Rule 2070-1 (b) specifically provides "to operate the business beyond such 30-day period, the trustee must, prior to expiration of the 30 day period, file and serve a motion for authorization to operate the debtor's business …". I.e., the Trustee did exactly what the Local Bankruptcy Rules authorize him to do. He filed a motion to operate on October 9, 2019 [Doc. #1086], which sought authority to |

9

2734433

| | |
|---|---|
| | approve his operation of, among other things, the Carmel Property effective as of September 9, 2019. Therefore, effective as of September 9, 2019, the Trustee was authorized to operate the Carmel Property (and the fact the order was not entered yet is irrelevant), and he was the only party authorized to collect rent pursuant to the Interim Turnover Order entered on August 30, 2019. |
| **Purported Evidence:**<br>The Debtor alleges that Heidi Robinson of Thunderbird Real Estate wrongfully attempted to access the Carmel Property on or about February 5, 2020 because the application to employ Heidi Robinson and Thunderbird Real Estate was not filed until February 6, 2020. Baroni Decl. ¶¶ 23, 24, 26 | **Actual Evidence:**<br>First, pursuant to the Interim Turnover Order, the Carmel Property was property of the bankruptcy estate under the Trustee's sole dominion and control.  Mr. Baroni had no right to interfere with Mr. Seror's operation of the property.  Second, it is quite common for real estate agents to access property to be sold prior to the filing of an employment application; otherwise, how would a real estate broker ever know what to put in the listing agreement as the purchase price (which listing agreement needs to be attached as an exhibit to an employment application).  The listing agreement was executed on January 22, 2020 and the Trustee's application to employ Heidi Robinson and Thunderbird Real Estate was filed on February 6, 2020.<br><br>The Trustee submits that the short delay between execution of the listing agreement and the filing of the application was reasonable.  *See, e.g., In re Hunanyan*, 631 B.R. 902, 911-13 (Bankr. C.D. Cal. 2021) (In holding that nunc pro tunc requirements did not apply to a chapter 7 trustee's timely application to employ accountants (which application was filed 20 days after the accountants began working for the estate), the court found: "Not every estate can wait until an employment application is prepared, noticed for hearing and ruled on before the professional can commence work. A professional hired by the trustee needs the authority of an estate representative to be effective without a question as to the legitimacy of employment."). |
| **Purported Evidence:**<br>"Seror harassed us by requiring us to provide the 3.5 year old cancelled check | **Actual Evidence:**<br>The Debtor did not turn over the $5,000 security deposit for the Carmel Property to the Trustee; |

2734433

| | |
|---|---|
| used to pay our $5,000.00 security deposit, when Calif. Code 1950.5 only requires the lease specifying the deposit (the lease was already in Seror's possession), or a statement from us." Hess Declaration, ¶10(c) and (f). | therefore, the Hess family was entitled to a prepetition claim against the estate.  However, because the Hess family were individuals (and not a business), the Trustee used his business judgment pursuant to the order authorizing him to operate the Carmel Property to use estate funds to pay the Hess deposit. However, since the Debtor failed to turn the Hess deposit over to him, of course he had to confirm that the Hess family actually paid the deposit prior to using estate funds to voluntarily return the funds to the Hess family. *Compare*, the Trustee's first motion to operate rental properties [Doc. #1086], original Carmel Property lease, Exhibit 3, at p. Exhibit 3_021, disclosing a security deposit of $5,000, with the *Debtor's Amended Final Report and Accounting Under F.R.B.P. 1019 and Local Bankruptcy Rule 2015-2* [Doc. #988], p. 4, which discloses details about the Carmel lease but which fails to disclose a security deposit. |
| **Purported Evidence:** "Driving the Hesses to vacate the Carmel property has cost the bankruptcy estate approximately $75,000, arising from the $5,000 a month rent the Hesses paid the Baronis under the lease for years, and would have kept on paying each month, if the Trustee had not driven the Hesses out of the Carmel Property  (January 2019 through May 2021)."  Motion to Remove, 13:26-28 to 14:1-2.  Baroni Decl, ¶33, 34, 35; Hess Decl. ¶6. | **Actual Evidence:** On December 10, 2019, Hans Hess sent an email to the Trustee informing the Trustee that he and his wife were ending their tenancy and moving out on Sunday, January 19th, 2020 by 5:00 p.m. (or 40 days from the date the email was sent). In that email, Mr. Hess writes "We plan on having the house and carpets cleaned before leaving on the 19th. If you have an agent who would like to inspect the house with us and to whom we can give the keys on the 19th, just let us know." Mr. Hess voluntarily informed the Trustee of his intent to vacate the Carmel Property. *See* Seror Decl., paragraphs 7-8 and Exhibit 4 thereto. The Debtor provides no evidence that the Trustee took any action to cause the Hess Family to vacate the Carmel Property other than unsupported allegations made in the Hess Decl. |

The Debtor and her counsel are wrong on the law and on the facts.  At all relevant times, the Trustee was authorized to take the actions he took with respect to the Carmel Property under applicable bankruptcy law cited above.  Moreover, the Debtor's allegation that the Trustee drove the tenant out of the Carmel Property is not supported with any evidence and is contradicted by the

2734433

evidence provided by the Trustee as part of his initial Opposition, and is even further belied by the

UST response to the Hess letter, which the Hesses have had since July 2021—before Hess submitted

her declaration in support of the Motion. Supp. Seror Decl., **Exhibit 1.**

### D. The Trustee's Alleged Poor Listing Strategy

| Debtor's Allegation/Evidence | Trustee's Position/What Actually Happened |
|---|---|
| "The Trustee's 'poor listing strategy' LOST $400,000 for the bankruptcy estate."  Motion to Remove, 17:9-10 | The sale of the Carmel property was subject to a full vetting before this Court, which approved the sale, and the BAP, which affirmed the order approving the sale. |
| **Purported Evidence:**<br>The Debtor cites to the District Court's *Order Denying Appellant's Emergency Motion to Stay* [District Court Doc. #53 in Case No. CV 20-4338 MWF] (the "Stay Order") and represents that the District Court found that the Trustee relied upon poor listing strategy and undersold the Carmel Property by $400,000.  Baroni Decl., ¶39. | **Actual Evidence:**<br>"In the Stay Order, the District Court states what the Debtor "contends" and makes no findings whatsoever that the Trustee's sale of the property was inappropriate or undervalued. In fact, the District Court affirmed the Turnover Order [District Court Doc. #40 in Case No. CV 20-4338 MWF]. The BAP order affirming the sale order of the Carmel Property noted that "The District Court's stay order notes that the bankruptcy court had approved a sale of the Carmel property and found that, although Debtor was unlikely to prevail on appeal, Debtor would be irreparably harmed by that sale, despite evidence that the Carmel property was seriously overencumbered and was not Debtor's residence." BAP Memorandum, No. 20-1278 & 20-1279, pp. 6-7, FN 5, entered July 13, 2021 [Bk. Doc. #1325].<br><br>*See also,* Stay Order, p. 8 ("the [District Court] is hesitant to conclude that Appellant has a substantial case for relief on the merits … it seems unlikely that the Ninth Circuit will decide that the Local Bankruptcy Rule 3020-1(d) 'abridge[s], enlarge[s], or modif[ies] any substantive right.' … While Appellant has demonstrated that her appeal raises important questions in need of resolution, she ultimately falls short of showing that she has a substantial case for relief on the merits." (emphasis added).<br><br>This Court made a significant record to support its conclusion that the sale of the Carmel Property was adequately marketed, and the BAP agreed. |

2734433

1   Bald accusations, previously rejected by this Court and the BAP and recycled here, do not

2   create facts.  The Debtor's claim that the Trustee "lost" $400,000 because of a poor listing strategy

3   was conjecture when first alleged by the Debtor to the District Court and has not transitioned to fact

4   in the interim.  Moreover, the Debtor had a full and fair opportunity to challenge the sale, including

5   raising the value received thereon.  Accordingly, the doctrines of res judicata and collateral estoppel

6   bar the Debtor's attempt to re-litigate this issue in the context of her attempt to remove the Trustee.

7   *See*, *In re Botany*, 493 F. Supp. at 798.

8       In *In re Botany*, a debtor and creditor sought the removal of a trustee alleging fraud and

9   negligence in the performance of the trustee's duties.  The bankruptcy court rejected the allegations

10  on the grounds that these same allegations had been made before in the context of a challenged sale

11  of stock and, thus, were subject to res judicata and collateral estoppel.  *See id.*  Here, this Court

12  already has approved the sale of the Carmel property and the BAP has affirmed the sale order

13  notwithstanding the Debtor's challenges, and the matter is now pending before the Ninth Circuit

14  Court of Appeals.  The Trustee submits that, absent reversal by the Ninth Circuit, this Court is bound

15  by its prior findings and the BAP's affirmance and does not have jurisdiction to reconsider the

16  Debtor's recycled arguments now brought in the context of a removal motion.

17      **E.    The Trustee's Alleged Misconduct in "Driving the Hesses to Vacate the Carmel
            Property" and Causing the Loss of Rental Income**

18

| Debtor's Allegation/Evidence | Trustee's Position/What Actually Happened |
|---|---|
| "Seror Lost $75,000 of Rent, due to misconduct of Seror and his broker regarding the Carmel Property". Motion to Remove, 20:10-16. | The admissible evidence before the Court evidences that the Hesses voluntarily vacated the Carmel Property. There is no contemporaneous evidence that the Trustee or his agents took any action against the Hesses to cause them to leave the property, let alone illegal conduct. |
| "However, Seror has refused to provide a copy of [the Carmel Property] lease to Baroni's attorneys, so they can determine whether/how much rent the Captains are paying.  It is unknown whether the lease agreement provides for lease payments to go toward the purchase price.  If so, then the Captains are paying no rent, rather they are making installment payments toward the purchase price, which does not benefit the estate." Motion to Remove, 14:21-26. | The admissible evidence before the Court evidences that the Trustee leased the Carmel Property to the Captains for $5,000 a month.  Had the lease been a lease-purchase agreement, the Trustee would have been required to seek Court approval as a lease-purchase agreement is not an ordinary course transaction under 11 U.S.C. § 363(b)(1). |

2734433

| Purported Evidence: | Actual Evidence: |
|---|---|
| Baroni Decl., ¶46 "Illegal treatment of the Hess tenants in the Carmel property, by Seror and his broker Robinson, drove the Hesses out of the property, costing the bankruptcy estate $75,000 of rent plus maintenance costs ($5,000 a month, from January 2019 to June 1, 2021, the date Seror alleges he leased the property to the Captains." | The Hess family voluntarily vacated the Carmel Property on January 19, 2020, immediately before the COVID Pandemic. *See* Seror Decl. in support of Opposition, paragraphs 7-8 and Exhibit 4 thereto. After that time, in consultation with the real estate broker, and given the condition of the Carmel Property (which was very poor), the Trustee decided to market and sell the Carmel Property instead. The sale of the Carmel Property was approved on December 16, 2020, and escrow would have closed by the end of December, 2020 had the Debtor not appealed the Sale Order (first to the BAP and now to the 9th Circuit). Escrow remains pending, and the buyers intend to close escrow once able to do so. Once the District Court stayed the sale of the Carmel Property, the Trustee immediately paid to renovate the Carmel Property so that it could be occupied, including but not limited to mold remediation, replacing the roof, repairing a sewer line required by the city of Carmel, replacing the garage door, etc. |
| **Purported Evidence:** | **Actual Evidence:** |
| Baroni Decl., ¶36 . "Seror has refused to provide a copy of [the Carmel Property] lease to my attorneys, so they can determine whether/how much rent the Captains are paying. It is unknown whether the lease agreement provides for lease payments to go toward the purchase price. If so, then the Captains are paying no rent, rather they are making installment payments toward the purchase price, which does not benefit the estate." | "The Carmel Property was vacant from approximately January 19, 2020 (when the prior tenants vacated voluntarily) until recently when the Trustee entered into a Lease Agreement dated April 9, 2021 with the Captains. The Captains took possession of the Carmel Property on or about June 1, 2021 and pay $5,000 a month in rent." ¶5 of the Declaration of David Seror annexed to the Trustee's third motion to operate rental properties [Doc. 1335].<br><br>Had the lease been a lease-purchase agreement, the Trustee would have been required to seek Court approval as a lease-purchase agreement is not an ordinary course transaction under 11 U.S.C. § 363(b)(1). In response to the Court's inquiry at the initial hearing on the Motion to Remove, the lease is attached as **Exhibit 2** to the Supp. Seror Decl. |

2734433

Throwing out words such as "illegal" and "drove" is not a substitute for facts. Neither the Debtor nor the former tenants provide any contemporaneous evidence that the Trustee took any action, let alone illegal action, designed to drive out the tenants. In fact, the only allegation of "harassment" leveled by the tenant occurred *after* they gave notice that they were voluntarily vacating and focused on the deposit they allegedly gave to the Debtor, which the Debtor in turn failed to turn over to the estate. The Hesses complained about the Trustee to the UST, and the Trustee provided a fulsome response about the Hess complaint to the UST. After conducting its investigation, the UST concluded that "the Chapter 7 Trustee did not evict you. You voluntarily vacated the Carmel Property on January 19, 2020." Supp. Seror Decl., **Exhibit 1**, at p. 3.

To be clear, Ms. Hess's declaration filed by Debtor in support of the Motion is purposefully misleading and false. On November 12, 2021, Ms. Hess signed her Declaration in support of the Motion and declared to this Court that on April 22, 2021 she and her husband filed a complaint with the UST, that complaint set out "eight areas of misconduct" and, further, that "[o]ur Complaint letter (**Exhibit A** hereto) is accurate." Motion, at p. 36, ¶ 5, p. 48-49, at ¶ 10, p. 49, at ¶ 11. Ms. Hess further states that "[a]fter receiving our Complaint (**Exhibit A** hereto), the Office of the US Trustee forced Seror to return our utility refund to us, which Seror returned to us on approximately May 21, 2021." *Id.*, at p. 49, ¶ 11.

What Ms. Hess failed to tell the Court was that she received the UST's fulsome analysis of her allegations on July 7, 2021—four months *before* she submitted her declaration in support of the Motion. Not only did the UST not "force" the Trustee to return any monies to the tenants, but the UST investigated, debunked, and rejected each and every allegation made by Ms. Hess. Supp. Seror Decl., **Exhibit 1**. The UST's investigation found no eviction and, further, also determined that the Trustee's actions did not cost the bankruptcy estate $75,000. *Id.* The UST found that the loss of the income was due to the Hess's voluntarily leaving the property and not as a result of any action taken by the Trustee. *Id.* Moreover, the UST debunked the very premise of the argument: namely that the Trustee had a duty to rent the property. As the UST found, "the Chapter 7 Trustee has the duty to liquidate property for the benefit of creditors. The Chapter 7 Trustee does not have a duty to continue to lease residential property indefinitely for the benefit of the tenants. Consistent with the

2734433

1  Chapter 7 Trustee's duty, on February 5, 2020, the Chapter 7 Trustee filed an application to employ

2  Thunderbird Real Estate and its agent, Ms. Robinson, to represent the estate in connection with the

3  sale of the Carmel Property." *Id.*  Thus, the UST rejected both the assertion that the tenant was

4  evicted, as well as the premise that the Trustee had a duty to continue to rent the property out rather

5  than seeking to sell the property—as well as every other argument that Hess made in April 2021 and

6  presented to this Court by way of her declaration on this Motion.

7          Thus, the Debtor and Hess have purposefully attempted to mislead the Court by providing an

8  incomplete record and material false allegations—*i.e.*, the false claim of eviction, bullying,

9  malfeasance—under the auspices that the Hesses' complaint (*i.e.,* letter to the UST) was "accurate"

10  and should be treated as proven (because she says so).  In fact, at the time Ms. Hess signed her

11  declaration the Hesses were in possession of the UST's completed investigation, which examined

12  and rejected each of her contentions and concluded to the contrary of the Hesses' allegations that

13  "the Trustee has administered the bankruptcy case of Allana Baroni in a manner consistent with the

14  Bankruptcy Code.  We found no evidence of misconduct related to the Chapter 7 Trustee's actions

15  relating to his administration of the Carmel Property."  Supp. Seror Decl., **Exhibit 1.**

16      **F.    The Trustee Allegedly Overpaid for Roof Replacement**

17

| **Allegation—No Evidence Submitted** | **Actual Evidence:** |
|---|---|
| Baroni Decl., ¶47 "Trustee Seror squandered $46,200 when he represented that the roof replacement costs for the Carmel property are $47,000 when I could have replaced the roof for $10,800." | The Trustee replaced the roof for approximately $27,960, which was the cost for a 30 year roof from a licensed and reputable contractor.  This is reflected in MORs for April and June 2021, Doc. ## 1315, 1331. The Debtor has not been in control of the Carmel property since September of 2019 and there was substantial damage to the roof. *See*, Supp. Seror Decl. attached hereto. |

24          The Debtor proffered no admissible evidence of the cost of the roof replacement and, further,

25  did not accurately state the amount the Trustee spent to replace the roof.   Thus, the Court is faced

26  with an allegation bereft of evidence. The Debtor exacerbates the absence of evidence by misstating

27  the actual facts.  Because the Debtor provided no admissible evidence, the Court is not in a position

28

16

2734433

to conduct an apples-to-apples comparison, let alone to verify that the Debtor could have replaced

the roof for $10,800.

But, even were the Debtor to have timely submitted such evidence and, further, demonstrated

that the Trustee spent approximately $18,000 more for a like-kind roof, the Debtor does not explain

how this fact—assumed for the moment—would warrant replacement of the Trustee, let alone

criminal charges.

### G.    The Allegation that the Trustee Allowed Insurance to Lapse

| Debtor's Allegation/Evidence | Trustee's Position/What Actually Happened |
|---|---|
| **Purported Evidence:**<br>Baroni Decl., ¶ 48 - Regarding State Farm insurance policies. | **Actual Evidence:**<br>The Debtor alleges that the Trustee allowed the insurance she had on the Carmel Property and the Camarillo Property to lapse. This is a misrepresentation of the facts. Instead of timely forwarding insurance invoices to the Trustee, the Debtor's counsel would send them the date the premiums were due and this was during COVID when the Trustee was rarely going to the office. Therefore, he would have to adjust his schedule and go to the office to immediately write a check. The Trustee requested multiple times that the Debtor timely forward the invoices – which she failed to do. Accordingly, the Trustee obtained separate insurance. Thus, any losses related hereto arise out of the Debtor's failure to timely forward invoices to the Trustee.  At no relevant time herein have either the Carmel Property or the Camarillo Property been without adequate insurance. Seror Decl. in support of Opposition, ¶ 10. *See also* Trustee's Reply to Debtor's Opposition to Third Motion to Operate [Doc. #1346], paragraph 3(f), explaining that the lender also carried insurance on the Carmel Property. |

2734433

| Purported Evidence: | Actual Evidence: |
|---|---|
| Baroni Decl., ¶ 48 - Regarding home warranty policy for Carmel Property | The Debtor never disclosed the existence of the home warranty to the Trustee or the Court. Despite multiple requests for it once he learned of it, the Trustee was not provided with a copy of the warranty until September 14, 2021 (or after it had already lapsed). The Trustee provided the Debtor with the information set forth in this paragraph in connection with his reply [Doc. #1346] to the Debtor's opposition to the Trustee's third motion to operate but will repeat that same information here (excluding exhibits which are attached to Doc. #1346]. On September 14, 2021, the Debtor provided the Trustee with a copy of the warranty for the first time, as well as a copy of an email she apparently received on January 8, 2020 regarding the warranty's expiration set to occur on February 5, 2020. Setting aside the question of whether or not the repairs paid for by the Trustee would even be covered under this warranty, the Debtor never forwarded this email to the Trustee, and the Trustee did not know about the warranty until June 2021, long after it expired. The Debtor never informed the Trustee of the warranty's existence and also failed to schedule the warranty on her Schedule B. There is no way the Trustee could have ensured that a warranty that the Debtor failed to disclose to him would not lapse. Neither the Trustee nor his counsel are mind readers. Therefore, all damages alleged by the Debtor in her Motion to Remove relating to the fact that the warranty lapsed are damages caused to the estate by the Debtor and her failure to preserve an estate asset, her failure to schedule an estate asset and her failure to inform the Trustee of an estate asset. Furthermore, even assuming a warranty was in place, per the terms of the warranty, the coverage was limited as follows: (i) Garage door replacement – Not covered; and (ii) Water heater replacement – Limited to $1,500 per contract term. It is also worth noting that the Debtor failed to disclose this warranty in her *Amended Final Report and Accounting Under F.R.B.P. 1019 and Local Bankruptcy Rule 2015-2* [Doc. #988], p. 4. |

2734433

**H.    The Allegation that the Trustee Improperly Paid Bank and Technology Fees and Violated Trust Procedures**

| Debtor's Allegation/Evidence | Trustee's Position/What Actually Happened |
|---|---|
| **Purported Evidence:**<br>¶49 of the Baroni Declaration: "Seror violated Trustee procedures by leaving up to $652,000 in zero interest accounts, while paying $17,528 of Bank and Technology Fees, for services Seror did not need. From the period of 3/31/20 through 8/25/21 Trustee Seror paid Metropolitan Commercial Bank $17,528.50 in bank and technology fees (See MORS 7 through 27)." | **Actual Evidence**:<br>United States Bankruptcy Court for the Central District of California General Order 11-02 ("General Order 11-02") authorizes chapter 7 trustees to "incur and pay any actual, necessary expenses … for bank fees and charges directly related to the administration of estate accounts ...".  General Order 11-02, ll. 15-21, which is attached as Exhibit 2 to the Opposition. |
| **Purported Evidence**:<br>¶¶49 & 50 of Baroni Decl. regarding interest free account | **Actual Evidence**:<br>The Trustee submitted a declaration that he believes he is in compliance with UST requirements regarding interest-bearing accounts, attached to the Initial Opposition. The UST appeared at the prior hearing on this matter and did not contradict what the Trustee said. The Trustee recognizes that the email correspondence attached as Exhibit 1 to the Opposition notes that it expired in 2012. It is the Trustee's best understanding that he is in compliance with the UST requirements, and if he is not, the Trustee suspects the UST would note that for the record. |

**I.    The Allegation that the Trustee Committed Knowing Misconduct with Respect to the Motion to Compromise Wells Fargo's Proof of Claim**

| Debtor's Allegation/Evidence | Trustee's Position/What Actually Happened |
|---|---|
| "Seror Committed Knowing Misconduct, and Bankruptcy Crime, By Filing, and Misleading This Court into Granting, Seror's Motion to Compromise". Motion to Remove, p. 22:17-28 | The Motion to Compromise was fully vetted by this Court, affirmed by the BAP and is currently on appeal to the Ninth Circuit. Neither the Debtor nor her counsel identify any "fact" that was not presented to the Court during the course of its deliberations, nor any fact that could not have been presented to the Court during the course of the settlement motion.  All of the Debtor's allegations were previously rejected and do not gain vitality through repetition. |
| **Purported Evidence:**<br>¶¶51 of Baroni Decl. - "Seror's Compromise Motion uses Wells Fargo's | **Actual Evidence**:<br>In the Debtor's plan [Doc. #376] (the "Plan"), the Debtor stripped part of the Wells Fargo lien |

2734433

| | |
|---|---|
| fraudulent POC 7-2 (on which ZERO was owed, as a matter of law), as the basis for misleading this Court into to granting Wells Fargo an allowed $450,000 general unsecured claim, to 'settle' Wells Fargo's POC 7-2, on which ZERO was owed, as a matter of law." | on the Henderson Property and pursuant to the Plan, Wells Fargo had both a secured claim (of $196,000) and an unsecured claim (of $605,712.98).  Debtor's Plan, p.26 of 44, class 5 treatment.  Because the Debtor bifurcated Wells Fargo's claim in the Plan, satisfaction in full of the secured claim (i.e., payment of the $196,000) did not discharge or otherwise satisfy Wells Fargo's  general unsecured claim.

The Debtor did not consummate her Plan or obtain a discharge (i.e., all unsecured claims under the Plan are still unsecured claims against the estate minus the de minimus amount she allegedly paid on them).  By the Debtor's own admissions in her Plan, Wells Fargo still has at least a $605,712.98 general unsecured claim.  *See, e.g., In re Weinstein*, 227 B.R. 284, 292 (9th Cir. BAP 1998) (When a secured creditor's lien is stripped, under §1111(b)(1)(A), "for purposes of the Chapter 11 process, all secured debt shall be allowed or disallowed under §502 as if it had recourse ... Thus, a nonrecourse undersecured Chapter 11 creditor's total claim is bifurcated into secured and unsecured portions, the creditor has the right to vote those two claims separately within two different classes during the vote on the reorganization plan, and is entitled to receive two distributions under that plan, one for each claim.")

As found by both this Court and the BAP in approving the settlement motion and then affirming it, the settlement with the rental lenders was fair and equitable and in the best interests of the estate and entering into the agreement was a proper exercise of the Trustee's business judgment. The Debtor's argument that the Trustee committed a crime by settling a disputed claim is an improper collateral attack of this Court's settlement order [Doc. #1273] and the BAP's order affirming the settlement order [Doc. #1325 and BAP Doc. #25 in Case No. 20-1278 and No. 20-1279]. At a minimum, this Court's approval of the settlement of the Wells Fargo proof of claim is res judicata as to these issues. |

| Purported Evidence: | Actual Evidence: |
|---|---|
| Baroni Decl. ¶58.  "I could have paid my actual unsecured claims in full, as a condition of the Court granting my motion to dismiss my bankruptcy case. However, I could not pay my actual unsecured claims, plus the additional fraudulent POC 7-2 which Wells Fargo filed on 7/16/19." | The Debtor's Plan placed undisputed unsecured claims in class 8 and the disputed unsecured claims of junior and stripped mortgage holders in class 9.  The treatment for class 8 and class 9 was the same.  Class 9 unsecured claims were estimated at $1,078,275.30, which included the $605,712.98 unsecured claim of Wells Fargo.  In the Motion to Remove, the Debtor assumes that class 9 claims are not valid without giving this Court any basis for such an assumption.  Pursuant to the Plan, there was $27,388.77 in class 8 unsecured claims and $1,078,275.30 in class 9 unsecured claims.  The basis for the Debtor's belief that class 9 claims were not valid because she disputes them makes no sense.  The class 9 treatment even provides that class 9 creditors are separately classified because "there will be protracted litigation and claim objections relating to these claims which may result in setoffs against such claims."  Plan, p. 34 of 44, class 9 treatment. |

The Debtor identifies no material fact hidden from this Court or the BAP, let alone any material fact that the Debtor did not know of, could not raise or did not raise in opposition to the settlement motion.  She identifies no evidence that was hidden from the Court or any materially misleading statements made by the Trustee, his counsel, Wells Fargo or its counsel.

Rather, in sum and substance, this attack is an improper motion for reconsideration of the Court's prior ruling and the BAP's affirmance thereof, not only because she identifies no new or different facts, but because the BAP ruling is subject to res judicata and collateral estoppel effect. The Debtor had a full and fair opportunity to challenge the settlement, including making the argument she raises here.  Accordingly, the doctrines of res judicata and collateral estoppel bar the Debtor's attempt to re-litigate this issue in the context of her attempt to remove the Trustee.  See *In re Botany*, 493 F. Supp. at 798.  Here, both this Court and the BAP have approved the settlement.  It is subject to a final non-appealable order.  To the extent that the Debtor is appealing the BAP ruling, jurisdiction over this issue rests with the appellate court, not this Court, and this Court is bound by its prior ruling and the BAP's affirmance unless reversed by the Ninth Circuit.  *See,* Transcript of

2734433

1   Proceedings from December 8, 2021 hearing on the Motion to Remove 23:22-25 (The Court: "…

2   Well, we're not arguing the merits of that [settlement] motion.  This Court has no jurisdiction to

3   revisit this issue.  It's on appeal").

4   **III.    CONCLUSION**

5          The Trustee submits that the Debtor and her counsel's conduct should be scrutinized for

6   filing this Motion, including the Declaration of Ms. Hess and her "complaint," which Ms. Hess knew

7   had been resoundingly disproven by the UST four months earlier.  The Motion contains no facts, is

8   propped up entirely by disprovable and disproven allegations peppered with conspiracy-laden

9   accusations of illegality, which in reality serve only to mask the Debtor's own illegal conduct (such

10  as filming in a courthouse).  The Debtor compounded her own malfeasance by securing a declaration

11  from Hess that contains knowingly false statements, such as Hess's claim to have been evicted when

12  Hess voluntarily vacated the Carmel property, which allegations by Hess were thoroughly

13  investigated by the UST and rejected.  Hess's claim that the Trustee was a bully and Hess's and the

14  Debtor's claim that the Trustee lost $75,000 in revenue were, likewise, reviewed by the UST and

15  found wanting.  For one, all of the emails between Hess and Trustee appeared to the UST to be

16  cordial.  Supp. Seror Decl., **Exhibit 1**.  If anything, the UST concluded that the Trustee went above

17  and beyond and "accommodated [Hess] in ways that were not necessarily required by law."  *Id.*.

18  There simply was no evidence of any bullying.  Likewise, the loss of rental revenue was the result of

19  Hesses' voluntary decision to leave, and assumes, incorrectly, that the Trustee has a duty to rent, not

20  sell estate property, after the Hesses' voluntary departure.

21         Debtor's counsel fares no better.  New to the case, she provided a declaration without a

22  scintilla of foundation or personal knowledge (and clearly without conducting any independent

23  investigation) wherein she accused the Trustee, the Trustee's counsel, Wells Fargo and its counsel of

24  illegal conduct.  In point of fact, Debtor's counsel merely recycled arguments previously made and

25  rejected by this Court, the District Court and the BAP.  Not only was there no fraud, but this Court

26  and the BAP were squarely presented with the Debtor's position that Wells Fargo did not have a

27  valid claim and both rejected the argument.  Nothing was hidden.

28

2734433

1    Enough is enough. The Debtor has demonstrated, through her conduct over the last decade

2  and through her actions when this case was in chapter 11 and after its conversion to chapter 7, that

3  she will stop at nothing to harm the creditors and the estate and disparage the Trustee, his counsel,

4  and creditors along the way. Her motion is without factual and legal support and, accordingly,

5  should be denied.

6  Dated:  January 14, 2022                    BG LAW LLP

7

8

9  By: _____
                    Jason B. Komorsky
                    Susan K. Seflin
10                 Jessica L. Bagdanov
                    Attorneys for David Seror, Chapter 7 Trustee
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2734433

1

### SUPPLEMENTAL DECLARATION OF DAVID SEROR

2    I, David Seror, declare:

3    1.    I am the duly appointed and acting Chapter 7 Trustee for this bankruptcy estate.  I

4  have personal knowledge of the facts contained in this declaration or have gained such knowledge

5  from information I customarily review in connection with my duties as Trustee, and if called as a

6  witness, would and could competently testify to these facts under oath.

7    2.    I make this declaration in further support of my opposition to the Debtor's motion

8  seeking my removal and criminal referral.  All initial capitalized terms used but not defined herein

9  have the same meanings ascribed to them in the foregoing supplemental opposition.

10    3.    On January 12, 2022, I received a copy of a letter from Peter C. Anderson to April

11  and Hans Hess dated July 7, 2021, a true and correct copy of which is attached hereto as **Exhibit 1.**

12    4.    To address the Court's inquiry raised at the initial hearing on this matter regarding the

13  Carmel Property lease, attached hereto as **Exhibit 2** is a true and correct copy of the lease I entered

14  into with David and Elaine Captain regarding the Carmel Property after the District Court stayed the

15  sale of that property.

16    5.    Finally, to address any confusion regarding the amount of money I paid to have the

17  roof repaired on the Carmel Property, I replaced the roof for approximately $27,960, which was the

18  cost for a 30-year warrantied roof from a licensed contractor.

19    I declare under penalty of perjury under the laws of the United States of America that the

20  foregoing is true and correct.

21    Executed this 14th day of January, 2022 at Woodland Hills, California.

22

23

24    _____
     David Seror

25

26

27

28

2734433



## U.S. Department of Justice

*United States Trustee*
*Central District of California*

| | | |
|---|---|---|
| 915 Wilshire Blvd., Suite 1850 | Phone: | (213) 894-6811 |
| Los Angeles, CA 90017 | Fax: | (213) 894-0276 |

July 7, 2021

April and Hans Hess
25891 Elinore Place
Carmel, CA 93923

Re:   <u>In re Allana Baroni</u>, Case No.: 1:12-bk-10986-MB
      Response to Complaint Regarding   Trustee David Seror

Dear Mrs. and Mr. Hess,

I am writing to you in response to your complaint against Chapter 7 Trustee David Seror (the "Chapter 7 Trustee"). The United States Trustee Program is the component of the Department of Justice responsible for supervising the administration of bankruptcy cases and private trustees under title 11 of the United States Code. To respond to your complaint, the United States Trustee reviewed information including, but not limited to, legal pleadings, emails between the parties, and invoices of California American Water ("Cal Am").

On February 1, 2012, Allana Baroni (the "Debtor") filed a voluntary petition under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "Bankruptcy Case"). The Bankruptcy Case was assigned case no. 1:12-bk-10986-MB. On February 20, 2019, the court entered its order converting the bankruptcy case from Chapter 13 to Chapter 11.   A hearing was held in open court on April 9, 2019, on the motion filed by The Bank of New York Mellon to convert or dismiss the Bankruptcy Case. By order entered on April 29, 2019, the Debtor's Chapter 11 case was converted to one under Chapter 7.

The next day, on April 30, 2019, the United States Trustee filed his Notice of Appointment of Trustee and Fixing Bond; Acceptance of Appointment as Interim Trustee, appointing David Seror as the Interim Trustee.   Since no trustee was elected at the Debtor's meeting of creditors, Mr. Seror became the permanent trustee for the Debtor's Bankruptcy Case.

Your complaints concern the residential real property located at 3435 Rio Road, in Carmel, California 93923 (the "Carmel Property"), where you were tenants pursuant to that certain Residential Lease or Month-to-Month Rental Agreement entered into between you (as tenants) and James Baroni and the Debtor (the "Landlord"). The original lease term began on August 1, 2016 and was to terminate on July 31, 2017. You and the Landlord signed a Lease Extension Addendum on June 6, 2018, renewing the lease term for a period of 1-year beginning on July 31, 2018, and ending on July 31, 2019, at 5 p.m. (the "Lease"). Per the terms of the Lease, you continued as a month-to-month tenant thereafter.

In your complaint, you allege that the Chapter 7 Trustee (1) was abusive and a bully, (2) surprised you when he told you that he would sell the Carmel Property, and gave you little notice to vacate and of the property inspection by Ms. Robinson, (3) evicted you and lost $75,000 in rental income for the estate, (4) improperly stopped payment on the $5,000 security deposit check, (5) required proof that you paid a $5,000 security deposit (the "Security Deposit") and did not repay it to you within the time required by California law, (6) changed the Cal Am water bill to his name for the purpose of retaining a $674.50 refund due to you, and (7) failed to utilize the Landlord's home warranty to repair a plumbing leak at a cost of only $75.

A primary duty of a chapter 7 trustee is to collect and reduce to money the property of the bankruptcy estate and close such estate as expeditiously as is compatible with the best interest of parties in interest.

1.  **Allegation 1: The Trustee was abusive and a bully.**

The U.S. Trustee has reviewed all email communications between the parties. There is no evidence that the Trustee was abusive or a bully. On the contrary, the tone of the emails and the relationship between the parties appears polite and cordial. Moreover, we have no evidence that you ever raised this claim during your course of dealings with the Chapter 7 Trustee, or with us although it has been about a year and a half since you vacated the Carmel Property. Finally, based upon the facts and circumstances described later in this correspondence, it appears that the Chapter 7 Trustee has accommodated you in ways that were not necessarily required by the law, and you have received payment of all sums to which you were legally entitled. Consequently, your claim that the Chapter 7 Trustee was abusive or a bully is not supported by the record.

2.  **Allegation 2: The Chapter 7 Trustee surprised you by informing you that he would sell the Carmel Property, and gave you little notice to vacate and of the property inspection by Ms. Robinson.**

Your one-year Lease expired on July 31, 2019, and thereafter, you became month-to-month tenants. Under the terms of the Lease, you could terminate the tenancy by giving written notice at least 30 days prior to the intended termination date. The Chapter 7 Trustee could also terminate the tenancy. Under California law, the Chapter 7 Trustee would have been required to give you at least 60 days' notice to vacate because your tenancy lasted more than 1 year.

The Chapter 7 Trustee did not give you any notice to vacate. On or about October 3, 2019, the Chapter 7 Trustee notified you that he intended to sell the Carmel Property but informed you that you would have at least 60 days to vacate once he sold it – consistent with the Lease and California law. On December 10, 2019, you notified the Chapter 7 Trustee that you would be vacating the Carmel Property on Sunday, January 19, 2020, by 5:00 p.m. Thus, it is incorrect to say that the Chapter 7 Trustee gave you little notice to vacate the Carmel Property. Instead, you provided the notice to terminate to the Chapter 7 Trustee.

On January 8, 2020, the Chapter 7 Trustee notified you that he was listing the Carmel Property for sale with Ms. Heidi Robinson, and that Ms. Robinson would contact you to arrange

2

for a property inspection. Based upon the email communications between Ms. Robinson and you, it appears that Ms. Robinson was accommodating to your schedule. The email communications do not support any allegation that the Chapter 7 Trustee or Ms. Robinson surprised you by scheduling an inspection of the Carmel Property.

**3. Allegation 3: The Chapter 7 Trustee evicted you and lost $75,000 in rental income.**

As explained above, the Chapter 7 Trustee did not evict you. You voluntarily vacated the Carmel Property on January 19, 2020. The Carmel Property remained vacant from January 20, 2020 to May 31, 2021. It is true that the Chapter 7 Trustee did not receive any rental income for the time period that the Carmel Property remained vacant, but the Chapter 7 Trustee has been satisfying his duties to the bankruptcy estate.

As stated above, the Chapter 7 Trustee has the duty to liquidate property for the benefit of creditors. The Chapter 7 Trustee does not have a duty to continue to lease residential property indefinitely for the benefit of the tenants. Consistent with the Chapter 7 Trustee's duty, on February 5, 2020, the Chapter 7 Trustee filed an application to employ Thunderbird Real Estate and its agent, Ms. Robinson, to represent the estate in connection with the sale of the Carmel Property. The Bankruptcy Court approved the application. Ultimately, the Chapter 7 Trustee entered into a purchase agreement for $1.4 million.

However, the sale of the Carmel Property has been stayed pending appeal. Starting on June 1, 2021, the Chapter 7 Trustee began leasing the Carmel Property to the proposed purchasers, bringing value to the bankruptcy estate, while the stay is still pending. It appears that once the stay is lifted, the Chapter 7 Trustee and the prospective purchasers will close the sale.

Based upon all of the facts and circumstances, I believe that the Chapter 7 Trustee has satisfied his duty to the bankruptcy estate.

**4. Allegation 4: The Chapter 7 Trustee requested proof that you had paid the $5,000 Security Deposit and did not return it to you within 21 days as required by California law.**

You claim that the Chapter 7 Trustee improperly requested that you show proof to him that you had paid the $5,000 Security Deposit, and thereafter, withheld it from repayment to you beyond the 21-calendar day deadline contrary to California law. At the bankruptcy Meeting of Creditors held under § 341(a) of the Bankruptcy Code, the Chapter 7 Trustee asked the Debtor if the Security Deposit had been paid and where it was located. The Debtor did not answer the question and testified under oath that she would have to look at her records. Thus, the Debtor was unable to confirm whether the deposit had in fact been paid, and if so, where the funds were deposited. Those funds were never identified – either informally to the Chapter 7 Trustee or formally in the Debtor's bankruptcy schedules – and have never been turned over to the Chapter 7 Trustee.

3

The Chapter 7 Trustee had a duty to investigate whether you had paid the $5,000 Security Deposit. In the absence of any segregated deposit funds, the Chapter 7 Trustee could have required that you file a proof of claim in the Bankruptcy Case on account of the Security Deposit. Under § 507(a)(7) of the Bankruptcy Code, a priority claim would have been limited to only $1,800, and only paid after all administrative expenses and secured claims were paid in full. Instead, the Chapter 7 Trustee in his business judgment and pursuant to the court order to operate the Carmel Property, paid you the entire $5,000 in recognition of your asserted claim against the estate for the Security Deposit.  Because the Security Deposit was paid before the Bankruptcy Case was filed, not segregated, and never turned over to the Chapter 7 Trustee, the Chapter 7 Trustee believes that he was not required to pay the Security Deposit within the 21-day period set forth in California law. Further, whether a federal bankruptcy trustee is bound by California law on this point, given these facts and circumstances, is an open question of law. Accordingly, I believe that the Chapter 7 Trustee acted appropriately under the circumstances.

5.  **Allegation 5: The Trustee improperly stopped payment on the $5,000 Security Deposit check.**

Under the Terms of the Lease, you were required to pay all the utility bills.  On February 10, 2020, the Chapter 7 Trustee issued you a check for the return of the $5,000 Security Deposit. On or about February 12, 2020, the Chapter 7 Trustee received a bill from Cal Am for $1,132.89 for the period December 5, 2019 to February 4, 2020.  It appears that Cal Am mistakenly combined your account with the Chapter 7 Trustee's account.  As a result, the Chapter 7 Trustee cancelled the Security Deposit refund check, because he was concerned that you had not fulfilled your obligations under the Lease to pay all the utility bills.  This action is understandable, particularly when (as noted above) there was a legal question whether you were entitled to payment of the Security Deposit from the estate without filing a proof of claim.

There is no evidence that the Chapter 7 Trustee created any problem with Cal Am. On the contrary, the Chapter 7 Trustee suggested to you that he would pay your share of the water bill out of the Security Deposit and then he would refund to you the remaining amount. You did not accept that offer.  Instead, you proposed that you would pay Cal Am $1,046.19, leaving the bankruptcy estate obligation at $56.01.  The Chapter 7 Trustee agreed with your proposal, and thereafter, you paid $1,046.19 to Cal Am. Ten days later, on March 7, 2020, the Chapter 7 Trustee mailed to you the $5,000 Security Deposit check.

Again, it appears that the Chapter 7 Trustee acted appropriately under the circumstances.

6.  **Allegation 6: The Chapter 7 Trustee changed the water bill to his name for the purpose of retaining a $674.50 refund due to you.**

You further claim that the Chapter 7 Trustee unilaterally changed the water bill into his name for the purpose of retaining a $647.50 water utility refund. The Chapter 7 Trustee changed the water account with Cal Am into his name with an effective date of January 20, 2020, the day

4

**EXHIBIT 1_28**

after you vacated the Carmel Property. This was the proper thing to do. There is no evidence that the Chapter 7 Trustee acted with an improper motive.

After you paid $1,046.19 to Cal Am, Cal Am moved $1,076.16 in charges from the Chapter 7 Trustee's account and onto your account, showing that you owed Cal Am an additional $1,076.16. To resolve the issues with payments and credits (including the $674.50), the Chapter 7 Trustee issued you a check in the amount of $1,076.16. As a result, it appears that this matter has been resolved.

7. **Allegation 7: The Chapter 7 Trustee failed to utilize the Landlord's home warranty to repair the plumbing leak at a cost of only $75.**

You claim that the Chapter 7 Trustee failed to utilize the Landlord's home warranty to repair a plumbing leak which would have only cost $75.

On February 29, 2012, the Debtor filed her schedules. On Schedule J – Current Expenditures of Individual Debtor(s), the Debtor listed a $43.75 monthly expense for a home warranty on the Carmel Property. However, the warranty was not listed on Schedule G as an executory contract that the Chapter 7 Trustee could assume or reject. If the warranty was an executory contract on the date that the Bankruptcy Case was converted to Chapter 7, the warranty would have been deemed rejected 60 days after the conversion date in accordance with § 365(d)(1) of the Bankruptcy Code and not enforceable by the Chapter 7 Trustee.

Even if the warranty was not an executory contract, the Chapter 7 Trustee has stated that the Debtor never gave a copy of the home warranty to him and that it was unlikely that the Debtor continued to pay the $43.75 monthly fee in order to maintain it. As a follow-up, the Chapter 7 Trustee's counsel has again sent an email to the Debtor's counsel, requesting copies of all warranties on the Carmel Property. To date, the Debtor has never produced any home warranty policy for the Carmel Property.

In summary, the Chapter 7 Trustee was required to repair the water leak, and so he did so. He has never obtained any home warranty policy from the Debtor. As a result, any criticism of the Chapter 7 Trustee under the circumstances is unjustified.

## Conclusion

Our review of this matter indicates that the Chapter 7 Trustee has administered the bankruptcy case of Allana Baroni in a manner consistent with the Bankruptcy Code. We found no evidence of misconduct related to the Chapter 7 Trustee's actions relating to his administration of the Carmel Property.

Although we understand that bankruptcy proceedings can be a painful process for tenants when a landlord files for bankruptcy protection, I do not believe that your claims against the Chapter 7 Trustee are well taken.

**EXHIBIT 1_29**

My staff and I will continue to monitor the Bankruptcy Case.

Very truly yours,

Peter C. Anderson
United States Trustee for Region 16

6

**30**                                              **EXHIBIT 1_30**

CALIFORNIA
ASSOCIATION
OF REALTORS®

**RESIDENTIAL LEASE OR
MONTH-TO-MONTH RENTAL AGREEMENT**
(C.A.R. Form LR, Revised 12/19)

COLDWELL BANKER
REALTY

Date **04/09/2021** , **David Seror, Chapter 7 Trustee for the Estate of Allana Baroni,** ("Landlord") and
**David and Elaine Captain** ("Tenant") agree as follows ("Agreement"):

1. **PROPERTY:**
   A. Landlord rents to Tenant and Tenant rents from Landlord, the real property and improvements described as: **3435 Rio Rd.,**
      **Carmel, CA 93923** ("Premises").
   B. The Premises are for the sole use as a personal residence by the following named person(s) **only:**
      **David, Elaine, ▓▓▓▓ Captain** .
   C. The following personal property, maintained pursuant to paragraph 11, is included: _____
      _____ or ☐ (if checked) the personal property on the attached addendum is included.
   D. The Premises may be subject to a local rent control ordinance _____ .

2. **TERM:** The term begins on (date) **May 1, 2021** ("Commencement Date"). If Tenant has not paid all amounts then due;
   **(i)** Tenant has no right to possession or keys to the premises and; **(ii)** this Agreement is voidable at the option of Landlord, 2 calendar
   days after giving Tenant a Notice to Pay (C.A.R. Form PPN). Notice may be delivered to Tenant **(i)** in person; **(ii)** by mail to Tenant's
   last known address; or **(iii)** by email, if provided in Tenant's application or previously used by Tenant to communicate with Landlord or
   agent for Owner. If Landlord elects to void the lease, Landlord shall refund to Tenant all rent and security deposit paid.
   **(Check A or B):**
   ☐ A. **Month-to-Month:** This Agreement continues from the commencement date as a month-to-month tenancy. Tenant may
      terminate the tenancy by giving written notice at least 30 days prior to the intended termination date. Tenant shall be
      responsible for paying rent through the termination date even if moving out early. Landlord may terminate the tenancy by
      giving written notice as provided by law. Such notices may be given on any date.
   ☒ B. **Lease:** This Agreement shall terminate on (date) **12/31/2021** at **5:00** ☐ AM/ ☒ PM. Tenant
      shall vacate the Premises upon termination of the Agreement, unless: **(i)** Landlord and Tenant have extended this
      Agreement in writing or signed a new agreement; **(ii)** mandated by any rent increase cap or just cause eviction control under
      any state or local law; or **(iii)** Landlord accepts Rent from Tenant (other than past due Rent), in which case a month-to-month
      tenancy shall be created which either party may terminate as specified in paragraph 2A. Rent shall be at a rate agreed to by
      Landlord and Tenant, or as allowed by law. All other terms and conditions of this Agreement shall remain in full force and
      effect.

3. **RENT:** "Rent" shall mean all monetary obligations of Tenant to Landlord under the terms of the Agreement, except security deposit.
   A. Tenant agrees to pay $ **5,000.00** per month for the term of the Agreement.
   B. Rent is payable in advance on the **1st (or** _____ ) **day** of each calendar month, and is delinquent on the next day.
   C. If Commencement Date falls on any day other than the day Rent is payable under paragraph 3B, and Tenant has paid one full
      month's Rent in advance of Commencement Date, Rent for the second calendar month shall be prorated and Tenant shall pay
      1/30th of the monthly rent per day for each day remaining in the prorated second month.
   D. **PAYMENT: (1)** Rent shall be paid by ☒ personal check, ☐ money order, ☐ cashier's check, made payable to _____
      **David Seror, Chapter 7 Trustee** , ☐ wire/electronic transfer, or ☐ other _____ .
      **(2)** Rent shall be delivered to (name) **David Seror, Chapter 7 Trustee**
      (whose phone number is) **818-827-9000** at (address) **21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367**
      _____ , (or at any other location subsequently specified by Landlord in writing to Tenant) (and ☐ if
      checked, rent may be paid personally, between the hours of _____ and _____ on the following days _____ ).
      **(3)** If any payment is returned for non-sufficient funds ("NSF") or because tenant stops payment, then, after that: **(i)** Landlord may, in
      writing, require Tenant to pay Rent in cash for three months and **(ii)** all future Rent shall be paid by ☐ money order, or ☐ cashier's check.
   E. Rent payments received by Landlord shall be applied to the earliest amount(s) due or past due.

4. **SECURITY DEPOSIT:**
   A. Tenant agrees to pay $ **7,500.00** as a security deposit. Security deposit will be ☐ transferred to and held by the
      Owner of the Premises, or ☐ held in Owner's Broker's trust account. *held in Landlord's trust account.
   B. All or any portion of the security deposit may be used, as reasonably necessary, to: **(i)** cure Tenant's default in payment of Rent (which
      includes Late Charges, NSF fees or other sums due); **(ii)** repair damage, excluding ordinary wear and tear, caused by Tenant or by a guest,
      invitee or licensee of Tenant; **(iii)** clean Premises, if necessary, upon termination of the tenancy; and **(iv)** replace or return personal property
      or appurtenances. **SECURITY DEPOSIT SHALL NOT BE USED BY TENANT IN LIEU OF PAYMENT OF LAST MONTH'S RENT.** If all or
      any portion of the security deposit is used during the tenancy, Tenant agrees to reinstate the total security deposit within five days after written
      notice is delivered to Tenant. Within 21 days after Tenant vacates the Premises, Landlord shall: **(1)** furnish Tenant an itemized statement
      indicating the amount of any security deposit received and the basis for its disposition and supporting documentation as required by
      California Civil Code § 1950.5(g); and **(2)** return any remaining portion of the security deposit to Tenant.
   C. Security deposit will not be returned until all Tenants have vacated the Premises and all keys returned. Any security
      deposit returned by check shall be made out to all Tenants named on this Agreement, or as subsequently modified.
   D. No interest will be paid on security deposit unless required by local law.
   E. If the security deposit is held by Owner, Tenant agrees not to hold Broker responsible for its return. If the security deposit is held in
      Owner's Broker's trust account, **and** Broker's authority is terminated before expiration of this Agreement, **and** security deposit is
      released to someone other than Tenant, **then** Broker shall notify Tenant, in writing, where and to whom security deposit has been
      released. Once Tenant has been provided such notice, Tenant agrees not to hold Broker responsible for the security deposit.

Tenant's Initials ( CC ) ( DC )          Landlord's Initials ( ____ ) ( ____ )

© 2019, California Association of REALTORS®, Inc.
**LR REVISED 12/19 (PAGE 1 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 1 OF 8)**

Coldwell Banker - Los Feliz, 1917 Hillhurst Ave Los Angeles, CA 90027          Phone: (323)210-1422      Fax: (323)665-0406          Training
Steven Flores                          Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5   www.lwolf.com

Premises:  3435 Rio Rd., Carmel, CA 93923                                                                              Date: 4/09/2021

**5. MOVE-IN COSTS RECEIVED/DUE:** Move-in funds shall be paid by ☒ personal check, ☐ money order, or ☐ cashier's check, ☐ wire/ electronic transfer.

| Category | Total Due | Payment Received | Balance Due | Date Due | Payable To |
|---|---|---|---|---|---|
| Rent from 5/1/2021<br>to 5/31/2021      (date) | $3,870.97** | | $3,870.97 | 04/20/2021 | David Seror, Chapter 7 Trustee |
| *Security Deposit | $7,500 | | $7,500 | 4/20/2021 | David Seror, Chapter 7 Trustee |
| Other | | | | | |
| Other | | | | | |
| Total | | | | | |

*The maximum amount of security deposit, however designated, cannot exceed two months' Rent for an unfurnished premises, or three months' Rent for a furnished premises.  **See Section 10a below.

**6. LATE CHARGE; RETURNED CHECKS:**

   **A.** Tenant acknowledges either late payment of Rent or issuance of a returned check may cause Landlord to incur costs and expenses, the exact amounts of which are extremely difficult and impractical to determine. These costs may include, but are not limited to, processing, enforcement and accounting expenses, and late charges imposed on Landlord. If any installment of Rent due from Tenant is not received by Landlord within 5 (or ☐ _____ ) **calendar days** after the date due, or if a check is returned, Tenant shall pay to Landlord, respectively, an additional sum of $ _____ or _____ % of the Rent due as a Late Charge and $25.00 as an NSF fee for the first returned check and $35.00 as a NSF fee for each additional returned check, either or both of which shall be deemed additional Rent.

   **B.** Landlord and Tenant agree that these charges represent a fair and reasonable estimate of the costs Landlord may incur by reason of Tenant's late or NSF payment. Any Late Charge or NSF fee due shall be paid with the current installment of Rent. Landlord's acceptance of any Late Charge or NSF fee shall not constitute a waiver as to any default of Tenant. Landlord's right to collect a Late Charge or NSF fee shall neither be deemed an extension of the date Rent is due under paragraph 3 nor prevent Landlord from exercising any other rights and remedies under this Agreement and as provided by law.

**7. PARKING: (Check A or B)**

   ☒ **A.** Parking is permitted as follows:    in 2 car garage or parking area

       The right to parking ☐ is ☐ is not included in the Rent charged pursuant to paragraph 3. If not included in the Rent, the parking rental fee shall be an additional $ _____ per month. Parking space(s) are to be used only for parking properly registered and operable motor vehicles, except for trailers, boats, campers, buses or trucks (other than pick-up trucks). Tenant shall park in assigned space(s) only. Parking space(s) are to be kept clean. Vehicles leaking oil, gas or other motor vehicle fluids shall not be parked on the Premises. Mechanical work, or storage of inoperable vehicles, or storage of any kind is not permitted in parking space(s) or elsewhere on the Premises except as specified in paragraph 8.

  OR ☐ **B.** Parking is not permitted on the real property of which the Premises is a part.

**8. STORAGE: (Check A or B)**

   ☐ **A.** Storage is permitted as follows: _____

       The right to separate storage space ☐ is, ☐ is not, included in the Rent charged pursuant to paragraph 3. If not included in the Rent, storage space fee shall be an additional $ _____ per month. Tenant shall store only personal property Tenant owns, and shall not store property claimed by another or in which another has any right, title or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, hazardous waste or other inherently dangerous material, or illegal substances.

  OR ☐ **B.** Except for Tenant's personal property, contained entirely within the Premises, storage is not permitted on the Premises.

**9. UTILITIES:** Tenant agrees to pay for all utilities and services, and the following charges:  gardening, tree trimming                 . except _____ , which shall be paid for by Landlord. If any utilities are not separately metered, Tenant shall pay Tenant's proportional share, as reasonably determined and directed by Landlord. If utilities are separately metered, Tenant shall place utilities in Tenant's name as of the Commencement Date. Landlord is only responsible for installing and maintaining one usable telephone jack and one telephone line to the Premises. Tenant shall pay any cost for conversion from existing utilities service provider.

   ☐ **A. Water Submeters:** Water use on the Premises is measured by a submeter and Tenant will be separately billed for water usage based on the submeter. See attached Water Submeter Addendum (C.A.R. Form WSM) for additional terms.

   ☐ **B. Gas Meter:** The Premises does not have a separate gas meter.

   ☐ **C. Electric Meter:** The Premises does not have a separate electrical meter.

**10. CONDITION OF PREMISES:** Tenant has examined Premises and, if any, all furniture, furnishings, appliances, landscaping and fixtures, including smoke alarm(s) and carbon monoxide detector(s).

   **(Check all that apply:)**

   ☒ **A.** Tenant acknowledges these items are clean and in operable condition, with the following exceptions: _____
      Tenant has agreed to have the inside of the house painted in exchange for a one week credit of rent (reflected in Section 5)                    .

   ☐ **B.** Tenant's acknowledgment of the condition of these items is contained in an attached statement of condition (C.A.R. Form MIMO).

   ☐ **C. (i)** Landlord will Deliver to Tenant a statement of condition (C.A.R. Form MIMO) ☐ within **3 days** after execution of this Agreement; ☐ prior to the Commencement Date; ☐ within **3 days** after the Commencement Date.
      **(ii)** Tenant shall complete and return the MIMO to Landlord within 3 (or ☐ _____ ) **days** after Delivery. Tenant's failure to return the MIMO within that time shall conclusively be deemed Tenant's Acknowledgement of the condition as stated in the MIMO.

Tenant's Initials ( _CC_ ) ( _DC_ )                                                    Landlord's Initials ( ___ ) ( ___ )

LR REVISED 12/19 (PAGE 2 OF 8)



**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 2 OF 8)**
Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5   www.lwolf.com       Training

32                                                                              EXHIBIT 2_32

Premises: 3435 Rio Rd., Carmel, CA 93923                                                    Date: 4/09/2021

☐ **D.** Tenant will provide Landlord a list of items that are damaged or not in operable condition within **3 (or** ☐ ____ **) days** after Commencement Date, not as a contingency of this Agreement but rather as an acknowledgement of the condition of the Premises.

☐ **E.** Other: _____.

## 11. MAINTENANCE USE AND REPORTING:

**A.** Tenant shall properly use, operate and safeguard Premises, including if applicable, any landscaping, furniture, furnishings and appliances, and all mechanical, electrical, gas and plumbing fixtures, carbon monoxide detector(s) and smoke alarms, and keep them and the Premises clean, sanitary and well ventilated. Tenant shall be responsible for checking and maintaining all carbon monoxide detectors and any additional phone lines beyond the one line and jack that Landlord shall provide and maintain. Tenant shall replace any burned out or malfunctioning light bulbs. Tenant shall immediately notify Landlord, in writing, of any problem, malfunction or damage with any item including carbon monoxide detector(s) and smoke alarms on the property. Tenant shall be charged for all repairs or replacements caused by Tenant, pets, guests or licensees of Tenant, excluding ordinary wear and tear. Tenant shall be charged for all damage to Premises as a result of failure to report a problem in a timely manner. Tenant shall be charged for repair of drain blockages or stoppages, unless caused by defective plumbing parts or tree roots invading sewer lines.

**B.** ☐ Landlord ☒ Tenant shall water the garden, landscaping, trees and shrubs, except: _____

**C.** ☐ Landlord ☒ Tenant shall maintain the garden, landscaping, trees and shrubs, except: _____.

**D.** ☐ Landlord ☐ Tenant shall maintain _____.

**E.** Landlord and Tenant agree that State or local water use restrictions shall supersede any obligation of Landlord or Tenant to water or maintain any garden, landscaping, trees or shrubs pursuant to 11B, 11C, and 11D.

**F.** Tenant's failure to maintain any item for which Tenant is responsible shall give Landlord the right to hire someone to perform such maintenance and charge Tenant to cover the cost of such maintenance.

**G.** The following items of personal property are included in the Premises without warranty and Landlord will not maintain, repair or replace them: Refrigerator, washer and dryer _____.

**H.** Tenant understands that if Premises is located in a Common Interest Development, Landlord may not have authority or control over certain parts of the Premises such as roof, electrical, gas or plumbing features inside certain walls, and common areas such as shared parking structure or garage.

**I.** Tenant shall not use the premises to plant, grow, cultivate or sell marijuana.

## 12. NEIGHBORHOOD CONDITIONS:
Tenant is advised to satisfy himself or herself as to neighborhood or area conditions, including, but not limited to, schools, proximity and adequacy of law enforcement, crime statistics, proximity of registered felons or offenders, fire protection, other governmental services, availability, adequacy and cost of any wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, cemeteries, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Tenant.

## 13. PETS:
Unless otherwise provided in California Civil Code §54.2, or other law, no animal or pet shall be kept on or about the Premises without Landlord's prior written consent, ☐ except as agreed to in the attached Pet Addendum (C.A.R. Form PET).

## 14. SMOKING:

**A. (i)** Tenant is responsible for all damage caused by smoking including, but not limited to stains, burns, odors and removal of debris; **(ii)** Tenant acknowledges that in order to remove odor caused by smoking, Landlord may need to replace carpet and drapes and paint the entire premises regardless of when these items were last cleaned, replaced or repainted. Such actions and other necessary steps will impact the return of any security deposit.

**B.** The Premises or common areas may be subject to a local non-smoking ordinance.

**C.** NO SMOKING of any substance is allowed on the Premises or common areas. If smoking does occur on the Premises or common areas, **(i)** Tenant is in material breach of this Agreement; **(ii)** Tenant, guests, and all others may be required to leave the Premises. ☐ Smoking of the following substances only is allowed: _____.

## 15. RULES/REGULATIONS:

**A.** Tenant agrees to comply with all Landlord rules and regulations that are at any time posted on the Premises or delivered to Tenant. Tenant shall not, and shall ensure that guests, invitees, and licensees of Tenant shall not, disturb, annoy, endanger or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, under federal, state, or local law including, but not limited to, using, manufacturing, selling, storing or transporting illicit drugs or other contraband, or violate any law or ordinance, or commit a waste or nuisance on or about the Premises.

**B. (If applicable, check one)**
☐ **1.** Landlord shall provide Tenant with a copy of the rules and regulations within _____ days or _____.
**OR** ☐ **2.** Tenant has been provided with, and acknowledges receipt of, a copy of the rules and regulations.

## 16. ☐ (If checked) CONDOMINIUM; PLANNED UNIT DEVELOPMENT:

**A.** The Premises are a unit in a condominium, planned unit development, common interest subdivision or other development governed by a homeowners' association ("HOA"). The name of the HOA is _____. Tenant agrees to comply with all HOA covenants, conditions and restrictions, bylaws, rules and regulations and decisions ("HOA Rules"). Tenant shall reimburse Landlord for any fines or charges imposed by HOA or other authorities, due to any violation by Tenant, or the guests or licensees of Tenant or Landlord shall have the right to deduct such amounts from the security deposit.

Tenant's Initials ( _CC_ ) ( _DC_ )                    Landlord's Initials ( _____ ) ( _____ )

**LR REVISED 12/19 (PAGE 3 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 3 OF 8)**
Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5   www.lwolf.com        Training

Premises: ___3435 Rio Rd., Carmel, CA 93923___                                                     Date: _4/09/2021_

B. If applicable, Tenant is required to pay a fee to the HOA to gain access to certain areas within the development such as but not necessarily including or limited to the front gate, pool, and recreational facilities. If not specified in paragraph 5, Tenant is solely responsible for payment and satisfying any HOA requirements prior to or upon or after the Commencement Date.

C. **(Check one)**
☐ 1. Landlord shall provide Tenant with a copy of the HOA Rules within _____ days
    or _____ .
OR☐ 2. Tenant has been provided with, and acknowledges receipt of, a copy of the HOA Rules.

**17. ALTERATIONS; REPAIRS:** Unless otherwise specified by law or paragraph 25C, without Landlord's prior written consent, **(i)** Tenant shall not make any repairs, alterations or improvements in or about the Premises including: painting, wallpapering, adding or changing locks, installing antenna or satellite dish(es), placing signs, displays or exhibits, or using screws, fastening devices, large nails or adhesive materials; **(ii)** Landlord shall not be responsible for the costs of alterations or repairs made by Tenant; **(iii)** Tenant shall not deduct from Rent the costs of any repairs, alterations or improvements; and **(iv)** any deduction made by Tenant shall be considered unpaid Rent.

**18. KEYS; LOCKS:**
A. Tenant acknowledges receipt of (or Tenant will receive ☒ prior to the Commencement Date, or ☐ _____ ):
    ☒ _____ key(s) to Premises,              ☒ _____ remote control device(s) for garage door/gate opener(s),
    ☐ _____ key(s) to mailbox,              _____ ,
    ☐ _____ key(s) to common area(s),       _____ .
B. Tenant acknowledges that locks to the Premises ☐ have, ☒ have not, been re-keyed.
C. If Tenant re-keys existing locks or opening devices, Tenant shall immediately deliver copies of all keys to Landlord. Tenant shall pay all costs and charges related to loss of any keys or opening devices. Tenant may not remove locks, even if installed by Tenant.

**19. ENTRY:**
A. Tenant shall make Premises available to Landlord or Landlord's representative for the purpose of entering to make necessary or agreed repairs (including, but not limited to, installing, repairing, testing, and maintaining smoke detectors and carbon monoxide devices, and bracing, anchoring or strapping water heaters, or repairing dilapidation relating to the presence of mold); providing decorations, alterations, or improvements, or supplying necessary or agreed services; or to show Premises to prospective or actual purchasers, tenants, mortgagees, lenders, appraisers, contractors and others (collectively "Interested Persons"). Tenant agrees that Landlord, Broker and Interested Persons may take photos of the Premises.
B. Landlord and Tenant agree that 24-hour written notice shall be reasonable and sufficient notice, except as follows: (1) 48-hour written notice is required to conduct an inspection of the Premises prior to the Tenant moving out, unless the Tenant waives the right to such notice. (2) If Landlord has in writing informed Tenant that the Premises are for sale and that Tenant will be notified orally to show the premises (C.A.R. Form NSE), then, for the next 120 days following the delivery of the NSE, notice may be given orally to show the Premises to actual or prospective purchasers. (3) No written notice is required if Landlord and Tenant orally agree to an entry for agreed services or repairs if the date and time of entry are within one week of the oral agreement. (4) No notice is required: **(i)** to enter in case of an emergency; **(ii)** if the Tenant is present and consents at the time of entry; or **(iii)** if the Tenant has abandoned or surrendered the Premises.
C. ☐ (If checked) Tenant authorizes the use of a keysafe/lockbox to allow entry into the Premises and agrees to sign a keysafe/lockbox addendum (C.A.R. Form KLA).

**20. PHOTOGRAPHS AND INTERNET ADVERTISING:**
A. In order to effectively market the Premises for sale or rental it is often necessary to provide photographs, virtual tours and other media to Interested Persons. Tenant agrees that Broker may photograph or otherwise electronically capture images of the exterior and interior of the Premises ("Images") for static and/or virtual tours of the Premises by Interested Persons for use on Broker's website, the MLS, and other marketing materials and sites. Tenant acknowledges that once Images are placed on the Internet neither Broker nor Landlord has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet.
B. Tenant acknowledges that prospective Interested Persons coming onto the Premises may take photographs, videos or other images of the Premises. Tenant understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Landlord has control over who views such Images nor what use viewers may make of the Images.

**21. SIGNS:** Tenant authorizes Landlord to place FOR SALE/LEASE signs on the Premises.

**22. ASSIGNMENT; SUBLETTING: A.** Tenant shall not sublet all or any part of Premises, or parking or storage spaces, or assign or transfer this Agreement or any interest in it, without Landlord's prior written consent. Unless such consent is obtained, any assignment, transfer or subletting of Premises or this Agreement or tenancy, by voluntary act of Tenant, operation of law or otherwise, shall, at the option of Landlord, terminate this Agreement. Any proposed assignee, transferee or sublessee shall submit to Landlord an application and credit information for Landlord's approval and, if approved, sign a separate written agreement with Landlord and Tenant. Landlord's consent to any one assignment, transfer or sublease, shall not be construed as consent to any subsequent assignment, transfer or sublease and does not release Tenant of Tenant's obligations under this Agreement. **B.** This prohibition also applies ( ☐ does not apply) to short term, vacation, and transient rentals such as, but not limited to, those arranged through AirBnB, VRBO, HomeAway or other short term rental services. **C.** Any violation of this prohibition is a non-curable, material breach of this Agreement.

**23. JOINT AND INDIVIDUAL OBLIGATIONS:** If there is more than one Tenant, each one shall be individually and completely responsible for the performance of all obligations of Tenant under this Agreement, jointly with every other Tenant, and individually, whether or not in possession.

**24. POSSESSION:**
A. (1) Tenant is not in possession of the Premises. If Landlord is unable to deliver possession of Premises on Commencement

Tenant's Initials ( _CC_ ) ( _DB_ )              Landlord's Initials ( ____ ) ( ____ )
LR REVISED 12/19 (PAGE 4 OF 8)

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 4 OF 8)**
Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5    www.lwolf.com        Training

34                                                                            EXHIBIT 2_34

Premises:   3435 Rio Rd., Carmel, CA 93923

Date:   4/09/2021

Date, such Date shall be extended to the date on which possession is made available to Tenant. If Landlord is unable to deliver possession within **5 (or ☐ _____ ) calendar days** after agreed Commencement Date, Tenant may terminate this Agreement by giving written notice to Landlord, and shall be refunded all Rent and security deposit paid.

**or (2)** Possession is deemed terminated when Tenant has returned all keys to the Premises to Landlord.

**B.** ☐ Tenant is already in possession of the Premises.

**25. TENANT'S OBLIGATIONS UPON VACATING PREMISES:**

**A.** Upon termination of this Agreement, Tenant shall: **(i)** give Landlord all copies of all keys and any opening devices to Premises, including any common areas; **(ii)** vacate and surrender Premises to Landlord, empty of all persons; and personal property belonging to Tenant **(iii)** vacate any/all parking and/or storage space; **(iv)** clean and deliver Premises, as specified in paragraph C below, to Landlord in the same condition as referenced in paragraph 10; **(v)** remove all debris; **(vi)** give written notice to Landlord of Tenant's forwarding address; and **(vii)** _____
_____ .

**B.** All alterations/improvements made by or caused to be made by Tenant, with or without Landlord's consent, become the property of Landlord upon termination. Landlord may charge Tenant for restoration of the Premises to the condition it was in prior to any alterations/improvements.

**C. Right to Pre-Move-Out Inspection and Repairs: (i)** After giving or receiving notice of termination of a tenancy (C.A.R. Form NTT), or before the expiration of this Agreement, Tenant has the right to request that an inspection of the Premises take place prior to termination of the lease or rental (C.A.R. Form NRI). If Tenant requests such an inspection, Tenant shall be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Agreement. **(ii)** Any repairs or alterations made to the Premises as a result of this inspection (collectively, "Repairs") shall be made at Tenant's expense. Repairs may be performed by Tenant or through others, who have adequate insurance and licenses and are approved by Landlord. The work shall comply with applicable law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. **(iii)** Tenant shall: **(a)** obtain receipts for Repairs performed by others; **(b)** prepare a written statement indicating the Repairs performed by Tenant and the date of such Repairs; and **(c)** provide copies of receipts and statements to Landlord prior to termination. Paragraph 25C does not apply when the tenancy is terminated pursuant to California Code of Civil Procedure § 1161(2), (3), or (4).

**26. BREACH OF CONTRACT; EARLY TERMINATION:** In addition to any obligations established by paragraph 25, in the event of termination by Tenant prior to completion of the original term of the Agreement, Tenant shall also be responsible for lost Rent, rental commissions, advertising expenses and painting costs necessary to ready Premises for re-rental. Landlord may withhold any such amounts from Tenant's security deposit.

**27. TEMPORARY RELOCATION:** Subject to local law, Tenant agrees, upon demand of Landlord, to temporarily vacate Premises for a reasonable period, to allow for fumigation (or other methods) to control wood destroying pests or organisms, or other repairs to Premises. Tenant agrees to comply with all instructions and requirements necessary to prepare Premises to accommodate pest control, fumigation or other work, including bagging or storage of food and medicine, and removal of perishables and valuables. Tenant shall only be entitled to a credit of Rent equal to the per diem Rent for the period of time Tenant is required to vacate Premises.

**28. DAMAGE TO PREMISES:** If, by no fault of Tenant, Premises are totally or partially damaged or destroyed by fire, earthquake, accident or other casualty that render Premises totally or partially uninhabitable, either Landlord or Tenant may terminate this Agreement by giving the other written notice. Rent shall be abated as of the date Premises become totally or partially uninhabitable. The abated amount shall be the current monthly Rent prorated on a 30-day period. If the Agreement is not terminated, Landlord shall promptly repair the damage, and Rent shall be reduced based on the extent to which the damage interferes with Tenant's reasonable use of Premises. If damage occurs as a result of an act of Tenant or Tenant's guests, only Landlord shall have the right of termination, and no reduction in Rent shall be made.

**29. INSURANCE: A.** Tenant's, guest's, invitees or licensee's personal property and vehicles are not insured by Landlord, manager or, if applicable, HOA, against loss or damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. **Tenant is advised to carry Tenant's own insurance (renter's insurance) to protect Tenant from any such loss or damage. B.** Tenant shall comply with any requirement imposed on Tenant by Landlord's insurer to avoid: **(i)** an increase in Landlord's insurance premium (or Tenant shall pay for the increase in premium); or **(ii)** loss of insurance. **C.** ☐ Tenant shall obtain liability insurance, in an amount not less than $_____, naming Landlord and, if applicable, Property Manager as additional insured for injury or damage to, or upon, the Premises during the term of this agreement or any extension. Tenant shall provide Landlord a copy of the insurance policy before commencement of this Agreement, and a rider prior to any renewal.

**30. WATERBEDS/PORTABLE WASHERS:** Tenant shall not use or have waterbeds on the Premises unless: **(i)** Tenant obtains a valid waterbed insurance policy; **(ii)** Tenant increases the security deposit in an amount equal to one-half of one month's Rent; and **(iii)** the bed conforms to the floor load capacity of Premises. Tenant shall not use on the Premises ☐ Portable Dishwasher or ☐ Portable Washing Machine.

**31. WAIVER:** The waiver of any breach shall not be construed as a continuing waiver of the same or any subsequent breach.

**32 NOTICE:** Notices may be served at the following address, or at any other location subsequently designated:

| Landlord: David Seror, Chapter 7 Trustee | Tenant: David and Elaine Captain |
|---|---|
| 21650 Oxnard Street, Suite 500 | 3435 Rio Rd. |
| Woodland Hills, CA 91367 | Carmel, CA 93923 |

Tenant's Initials ( _CC_ ) ( _DC_ )   Landlord's Initials ( _____ ) ( _____ )

**LR REVISED 12/19 (PAGE 5 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 5 OF 8)**

Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5   www.lwolf.com          Training

35          EXHIBIT 2_35

Premises: 3435 Rio Rd., Carmel, CA 93923     Date: 4/09/2021

**33. TENANT ESTOPPEL CERTIFICATE:** Tenant shall execute and return a tenant estoppel certificate delivered to Tenant by Landlord or Landlord's agent within **3 days** after its receipt (C.A.R. Form TEC). Failure to comply with this requirement shall be deemed Tenant's acknowledgment that the tenant estoppel certificate is true and correct, and may be relied upon by a lender or purchaser.

**34. REPRESENTATION**

   **A. TENANT REPRESENTATION; OBLIGATIONS REGARDING OCCUPANTS; CREDIT:** Tenant warrants that all statements in Tenant's rental application are accurate. Landlord requires all occupants 18 years of age or older and all emancipated minors to complete a lease rental application. Tenant acknowledges this requirement and agrees to notify Landlord when any occupant of the Premises reaches the age of 18 or becomes an emancipated minor. Tenant authorizes Landlord and Broker(s) to obtain Tenant's credit report periodically during the tenancy in connection with the modification or enforcement of this Agreement. Landlord may cancel this Agreement: **(i)** before occupancy begins; upon disapproval of the credit report(s), or upon discovering that information in Tenant's application is false; **(ii)** After commencement date, upon disapproval of an updated credit report or upon discovering that information in Tenant's application is no longer true. A negative credit report reflecting on Tenant's record may be submitted to a credit reporting agency if Tenant fails to fulfill the terms of payment and other obligations under this Agreement.

   **B. LANDLORD REPRESENTATIONS:** Landlord warrants that, unless otherwise specified in writing, Landlord is unaware of **(i)** any recorded Notices of Default affecting the Premise; **(ii)** any delinquent amounts due under any loan secured by the Premises; and **(iii)** any bankruptcy proceeding affecting the Premises.

**35. MEDIATION:**

   **A.** Consistent with paragraphs B and C below, Landlord and Tenant agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action.

   **B.** The following matters are excluded from mediation: **(i)** an unlawful detainer action; **(ii)** the filing or enforcement of a mechanic's lien; and **(iii)** any matter within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation provision.

   **C.** Landlord and Tenant agree to mediate disputes or claims involving Listing Agent, Leasing Agent or property manager ("Broker"), provided Broker shall have agreed to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to such Broker. Any election by Broker to participate in mediation shall not result in Broker being deemed a party to this Agreement.

**36. ATTORNEY FEES:** In any action or proceeding arising out of this Agreement, the prevailing party between Landlord and Tenant shall be entitled to reasonable attorney fees and costs, collectively not to exceed $1,000 (or $_____), except as provided in paragraph 35A.

**37. C.A.R. FORM:** C.A.R. Form means the specific form referenced or another comparable form agreed to by the parties.

**38. STATUTORY DISCLOSURES:**

   **A.** ☐ **LEAD-BASED PAINT (If checked):** Premises were constructed prior to 1978. In accordance with federal law, Landlord gives and Tenant acknowledges receipt of the disclosures on the attached form (C.A.R. Form FLD) and a federally approved lead pamphlet.

   **B. PERIODIC PEST CONTROL (CHECK IF EITHER APPLIES):**
      **1.** ☐ Landlord has entered into a contract for periodic pest control treatment of the Premises and shall give Tenant a copy of the notice originally given to Landlord by the pest control company.
      **2.** ☒ Premises is a house. Tenant is responsible for periodic pest control treatment.

   **C.** ☐ **METHAMPHETAMINE CONTAMINATION:** Prior to signing this Agreement, Landlord has given Tenant a notice that a health official has issued an order prohibiting occupancy of the property because of methamphetamine contamination. A copy of the notice and order are attached.

   **D. BED BUGS:** Landlord has no knowledge of any infestation in the Premises by bed bugs. See attached Bed Bug Disclosure (C.A.R. Form BBD) for further information. Tenant shall report suspected bed bug infestation to Landlord or, if applicable, property manager and cooperate with any inspection for and treatment of bed bugs. Landlord will notify tenants of any units infested by bed bugs.

   **E. MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Landlord nor Brokers, if any, are required to check this website. If Tenant wants further information, Tenant should obtain information directly from this website.)

   **F.** ☐ **RESIDENTIAL ENVIRONMENTAL HAZARDS BOOKLET:** Tenant acknowledges receipt of the residential environmental hazards booklet.

   **G.** ☐ **MILITARY ORDNANCE DISCLOSURE:** (If applicable and known to Landlord) Premises are located within one mile of an area once used for military training, and may contain potentially explosive munitions.

   **H. FLOOD HAZARD DISCLOSURE:** Flooding has the potential to cause significant damage to personal property owned by Tenant. See attached Tenant Flood Hazard Disclosure (C.A.R. Form TFHD) for additional information.

**39. SERVICEMEMBERS CIVIL RELIEF ACT:** Notwithstanding anything to the contrary in paragraphs 2, 4, 26 or elsewhere in this Agreement, the Servicemembers Civil Relief Act applies to this Agreement and any effort to terminate it, as specified in Sections 3951 and 3955 of the Act.

**40. TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement

Tenant's Initials ( CC ) ( DC )     Landlord's Initials ( ) ( )

**LR REVISED 12/19 (PAGE 6 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 6 OF 8)**

Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5   www.lwolf.com        Training

36        EXHIBIT 2_36

Premises: 3435 Rio Rd., Carmel, CA 93923                                                           Date: 4/09/2021

with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed except in writing. This Agreement is subject to California landlord-tenant law and shall incorporate all changes required by amendment or successors to such law. This Agreement and any supplement, addendum or modification, including any copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.

**41. AGENCY:**
  **A. CONFIRMATION:** The following agency relationship(s) are confirmed for this transaction:
    Landlord's Brokerage Firm _____ License Number _____
    Is the broker of (check one): ☐ the Landlord; or ☐ both the Tenant and Landlord. (Dual Agent).
    Landlord's Agent _____ License Number _____
    Is (check one): ☐ the Landlord's Agent. (salesperson or broker associate) ☐ both the Tenant's and Landlord's Agent. (Dual Agent)
    Tenant's Brokerage Firm _____ License Number _____
    Is the broker of (check one): ☐ the Tenant; or ☐ both the Tenant and Landlord. (Dual Agent)
    Tenant's Agent _____ License Number _____
    Is (check one): ☐ the Tenant's Agent. (salesperson or broker associate) ☐ both the Tenant's and Landlord's Agent. (Dual Agent)
  **B. DISCLOSURE:** ☐ (If checked): The term of this Agreement exceeds one year. A disclosure regarding real estate agency relationships (C.A.R. Form AD) has been provided to Landlord and Tenant, who each acknowledge its receipt.
**42.** ☐ **TENANT COMPENSATION TO BROKER:** Upon execution of this Agreement, Tenant agrees to pay compensation to Broker as specified in a separate written agreement between Tenant and Broker.
**43. NOTICE OF RIGHT TO RECEIVE FOREIGN LANGUAGE TRANSLATION OF LEASE/RENTAL AGREEMENTS:** California Civil Code requires a landlord or property manager to provide a tenant with a foreign language translation copy of a lease or rental agreement if the agreement was negotiated primarily in Spanish, Chinese, Korean, Tagalog or Vietnamese. If applicable, every term of the lease/rental needs to be translated except for, among others, names, dollar amounts and dates written as numerals, and words with no generally accepted non-English translation.
**44. OWNER COMPENSATION TO BROKER:** Upon execution of this Agreement, Owner agrees to pay compensation to Broker as specified in a separate written agreement between Owner and Broker (C.A.R. Form LL or LCA).
**45. RECEIPT:** If specified in paragraph 5, Landlord or Broker, acknowledges receipt of move-in funds.
**46. OTHER TERMS AND CONDITIONS;** If checked, the following ATTACHED documents are incorporated in this Agreement:
  ☐ Keysafe/Lockbox Addendum (C.A.R. Form KLA); ☐ Lead-Based Paint and Lead-Based Paint Hazards Disclosure (C.A.R. Form FLD);
  ☐ Lease/Rental Mold and Ventilation Addendum (C.A.R. Form LRM); ☐ Landlord in Default Addendum (C.A.R. Form LID)
  ☐ Bed Bug Disclosure (C.A.R. Form BBD); ☑ Tenant Flood Hazard Disclosure (C.A.R. Form TFHD)
  ☑ Rent Cap and Just Cause Addendum (C.A.R. Form RCJC) _____
  Other: _____
  _____
  _____
**47. REPRESENTATIVE CAPACITY:** If one or more Parties is signing this Agreement in a representative capacity and not for him/herself as an individual then that Party shall so indicate in paragraph 50 or 51 and attach a Representative Capacity Signature Disclosure (C.A.R. Form RCSD). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Party acting in a representative capacity **(i)** represents that the entity for which that party is acting already exists and **(ii)** shall Deliver to the other Party and Escrow Holder, within 3 Days After Acceptance, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code §18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

Landlord and Tenant acknowledge and agree Brokers: **(a)** do not guarantee the condition of the Premises; **(b)** cannot verify representations made by others; **(c)** cannot provide legal or tax advice; **(d)** will not provide other advice or information that exceeds the knowledge, education or experience required to obtain a real estate license. Furthermore, if Brokers are not also acting as Landlord in this Agreement, Brokers: **(e)** do not decide what rental rate a Tenant should pay or Landlord should accept; and **(f)** do not decide upon the length or other terms of this Agreement. Landlord and Tenant agree that they will seek legal, tax, insurance and other desired assistance from appropriate professionals.

**48.** ☐ **INTERPRETER/TRANSLATOR:** The terms of this Agreement have been interpreted for Tenant into the following language: _____ . Landlord and Tenant acknowledge receipt of the attached interpreter/translator agreement (C.A.R. Form ITA).
**49.** The Premises is being managed by Owner, (or, if checked):
  ☐ Listing firm in box below    ☐ Leasing firm in box below    ☐ Property Management firm immediately below

Real Estate Broker (Property Manager) _____ DRE Lic # _____
By (Agent) _____ DRE Lic # _____
Address _____ Telephone # _____

Tenant's Initials ( *CC* ) ( *DC* )                                Landlord's Initials ( _____ ) ( _____ )

**LR REVISED 12/19 (PAGE 7 OF 8)**
**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 7 OF 8)**

Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5  www.lwolf.com      Training

Premises: 3435 Rio Rd., Carmel, CA 93923 _____ Date: 4/09/2021

**50. Tenant agrees to rent the Premises on the above terms and conditions.**
☐ One or more Tenants is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (For Tenant Representative) (C.A.R. Form RCSD-T) for additional terms.

Tenant _David Captain_  *David Captain* _____ Date 04/9/21
Print Name _____
Address _____ City Carmel _____ State CA  Zip 93923
Telephone _____ Fax _____ E-mail _____
Tenant _Elaine Captain_  *Elaine Captain* _____ Date 04/9/21
Print Name _____
Address _____ City Carmel _____ State CA  Zip 93923
Telephone _____ Fax _____ E-mail _____

☐ Additional Signature Addendum attached (C.A.R. Form ASA)

☐ **GUARANTEE:** In consideration of the execution of this Agreement by and between Landlord and Tenant and for valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Guarantor") does hereby: **(i)** guarantee unconditionally to Landlord and Landlord's agents, successors and assigns, the prompt payment of Rent or other sums that become due pursuant to this Agreement, including any and all court costs and attorney fees included in enforcing the Agreement; **(ii)** consent to any changes, modifications or alterations of any term in this Agreement agreed to by Landlord and Tenant; and **(iii)** waive any right to require Landlord and/or Landlord's agents to proceed against Tenant for any default occurring under this Agreement before seeking to enforce this Guarantee.

Guarantor (Print Name) _____
Guarantor _____ Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

**51. Landlord (owner or ☐ agent for owner) agrees to rent the Premises on the above terms and conditions.**
☐ One or more Landlords is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (For Landlord Representative) (C.A.R. Form RCSD-LL) for additional terms.

Landlord _David Seror, Chapter 7 Trustee_ _____ Date _____ Landlord _____ Date _____

Address _21650 Oxnard Street, Suite 500, Woodland Hills, CA 91364_
Telephone _818-827-9000_ Fax _____ E-mail _dseror@bg.law_

---

**REAL ESTATE BROKERS:**
**A.** Real estate brokers who are not also Landlord under this Agreement are not parties to the Agreement between Landlord and Tenant.
**B.** Agency relationships are confirmed in paragraph 41.
**C.** **COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker (Leasing Firm) and Cooperating Broker agrees to accept: **(i)** the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in which the Property is offered for sale or lease or a reciprocal MLS; or **(ii)** ☐ (if checked) the amount specified in a separate written agreement between Listing Broker and Cooperating Broker.

Real Estate Broker (Leasing Firm) _____ DRE Lic. # _____
By (Agent) _____ DRE Lic. # _____ Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

Real Estate Broker (Listing Firm) _____ DRE Lic. # _____
By (Agent) _____ DRE Lic. # _____ Date _____
Address _____ City _____ State _____ Zip _____
Telephone _____ Fax _____ E-mail _____

---

© 2019, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**LR REVISED 12/19 (PAGE 8 OF 8)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 8 OF 8)**


Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5   www.lwolf.com          Training

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
21650 Oxnard St., Suite 500, Woodland Hills, California 91367

A true and correct copy of the foregoing document entitled: **TRUSTEE'S SUPPLEMENTAL OPPOSITION TO: MOTION OF DEBTOR ALLANA BARONI, MOVING THE BANKRUPTCY COURT FOR AN ORDER REMOVING CHAPTER 7 TRUSTEE DAVID SEROR FOR CAUSE, PURSUANT TO 11 U.S.C. § 324(b); AND MOVING COURT TO MAKE CRIMINAL REFERRALS OF WELLS FARGO BANK, OF BANK'S ATTORNEY BERNARD KORNBERG, AND OF SEROR; SUPPLEMENTAL DECLARATION OF DAVID SEROR** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On January 14, 2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Richard L Antognini**    , rlalawyer@yahoo.com
- **Richard L Antognini**    rlalawyer@yahoo.com, rlalawyer@yahoo.com
- **Jessica L Bagdanov**    jbagdanov@bg.law, ecf@bg.law
- **Justin D Balser**    Justin.Balser@troutman.com, LitigationDocketRequests@troutman.com;Elizabeth.Streible@troutman.com;Tracey.Cantu@troutman.com;evelyn.duarte@troutman.com
- **Adam N Barasch**    anb@severson.com, elw@severson.com
- **Eric Bensamochan**    eric@eblawfirm.us, G63723@notify.cincompass.com
- **Justin C Bentley**    justinbentley@yahoo.com, mslattery@lkfirm.com,mabner@lkfirm.com,caguilar@lkfirm.com
- **Linda M Blank**    linda@lmblank.com, lindablank.lb@gmail.com
- **Theron S Covey**    theronscovey@hotmail.com, sferry@raslg.com
- **Ryan Coy**    rcoy@bg.law, ecf@bg.law
- **Michael Daniels**    BkECFnotifications@nationstarmail.com
- **Louis J Esbin**    Louis@Esbinlaw.com
- **Richard W Esterkin**    richard.esterkin@morganlewis.com
- **Oscar Estrada**    oestrada@ttc.lacounty.gov
- **Sean C Ferry**    sferry@raslg.com, sferry@ecf.courtdrive.com
- **Christopher R Fredrich**    cfredrich@stroock.com, lacalendar@stroock.com
- **Daniel K Fujimoto**    wdk@wolffirm.com
- **Steven T Gubner**    sgubner@bg.law, ecf@bg.law
- **M. Jonathan Hayes**    jhayes@rhmfirm.com, roksana@rhmfirm.com;matt@rhmfirm.com;rosario@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com;boshra@rhmfirm.com;rosario@rhmfirm.com
- **Gregory K Jones**    gjones@stradlinglaw.com, smjohnson@sycr.com;smjohnson@stradlinglaw.com
- **Jeff Katofsky**    jeff@oremowlz.com, jgroves@propertymanagers.biz
- **Kelly M Kaufmann**    bknotice@mccarthyholthus.com, kraftery@ecf.courtdrive.com
- **Bernard J Kornberg**    bernard.kornberg@practus.com, elw@severson.com
- **Andrew Kussmaul**    Andrew.Kussmaul@Bonialpc.com
- **Lewis R Landau**    Lew@Landaunet.com
- **Kathleen P March**    kmarch@bkylawfirm.com, kmarch3@sbcglobal.net,kmarch@sbcglobal.net
- **Jeannette Marsala**    jmarsala@marsalalawfirm.com, jmarsala@marsalalawfirm.com
- **Thomas E McCurnin**    tmccurnin@bkolaw.com, aduran@bkolaw.com;kescano@bkolaw.com
- **Kenneth Misken**    Kenneth.M.Misken@usdoj.gov
- **John Rafferty**    john.rafferty@bonialpc.com
- **Robert Reganyan**    reganyanlawfirm@gmail.com
- **Robert Reganyan**    reganyanlawfirm@gmail.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

- **Matthew D. Resnik**    matt@rhmfirm.com,
  roksana@rhmfirm.com;rosario@rhmfirm.com;susie@rhmfirm.com;max@rhmfirm.com;priscilla@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rhmfirm.com
- **J. Alexandra Rhim**    arhim@hrhlaw.com
- **Cassandra J Richey**    cdcaecf@bdfgroup.com
- **Michael S Riley**    mriley8@aol.com, 10986aa@gmail.com
- **Stefanie A Schiff**    stefanie.schiff@akerman.com,
  preston.ascherin@akerman.com;Melissa.cizmorris@akerman.com;Suzanne.jimenez@akerman.com
- **Susan K Seflin**    sseflin@bg.law, ecf@bg.law
- **David Seror (TR)**    aquijano@bg.law, C133@ecfcbis.com;mgalvan@bg.law
- **Mark M Sharf**    msharf00@gmail.com, 2180473420@filings.docketbird.com;mark_091@ecf.courtdrive.com
- **Wayne A Silver**    ws@waynesilverlaw.com, w_silver@sbcglobal.net
- **James K Snyder**    ksnyder@dykema.com, cacossano@dykema.com
- **Lukas Sosnicki**    lsosnicki@thompsoncoburn.com, bgutierrez@thompsoncoburn.com
- **Bill Taylor**    ecfnotices@4stechnologies.com
- **Edward A Treder**    cdcaecf@bdfgroup.com
- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov
- **Kristin A Zilberstein**    Kris.Zilberstein@Padgettlawgroup.com,
  BKecf@padgettlawgroup.com;Kris.Zilberstein@ecf.courtdrive.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On ___, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 14, 2022 | Jessica Studley | /s/ Jessica Studley |
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                 **F 9013-3.1.PROOF.SERVICE**