# FOR PUBLICATION



FILED & ENTERED

AUG 09 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Cetulio          DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re: | Case No. 1:12-bk-10986-MB |
| ALLANA BARONI, | Chapter 7 |
| Debtor. | |
| | **MEMORANDUM OF DECISION** |

After debtor Alanna Baroni (the "Debtor") materially breached her confirmed chapter 11 plan, the Court granted the motion of creditor Bank of New York Mellon ("BONYM") to convert the case to chapter 7.[1]  The Debtor opposed the conversion motion and has opposed every subsequent effort by the chapter 7 trustee (the "Trustee") to administer the case—a motion for turnover, a motion to approve a settlement between the estate and various secured creditors, and a motion to sell property of the estate.  Most of these decisions have been affirmed on appeal or the appeal withdrawn; several appeals remain pending.

In her latest effort, the Debtor accuses the Trustee, together with creditor Wells Fargo Bank ("Wells Fargo") and its former counsel, of committing a federal bankruptcy crime under 18 U.S.C. § 152(4) in respect of an allegedly "false" claim filed by Wells Fargo.  Case Dkt. 1378 (the "Motion").  The Debtor requests that the Court refer the Trustee, Wells Fargo and Wells Fargo's former counsel, for criminal prosecution pursuant to 18 U.S.C. § 3057.  Based on the Trustee's alleged crime, and other alleged instances of mismanagement and misconduct, the Debtor also seeks removal of the Trustee from this case—and from all other cases in which the Trustee serves as chapter 7 trustee—pursuant to Bankruptcy Code section 324(a).  The Debtor is joined in these requests by one of her attorneys, Richard Antognini ("Antognini"), who asserts standing to do so as a creditor in this case.

As set forth below, the Court holds: (i) neither the Debtor nor Antognini have statutory standing to request a criminal referral pursuant to 18 U.S.C. § 3057 because the statute does not grant parties to a bankruptcy case the procedural right to make such a request; (ii) even if the request were appropriate, the Court does not find reasonable grounds for believing that a bankruptcy crime has been committed under 18 U.S.C. § 152(4); and (iii) based on the record before the Court, cause does not exist to remove the Trustee from this or any other case under 11 U.S.C. § 342.

---

[1]  Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

# I.

# BACKGROUND

Prepetition, the Debtor and her husband, James Baroni, purchased a condominium in Henderson, Nevada (the "Henderson Property").  To finance that purchase, they executed a note (the "Henderson Note") and a deed of trust securing repayment of the Henderson Note.  On February 1, 2012 (the "Petition Date"), the Debtor filed a voluntary chapter 13 petition.  Later that same month, the Debtor voluntarily converted her case to chapter 11.  Wells Fargo timely filed a secured proof of claim asserting a debt totaling $801,712.98 as of the Petition Date.  POC 7-1 (the "Original Wells Fargo POC").[2]

## A.    The Confirmed Plan.

The Debtor filed her combined second amended disclosure statement and plan (the "Plan") on March 20, 2013.  Case Dkt. 376.  The Plan was confirmed by an order entered on April 15, 2013.  Case Dkt. 423.  At that time, the Debtor owned three rental properties:  the Henderson Property, a single-family residence in Camarillo, California (the "Camarillo Property") and a single-family residence in Carmel, California (the "Carmel Property" and, collectively with the Henderson Property and the Camarillo Property, the "Rental Properties").  The Plan treats each of the first trust deed holders secured by the Rental Properties as partially unsecured and bifurcates their claims into secured claims and unsecured claims.  The Plan places Wells Fargo's secured claim in Class Five, fixes the amount of the secured claim at $196,000, places the $605,712.98 balance of the Original Wells Fargo POC in Class Nine with other general unsecured claims and modifies the deed of trust by reducing it to the amount of the $196,000 secured claim.[3]  Case Dkt. 376 at 26-28. 34.  The Plan

---

[2]  The Original Wells Fargo POC was filed by "Wells Fargo Bank, National Association as Trustee for Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-17."

[3]  The Plan does not expressly mention Wells Fargo except on Exhibit 2 listing "Wells Fargo Bank, N.A." as one of five lenders against whom she asserted claims.  The body of the Plan uses "Countrywide Home Loans, Inc." to refer to Wells Fargo and, at other times, to refer to BONYM, the first deed of trust holder secured by the Camarillo Property.  Case Dkt. 376 at 26, 30, 34.  The Plan's references to "Countrywide Home Loans, Inc." in Class Five relate to Wells Fargo's secured $196,000 claim; the Plan's references to "Countrywide Home Loans, Inc." in Class Seven relate to BONYM's secured claim of $1,145,000.

provides similar treatment to BONYM, the first trust deed holder secured by the Camarillo Property and to Nationstar Mortgage, LLC ("Nationstar"), the first trust deed holder secured by the Carmel Property.  The Plan places the unsecured portions of the BONYM and Nationstar claims in Class Nine, along with Wells Fargo's unsecured claim.  *Id*. at 28-32, 34.

The Debtor disputed that Wells Fargo held a claim secured by the Henderson Property and that it was entitled to enforce the Henderson Note.  She similarly contested whether BONYM held a claim secured by the Camarillo Property and whether Nationstar held a claim secured by the Carmel Property.  With respect to all contested claims, including the secured and unsecured claims of Wells Fargo, BONYM and Nationstar, the Plan required the Debtor to establish a separate reserve account for each secured claim and one reserve account for all disputed unsecured claims.  *Id*. at 19-20.  The Debtor was required to make monthly plan payments into the reserve accounts and, when the disputed claim became an allowed claim, to distribute the reserve account funds within ten business days "of entry of an order identifying the allowed claim holder." *Id*.

**B.**     **Debtor's Litigation Against Wells Fargo.**

After confirmation of the Plan, the Debtor filed an adversary proceeding against Wells Fargo seeking a judicial determination that Wells Fargo did not hold an enforceable claim against the Henderson Property, that Wells Fargo was not entitled to enforce the Henderson Note and that the Original Wells Fargo POC should be disallowed.  Adv. 1:13-ap-01071-AA.[4]  The Court granted summary judgment in favor of Wells Fargo, concluding it was in possession of the Henderson Note, or a transferee entitled to enforce the Henderson Note as a "nonholder in possession of the instrument who has the rights of a holder." Adv. 1:13-ap-01071-AA, Dkt. 69.  The Debtor appealed. The Bankruptcy Appellate Panel for the Ninth Circuit ("BAP") affirmed.  BAP Case No. CC-14-1579.  The Debtor appealed to the Ninth Circuit Court of Appeals.  On September 22, 2017, the Ninth Circuit affirmed.  9th Cir. Case No. 15-60082, Dkt. 45.  On January 16, 2018, the 90-day

---

[4]  The Debtor filed similar adversary proceeding complaints against BONYM, Nationstar, a junior deed of trust holder regarding the Henderson Property and the first deed of trust holder secured by her residence.  Adv. 1:13-ap-01072-AA, 1:13-ap-01069-AA, 1:13-ap-01070-AA, 1:13-ap-01249-AA.

1    period for the Debtor to petition for certiorari lapsed.  Pursuant to the Plan, on that date the Original

2    Wells Fargo POC became an allowed claim in Class Five for $196,000 (plus all the monthly

3    payments that came due between the April 15, 2013 plan confirmation date and January 16, 2018)

4    and in Class Nine for $605,712.98.

5         After it obtained summary judgment, Wells Fargo moved for an award of attorneys' fees

6    based on the attorneys' fees provision in the deed of trust.  Adv. 1:13-ap-01071-AA, Dkt. 73.  The

7    Court granted Wells Fargo's motion, awarding Wells Fargo $50,620.76 in fees and costs and

8    determining that the award should be treated as a prepetition claim (the "Wells Fargo Fee Award").

9    Adv. 1:13-ap-01071-MB, Dkt. 158, 159.[5]  The Debtor appealed the award of fees and Wells Fargo

10   appealed from the characterization of the award as a prepetition claim.  The BAP affirmed both

11   aspects of the Wells Fargo Fee Award.  BAP Case Nos. CC-16-1345, CC-16-1383.  Both parties

12   appealed to the Ninth Circuit.  On June 19, 2018, the Debtor's appeal from the Wells Fargo Fee

13   Award was dismissed pursuant to the stipulation of the parties.  9th Cir. Case No. 17-60062, Dkt. 24.

14   Thereafter, Wells Fargo's cross-appeal was dismissed as moot.  9th Cir. Case No. 17-60062, Dkt. 66,

15   67.  The Wells Fargo Fee Award is therefore a final order.

16

17            **C.    Debtor Fails to Pay the Allowed Wells Fargo Claims &
                      the Allowed BONYM Claims.**

18        Once Wells Fargo's claims became allowed claims in January 2018, the Debtor failed to pay

19   Wells Fargo on either claim and failed to make monthly payments on the secured claim each month

20   after January 2018.  *Order on Motion of Wells Fargo Bank, N.A. . . to Convert or Dismiss, etc.*, Case

21   Dkt. 904 ("Thus, the allowance of Claim No. 7-1 became final and non-appealable no later than

22   January 16, 2018, and the balance of the reserve account for Claim No. 7-1 should have been

23   remitted to the holder . . . Baroni failed to do so.  Baroni also has failed to remit to the holder . . the

24   payments that have come due thereafter").  The Debtor also failed to seek relief from the Court

25   regarding her Plan payment obligations to Wells Fargo.  On August 21, 2018, Wells Fargo moved to

26   convert or dismiss based on material defaults under her Plan.  Dkt. 865.  On October 9, 2018, the

27

28   [5]  *See In re Baroni*, 558 B.R. 916 (Bankr. C.D. Cal. 2016).

Court determined the Debtor was in material breach of the Plan and stated it would convert the case unless the Debtor paid the $57,208.45 arrearage by October 15, 2018.  Case Dkt. 904.  The Debtor cured the default and, ultimately, the Court denied Wells Fargo's motion to convert as moot.  Case Dkt. 958.

Like Wells Fargo, BONYM prevailed in the Debtor's litigation against it seeking to disallow BONYM's secured and unsecured claims.  The Court entered summary judgment in favor of BONYM in 2016.  The Debtor appealed.  The United States District Court affirmed.  CACD Case No. 2:16-cv-01493, Dkt. 25.  The Debtor appealed to the Ninth Circuit.  The Ninth Circuit affirmed. 9th Cir. Case No. 16-56617, Dkt. 37.  On October 9, 2018, the Supreme Court denied Debtor's petition for certiorari.  Adv. 1:13-ap-01072-MB, Dkt. 165.  Pursuant to the Plan, on that date BONYM had an allowed claim in Class Seven for $1,145,000 (plus all the monthly payments that came due between the April 15, 2013 confirmation date and October 9, 2018) and in Class Nine for $256,460.90.  Case Dkt. 376 at 30.

**D.    The Court Converts the Case to Chapter 7.**

Once again, the Debtor materially defaulted under her Plan by failing to pay BONYM on its claims when they became allowed claims.  Once again, the Debtor failed to seek relief from the Court regarding her Plan payment obligations to BONYM.  On March 11, 2019, six months after the Debtor defaulted on her plan payments with a past due amount of at least $200,000, BONYM moved to convert or dismiss the case based on the Debtor's material defaults under the Plan.  Case Dkt. 949. By its order entered on April 29, 2019, the Court converted the case to chapter 7, finding that the Debtor's failure to pay BONYM was a material breach of the Plan.  Case Dkt. 967; Hearing Transcript for April 9, 2019, Case Dkt. 966 at 20:21-21:5.[6]  The Debtor appealed.  The United States District Court affirmed this Court's findings that the Debtor "twice concocted specious reasons to hold overdue funds in reserve accounts" and "had not complied (and was unwilling to comply voluntarily) with the material provisions of the Plan directing her to make payments to creditors."

---

[6] References to transcripts herein refer to the .pdf page number assigned by CM/ECF upon the filing of the document (and electronically stamped at the top thereof).  In some cases that page number differs from the original, internal page number shown in the transcript.

1    *Order re: Appeal from the United States Bankruptcy Court's Conversion Order*, CACD Case No.

2    CV 19-7548, Dkt. 34 at 9.  The Debtor appealed to the Ninth Circuit, which affirmed this Court's

3    conversion of the case to chapter 7.  *In re Baroni*, 36 F.4th 958, 970 (9th Cir. 2022).[7]

4         On April 30, 2019, the United States Trustee appointed David Seror as the chapter 7 trustee

5    for this case.  Case Dkt. 968.

6
7         **E.    The Debtor Sells the Henderson Property; Wells Fargo Returns the Henderson
               Note; and Wells Fargo Amends its POC.**

8         In March 2019, before the Court converted this case (but after BONYM had filed its motion

9    to convert), the Debtor sold the Henderson Property.  Equity Title of Nevada Closing Statement

10   dated March 16, 2019 ("Henderson Closing Statement"), Case Dkt. 1032 at 157-58.  In connection

11   with that sale, Wells Fargo submitted a payoff demand for its Class Five secured claim and was paid

12   $178,884.97.  The Debtor and her husband received $315,078.12 from the sale (the "Net Henderson

13   Proceeds").  *Id.*[8]

14        On or about April 1, 2019, Mr. Cooper (as an agent of Wells Fargo) sent the Henderson

15   Note, now stamped "PAID IN FULL," to the Debtor and her husband.  Declaration of Allana Baroni

16   (June 4, 2019), Case Dkt. 984, ¶ 3.  The Debtor filed copies of the returned Henderson Note, the

17   accompanying deed of trust and the April 1, 2019 cover letter, on both June 4, 2019, and August 20,

18   2019.  Case Dkt. 984, Exh. A; Case Dkt. 1037, Exh. F.  Following conversion of the case to chapter

19   7, the Debtor discussed the returned Henderson Note (including that it was stamped as paid) in

20   pleadings filed on both June 15, 2019, and July 3, 2019.  Case Dkt. 989 at 11; Declaration of Allana

21   Baroni (July 3, 2019), Case Dkt. 1004, ¶ 5.

22

23

24   _____

25   [7]  The Ninth Circuit issued its mandate on July 21, 2022.  9th Cir. Case No. 21-55150, Dkt. 37.

26   [8]  The closing statement lists $303,248.43 "Seller Proceeds Already Issued to Allana A. & James J.
     Baroni" and $11,829.69 "Due to Sellers."  Case Dkt. 1032 at 157-58. The Court made a factual

27   finding that Debtor received $315,078.12 from the sale of the Henderson Property.  *Amended
     Findings of Fact and Conclusions of Law Regarding Order Granting Trustee's Turnover Motion*,

28   Case Dkt. 1158 at 7-8, *aff'd In re Baroni*, 36 F.4th 958, 970 (9th Cir. 2022).

On July 3, 2019, Wells Fargo stated the Henderson Note was released in error, stating that it "may demand its return." Case Dkt. 1002 at 5-6. On July 16, 2019, Wells Fargo amended the Original Wells Fargo POC (the "Amended Wells Fargo POC") asserting an unsecured claim for $839,944.84 which included the following Rule 3001(c)(2)(A) itemization:

| | |
|---|---|
| Principal Balance | $647,065.93 |
| Interest | $0.00 |
| Fees and Charges: (excluding Attorneys' Fees and Costs) | $35,037.19 |
| September 20, 2016 Fee Award | $50,620.76 |
| Unliquidated Post-September 30, 2016 Attorneys' Fees and Costs for Prosecuting Appeals and Actions Taken in Bankruptcy Case: | $107,220.96 |

POC #7-2, Part 2 at 1. Wells Fargo included a disclaimer that it was "still in the process of reviewing the legal effect of the April 29, 2019 conversion of this case to Chapter 7 and reconciling the accounting of the loan based on the conversion." *Id.* Wells Fargo attached a copy of the Henderson Note without the "PAID IN FULL" stamp. *Id.*

The day after Wells Fargo filed the Amended Wells Fargo POC, during hearings on motions brought by the Debtor and the Trustee, counsel for Wells Fargo informed the Court on the record that Wells Fargo had amended its claim and disclosed that "we reconveyed the deed of trust and released the note back to her . . . it was done in error, and we, have case law to back that up. So we are going to assert that that essentially is an unsecured claim that should be paid, including the massive amount attorney's fees she's incurred on it, including the fee award, which is separate and independent of the note itself, and that was never paid." Hearing Transcript for July 17, 2019, Case Dkt. 1020 at 77:10-78:10.[9] The Court and Wells Fargo's counsel discussed whether Wells Fargo was going to sue Debtor for a return of the Henderson Note. *Id*. at 78-80.

---

[9] Wells Fargo was represented at the hearing by Bernard J. Kornberg ("Former Counsel") of Severson & Werson, APC. Mr. Kornberg has changed firms; Severson & Werson remains counsel of record for Wells Fargo regarding the Henderson Property.

1       On August 20, 2019, the Debtor sought a Rule 2004 examination order seeking discovery

2 from Wells Fargo so that she could "investigate the legitimacy" of the Amended Wells Fargo POC.

3 Case Dkt. 1037.  The Debtor again disclosed that the Henderson Note had been returned stamped

4 "PAID IN FULL," noted that the copy of the Henderson Note attached to the amended claim omitted

5 this stamp, and again attached a copy of the stamped Henderson Note.  *Id*. at 8, 19, Exh. F.  The

6 Court denied the Debtor's discovery request without prejudice because, as a chapter 7 debtor, she

7 lacked "standing to prosecute matters on behalf of the bankruptcy estate, including any objection to

8 the amended Wells Fargo" claim and required in any renewed motion that Debtor submit sufficient

9 evidence to "establish a pecuniary interest in the estate" either by showing "that there is a surplus

10 estate or that there is a sufficient possibility that disallowance of Amended POC 7 will produce a

11 surplus estate."  Case Dkt. 1084 at 3-4.

12       Three days later, the Debtor again informed the Court that the Henderson Note had been

13 returned with the "PAID IN FULL" stamp, and that this was missing from the version of the note

14 Wells Fargo attached to the Amended Wells Fargo POC.  Case Dkt. 1046 at 5.

15

16         **F.**     **The Trustee's Motion for Turnover of the Camarillo and Carmel Rental
Properties and the Net Henderson Proceeds & Debtor's Motion to Dismiss**

17       On June 25, 2019, the Debtor moved for an order dismissing this bankruptcy case (the

18 "Motion to Dismiss"), which was opposed by Wells Fargo, BONYM and the Trustee.  Case Dkt.

19 989, 1002, 1003, 1005.  The next day, the Trustee filed a motion seeking an order requiring the

20 Debtor to turn over to the Trustee the Net Henderson Proceeds and the post-conversion rents

21 collected from the Camarillo and Carmel Properties (the "Turnover Motion"), which the Debtor

22 opposed.  Case Dkt. 991, 1004.  Both motions raised the issue: *what assets vested in the chapter 7*

23 *estate upon conversion of the case*?

24       Following supplemental briefing on this issue from all of the parties, the Court held a hearing

25 on August 29, 2019, and ruled from the bench on both motions, denying the Motion to Dismiss and

26 granting the Turnover Motion.  Hearing Transcript for August 29, 2019, Case Dkt. 1059 at 72:8-9

27 ("I'm going to deny the motion to dismiss the case"), 73:4-6 ("[T]he proceeds of the Henderson

28

1    property were property of the estate, and I'm going to order those turned over . . . as well as . . . the

2    three other properties and the rents that are derived from those properties").

3         At that hearing, however, the record was inadequate for the Court to determine the *amount*

4    the Debtor was required to turn over.  The Debtor and the Trustee disputed (i) the amount of the Net

5    Henderson Proceeds remaining as of case conversion on April 29, 2019, and (ii) the amount of the

6    proceeds spent by the Debtor between the closing date on March 26, 2019 and the conversion.

7    Accordingly, on August 30, 2019, the Court entered its *Interim Order Directing Turnover of*

8    *Property of the Estate* (the "Interim Turnover Order").  Case Dkt. 1057.

9         The Court conducted a subsequent hearing on October 7, 2019, on the issue of the amount of

10   remaining Net Henderson Proceeds on the conversion date, and the form of the proposed findings on

11   the Turnover Motion.  At that hearing, the Court set an evidentiary hearing for December 17, 2019,

12   to determine the amount of the remaining Net Henderson Proceeds.

13        Prior to the evidentiary hearing, the Debtor capitulated and agreed to a finding that all

14   $315,078.12 of the Net Henderson Proceeds remained on the conversion date.  Accordingly, on

15   March 31, 2020, the Court entered its findings and conclusions on the Motion to Dismiss and the

16   Turnover Motion and companion orders.  Case Dkt. 1144, 1146, 1148, 1149.   The Debtor appealed

17   from the final turnover order.  The United States District Court affirmed.  CACD Case No. 20-4338-

18   MWF.  The Debtor appealed to the Ninth Circuit, which affirmed the turnover order. *In re Baroni*,

19   36 F.4th at 970.[10]   The Debtor did not appeal from the denial of her Motion to Dismiss and that order

20   is also final.

21

22        **G.    The Trustee Is Authorized to Operate the Carmel and
               Camarillo Rental Properties**

23        The Interim Turnover Order expressly found that the Carmel Property and Camarillo

24   Property, and all rents generated therefrom after the conversion date, were property of the chapter 7

25   estate and ordered immediate turnover by Debtor.  Case Dkt. 1057. On October 9, 2019, the Trustee

26   sought authority to operate the Carmel Property and Camarillo Property from September 9, 2019, to

27

28   [10]  The Ninth Circuit issued its mandate on July 21, 2022.  9th Cir. Case No. 21-55076, Dkt. 39.

September 9, 2020 (the "First Motion to Operate").  Case Dkt. 1086.  The Court granted the First

Motion to Operate effective as of September 9, 2019.  The Court's order expressly authorized the

Trustee to collect rents directly from the tenants of those properties and authorized the Trustee to pay

expenses, including debt service and property taxes.  Case Dkt. 1110.  Based on subsequently filed

motions to operate, the Trustee's authority has been extended to September 9, 2021, and again to

September 9, 2022.  Case Dkt. 1235, 1369.

**H.    Antognini Sues Wells Fargo for Criminal Violations of 18 U.S.C. §152(4).**

On November 14, 2019, Antognini, in his capacity as an unsecured creditor of the chapter 7

estate, filed an adversary complaint (the "Antognini Complaint") against Wells Fargo Bank, N.A.,

seeking disallowance of the Amended Wells Fargo POC.  Adv. 1:19-ap-01134-MB, Dkt. 1.

Antognini alleged the Henderson Note had been returned to the Debtor marked "PAID IN FULL"

but that the Amended Wells Fargo POC did "not disclose that the Note was cancelled, marked PAID

IN FULL and returned to the maker."  *Id*. at ¶¶ 14-16, 20, 28, 40-41.  Among other causes of action,

Antognini sued Wells Fargo for "False Proof of Claim (Violations of 18 U.S.C. § 152)" (the

"Criminal Claim") alleging that the Amended Wells Fargo POC was "false" and that it was filed

"knowingly and fraudulently."  *Id*. at ¶¶ 34-36.

Wells Fargo moved to dismiss the Antognini Complaint, arguing, among other things, that

the Criminal Claim had to be dismissed because "18 U.S.C. §152 does not provide a private right of

action. *In re Nordeen*, 495 B.R. 468, 484-85 (9th Cir. B.A.P. 2013)."  Adv. 1:19-ap-01134-MB,

Dkt. 6 at 9:16-19.  The Court dismissed the Criminal Claim with prejudice, and in its February 6,

2020, oral findings of fact and conclusions of law held:

> Your first cause of action alleges a crime has occurred; that's not a
>
> claims objection.  And as has been pointed out, there is no private
>
> cause of action with respect to the crime you have claimed . . . . With
>
> respect to the criminal count, I would be remiss if I did not dismiss
>
> that without leave to amend.  There's no private cause of action for a
>
> crime . . . that cause of action is not a cause of action.  It is not worth

1    the paper it is written on, even if you had established your standing to

2    file the complaint.

3    Audio Record of Proceedings held February 6, 2020.[11]   The Court entered its *Order on Wells Fargo*

4    *Bank, N.A., as Trustee, etc.'s Motion to Dismiss and to Strike Pursuant to Federal Rule of*

5    *Bankruptcy Procedure 7012*, dismissing the Criminal Claim with prejudice on April 13, 2020.  Adv.

6    1:19-ap-01134-MB, Dkt. 45.  No appeal was filed and that order is final.

7        **I.    The February 6, 2020 Ex Parte Communication.**

8        On February 6, 2020, after the conclusion of the hearing on Wells Fargo's motion to dismiss

9    the Antognini Complaint and other matters, one of the Trustee's attorneys, Jessica Bagdanov,

10   appeared in the courtroom, on the record, just as the Court was about to adjourn.  Bagdanov

11   appeared visibly distraught and stated that while she was engaged with "very upset pro se litigants"

12   involved in a case before Judge Victoria Kaufman, she noticed the Debtor was watching and

13   Bagdanov "perceived her to be videotaping me . . . I perceived her to be videotaping me with her

14   iPhone up . . ."  *See* Unofficial Hearing Transcript, February 6, 2020 (filed by the Debtor), Case Dkt.

15   1378 at 100-01.  A Court Security Officer was present and asked Bagdanov to tell the Court what

16   had happened.  *Id*. at 101, 104.  The Court inquired why Bagdanov was so upset and whether she felt

17   physically threatened.  Bagdanov clarified that she did not feel physically threatened by the Debtor,

18   but instead by the pro se parties in the case before Judge Kaufman.  Bagdanov, however, volunteered

19   she was concerned about what the Debtor would do with the video.  *Id*. at 103.  Bagdanov also stated

20   that that there had "been issues this week that I will not get into because they are not before, you

21   with some harassment of the trustee's broker on one of the properties by her family members."  *Id*.

22   After determining that there was no imminent threat to Bagdanov, that additional communication

23   was neither necessary nor appropriate, and encouraging her to seek the assistance of the Court

24   Security Officers if she ever felt she needed it, the Court adjourned for the day.  The Court's

25

26

27   [11] No party requested a written transcript of this hearing.  The Court derived this statement from the audio recording of the hearing held February 6, 2020.  Exhibit A to the Motion is an unofficial transcript of the final moments of the February 6, 2020 hearings.  Case Dkt. 1378 at 98-106.  The Debtor incorrectly describes this transcript as an "official transcript."  *Id*. at 74, ¶ 10.

28

1  conversation was on the record; no communications occurred that were not recorded.  *See* Case Dkt.

2  1378 at 98-106.

3      The Court Security Officer on duty filed a "Court Facility Incident Report" regarding a "loud

4  conversation" between parties exiting Judge Kaufman's courtroom that grew increasingly intense and

5  appeared that it "might end in a physical altercation."  Court Facility Incident Report, Case Dkt.

6  1126 at 2.  The Officer noticed the Debtor "filming the encounter with her cell phone" and

7  "attempted to contact Ms. Baroni re: the policy on filming in the building.  However, she had made

8  her way downstairs and out of the building before I could do so."  *Id*.  A different Court Security

9  Officer escorted Bagdanov downstairs and both Officers escorted her out of the building.  The

10  Officers noticed the Debtor talking with the parties who had appeared before Judge Kaufman, and

11  photographed the parties, attaching the photograph to the Incident Report.  *Id*. at 3-4.

12      The following day, February 7, 2020, the Court filed a *Notice of Ex Parte Communication*

13  *and Order Setting Deadline for Any Responses Thereto* (the "Ex Parte Notice") in the main

14  bankruptcy case as well as the adversary proceeding filed by Antognini.  Case Dkt. 1118; Adv. 1:19-

15  ap-01134-MB, Dkt. 34.  In response to the Ex Parte Notice, the Trustee filed a *Notice of Filing of*

16  *Incident Report* and the Debtor filed the *Declaration of Allana Baroni in Response to Court's Notice*

17  *of Ex Parte Communication*.  Case Dkt. 1126, 1127.  After reviewing the parties' submissions, the

18  Court concluded that there was no additional action to be taken by the Court in respect of the

19  incident.

20      **J.  The Trustee's Settlement with the Rental Lenders.**

21      In the meantime, the Trustee negotiated a settlement with BONYM, Nationstar, and Wells

22  Fargo (collectively, the "Rental Lenders" and the "Rental Lenders Settlement").  As described above,

23  the confirmed Plan bifurcated the claims of the Rental Lenders into secured claims and unsecured

24  claims.  BONYM's claim was bifurcated into a secured claim of $1,145,000 and an unsecured claim

25  of $256,460, Nationstar's claim was bifurcated into a secured claim of $1,400,000 and an unsecured

26  claim of $80,705, Wells Fargo's claim was bifurcated into a secured claim of $196,000 and an

27  unsecured claim of $605,712.  Case Dkt. 376 at 26, 28, 30.

28

The Trustee, on the one hand, and BONYM and Nationstar, on the other hand, disagreed as to whether conversion of the case to chapter 7 unwound the bifurcation of their claims. BONYM and Nationstar contended that it did and that their secured claims were no longer capped by the amounts stated in the Plan. The Trustee, however, believed the bifurcation in the Plan still controlled, and capped the amount of the secured claims of BONYM and Nationstar at $1,145,000 and $1,400,000, respectively. Case Dkt. 1120 at 20 ("As an initial matter, the Trustee and the Rental Lenders disagreed as to whether or not the bifurcation of claims under the Plan survived the conversion of the case to chapter 7. The Rental Lenders asserted that it did not, and thus they had entirely secured claims. The Trustee asserted that the bifurcation of the Rental Lenders' claims survived conversion. The treatment of the Rental Lenders' claims in this case is dependent upon whether or not the bifurcation survived conversion of the case and the Debtor's failure to consummate the Plan. The Trustee believes that this issue alone could involve extensive and expensive litigation as there is a paucity of case law on the issue.").

A dispute also existed between the Trustee, on the one hand, and BONYM and Nationstar, on the other hand, regarding the funds paid by the Debtor into reserve accounts post-confirmation pursuant to the Plan. The Plan required the Debtor to establish separate reserve accounts for each of the Rental Lenders, and for OneWest Bank, FSB, as well as a fifth separate reserve account for payments to members of the general unsecured class with disputed claims. Case Dkt. 376 at 19-20. After conversion of the case to chapter 7, the Trustee demanded the Debtor turn over all the funds in these reserve accounts.

The Debtor complied and tendered a lump sum of $533,307.62 in funds to the Trustee but was either unable or unwilling to provide any tracing of rents into the reserve accounts and only a limited accounting regarding what amounts had been reserved for BONYM and Nationstar (and apparently no accounting of the amounts reserved for the general unsecured class).

BONYM and Nationstar contended that none of the $533,307.62 (the "Disputed Funds") became property of the chapter 7 estate, arguing that pursuant to the Plan such funds were held in trust for the allowed claim holder. They also asserted that the sum of what the Debtor was required to reserve on behalf of BONYM and Nationstar was more than $533,307.62. Because the Debtor

failed to provide tracing or an adequate accounting, the Trustee was unconvinced that the entirety of the Disputed Funds belonged to BONYM and Nationstar and he contended such funds were property of the chapter 7 estate.

The Trustee also disputed the amount of the claims of the Rental Lenders, including the Amended Wells Fargo POC, each of which included significant attorneys' fees and costs incurred post-confirmation.  The Trustee contended that Wells Fargo's entitlement to an unsecured claim in the chapter 7 case was based on the Plan, rather than the Amended Wells Fargo POC filed following the sale of the Henderson Property and the conversion of the case.  According to the Trustee, Wells Fargo had a $605,712.98 unsecured claim based on the Plan bifurcation and that only its secured claim was satisfied from the Debtor's pre-conversion sale of the Henderson Property.

Upon conversion, the Trustee also became the real party in interest in two pending adversary proceedings filed by the Debtor.  The first was *Baroni v. Nationstar Mortgage LLC*, adversary proceeding 13-01069 (the "Nationstar Adversary").  In 2014, the Court entered summary judgment in this adversary in favor of Nationstar on all causes of action asserted by the Debtor.  The BAP subsequently affirmed in part, reversed in part and remanded for further proceedings to determine whether the original promissory note secured by the Carmel Property was duly endorsed in blank such that Nationstar qualified as a holder of the note.  *Baroni v. Nationstar Mortgage, LLC* (*In re Baroni*), 2015 WL 695664 (9th Cir. B.A.P. 2015).  The Court thereafter conducted a trial on that issue in October 2018.  Before judgment was entered, however, the bankruptcy case was converted, and the Trustee became the real party in interest in place of the Debtor.

The second was *Baroni v. Specialized Loan Servicing, LLC,* adversary proceeding 19-01037 (the "Second BONYM Adversary").  As detailed above, in 2016, BONYM prevailed in the Debtor's adversary proceeding seeking to disallow its proof of claim.  That judgment became final in 2018, when the Supreme Court denied the Debtor's petition for certiorari.  On April 9, 2019, approximately 50 minutes before the hearing on BONYM's motion to convert the case to chapter 7, the Debtor filed the Second BONYM Adversary against BONYM and its agents seeking disallowance of BONYM's proof of claim.  After the Court converted the bankruptcy case, the Trustee became the real party in interest in the Second BONYM Adversary.

1    On February 21, 2020, the Trustee filed his motion (the "Compromise Motion") to approve

2    the Rental Lenders Settlement, a comprehensive settlement between the Trustee, BONYM,

3    Nationstar and Wells Fargo.  Case Dkt. 1120.  In pertinent part, the parties agreed to the following:

4    **BONYM**

5    • BONYM's claim remains bifurcated with a secured claim of $1,145,000 (the same amount as

6       provided in the Plan), an unsecured claim of $403,359 and an administrative claim of

7       $41,150 for pre-conversion property tax advances;

8    • BONYM reduces its claim to the Disputed Funds from $242,610 to $60,652, which amount

9       the Trustee shall turn over to BONYM;

10   • The Trustee will market and sell the Camarillo Property and BONYM agrees to carve out

11      $75,000 from its $1,145,000 secured claim for the estate; and

12   • The Trustee will dismiss the Second BONYM Adversary.

13   **Nationstar**

14   • Nationstar's claim remains bifurcated with a secured claim of $1,400,000 (the same amount

15      as provided in the Plan), an unsecured claim of $363,971 and an administrative claim of

16      $44,211 for pre-conversion property tax advances;

17   • Nationstar reduces its claim to the Disputed Funds from $295,416 to $73,854, which amount

18      the Trustee shall turn over to Nationstar;

19   • The Trustee will market and sell the Carmel Property and Nationstar agrees to carve out

20      $75,000 from its $1,400,000 secured claim for the estate;[12] and

21   • The Trustee stipulates to entry of judgment in favor of Nationstar in the Nationstar

22      Adversary.

23

24   _____

25   [12]  The Trustee sold the Carmel Property for $1,400,000, subject to the $75,000 carve out for the
      estate.  The Debtor appealed from the sale order (the "Carmel Sale Order").  The BAP affirmed the

26   Carmel Sale Order on July 13, 2021.  *Baroni v. Seror (In re Baroni)*, 2021 WL 3011907, *8 (9th Cir.
      B.A.P., Jul. 13, 2021).  The Debtor appealed to the Ninth Circuit but later moved to dismiss her

27   appeal.  On June 28, 2022, the Ninth Circuit granted her motion and dismissed the appeal.   9th Cir.
      Case No. 21-60046, Dkt. 33.  The Carmel Sale Order, and the BAP opinion affirming that order, are

28   now final.

**Wells Fargo**

- Wells Fargo is allowed an unsecured claim in the amount of $450,000 and will further amend the Amended Wells Fargo POC to reduce the amount from $839,944 to $450,000.

*Id.*

The Debtor opposed the Compromise Motion, principally based on her contention that the Disputed Funds, the Carmel Property and the Camarillo Property were not property of the chapter 7 estate—matters that were then on appeal in connection with the Court's turnover order. The Debtor also argued that Wells Fargo waived its $605,712 unsecured claim by failing to include this amount in its escrow demand at the time of her pre-conversion sale of the Henderson Property and by thereafter returning the original promissory note to the Debtor. In his response, the Trustee reaffirmed his position that Wells Fargo had an unsecured claim based on the terms of the confirmed Plan:

> For some inexplicable reason, the Debtor and her counsel seem to think that the Debtor's failure to consummate her plan somehow undoes the terms of the plan. It does not. . . . When the Debtor sold the Henderson Property (after BoNYM filed its motion to convert but before the motion was granted), Wells Fargo put its demand into escrow for its secured claim – which is all that it was legally entitled to do. Wells Fargo then returned the promissory note as "paid in full" because the secured claim was paid in full. The Debtor's arguments that Wells Fargo somehow isn't entitled to the general unsecured claim that the terms of her plan gave to Wells Fargo are disingenuous at best. . . . The terms of the plan clearly show that Wells Fargo obtained a general unsecured claim in the amount of $605,712.98. This claim was never disallowed and the Debtor's argument that Wells Fargo gave up its right to its unsecured claim when it gave escrow an amount to pay off the secured claim are inane at best.

Case Dkt. 1132 at 3-4, 6.

Prior to the hearing on the Compromise Motion, the Debtor's husband, James Baroni, moved for more time to file an opposition. Case Dkt. 1130. The Court granted James Baroni's motion, extended his opposition deadline and continued the hearing on the compromise motion. Case Dkt. 1140. On April 3, 2020, at a continued hearing on the Compromise Motion, James Baroni again requested more time, indicating that he wanted time to evaluate whether to assert his section 363(i) rights regarding the effective sale by the estate of the causes of action in the Second BONYM Adversary and the Nationstar Adversary. The Court again granted James Baroni's request for more time, set a deadline for him to file a matching or competing offer to the offer made by the Rental Lenders in the settlement, and continued the hearing on the compromise motion to May 1, 2020.

James Baroni declined to make a section 363(i) offer and the Court granted the Trustee's Compromise Motion over the oppositions of James Baroni and the Debtor. Case Dkt. 1272, 1273. The Debtor appealed from the Court's order approving the Rental Lender Settlement (the "Compromise Order") but James Baroni did not. On appeal, the BAP affirmed the Compromise Order. *Baroni v. Seror (In re Baroni)*, 2021 WL 3011907, *7-8 (9th Cir. B.A.P., Jul. 13, 2021). The Debtor has appealed to the Ninth Circuit and that appeal remains pending.

### K. The Debtor Files the Present Motion; Antognini Joins the Motion Two Days Before the Hearing; and The Debtor Belatedly Requests Discovery to Save Her Motion.

The Debtor filed this Motion on November 17, 2021 and chose to set it for hearing on December 8, 2021, presumably to coincide with the hearing in the *First Interim Application of Brutzkus Gubner, Counsel for the Chapter 7 Trustee, etc.* (the "Interim Fee App"). Case Dkt. 1378. The Debtor objected to the Interim Fee App, principally for the same reasons detailed in this Motion. Case Dkt. 1395. On December 1, 2021, Brutzkus Guber filed its reply in support of its Interim Fee App, (i) arguing the Debtor lacked standing to object to the Interim Fee App, citing *Fondiller v. Robertson (Matter of Fondiller)*, 707 F.2d 441, 442 (9th Cir. 1983), *In re Benham*, 678 Fed. Appx. 474, 476 (9th Cir. 2017) and (ii) noting the Debtor's lack of standing has been raised multiple times in this chapter 7 case. Case Dkt. 1396 at 2-3.

On December 6, 2021, just five days after Brutzkus Gubner argued the Debtor lacked standing, Antognini filed a two-sentence joinder to this Motion (the "Joinder").  Case Dkt. 1402.[13] The Joinder failed to include the disclosure required by LBR 9013-1(l) that (1) Antognini had previously filed a complaint alleging the Criminal Claim based on 18 U.S.C. § 152 against Wells Fargo and (2) this Court had dismissed the Criminal Claim with prejudice, expressly stating at its hearing held on February 6, 2020: "[t]here's no private cause of action for a crime. . . that cause of action is not a cause of action.  It is not worth the paper it is written on, even if you had established your standing to file the complaint."

The Court held its initial hearings on the Motion and Interim Fee App on December 8, 2021 (the "December 8 Hearing").  After more than two hours of argument, the Court stated that the Debtor's principal argument advanced in her Motion—that the filing of a proof of claim can be fraudulent as a matter of law—was implausible and that her Motion was fatally flawed for failing to submit any evidence of criminal intent by the Trustee, Wells Fargo and its Former Counsel.  Hearing Transcript for December 8, 2021, Case Dkt. 1411 at 75:25-76:5.  The Debtor thereafter requested an opportunity to depose Wells Fargo, but the Court denied this request.  *Id.* at 76:10-22 ("[Y]ou could have filed this motion, set it for three months from now, and done your own discovery, because you'd have a pending contested matter. You didn't choose to do that, and I'm not going to reward the Debtor, in its planning, or lack of planning or diligence, with respect to this motion").  The Court nevertheless continued the hearings on the Motion and the Interim Fee App, and entered a scheduling order allowing all parties to submit supplemental evidence and briefing, as well as supplemental reply briefs.  Case Dkt. 1410.

Two days after the hearing, despite the Court having denied the Debtor's request to conduct discovery, the Debtor and Antognini noticed the depositions of the Trustee, Wells Fargo, and its Former Counsel, propounded twelve sets of written discovery and served subpoenas on Brutzkus Gubner.  Case Dkt. 1413 at 141-144, 146-149, 151-155, 157-161, 163-168, 170-177, 192-202 and 204-232.  The Trustee filed an emergency motion, essentially asking the Court to issue an order

---

[13]  The following day Antognini also filed a two-sentence joinder to the Debtor's objection to the Interim Fee App.  Case Dkt. 1403.

1  stating that it meant what it said at the December 8 hearing when it denied Debtor's oral request to

2  conduct discovery.  Case Dkt. 1413.  The Court granted the emergency motion and expressly stayed

3  all discovery until further order of the Court.  Case Dkt. 1417.

4      The Court held a continued hearing on the Motion and Interim Fee App on February 8, 2022

5  (the "February 8 Hearing").  At the conclusion of the arguments, the Court expressly ruled that

6  evidence was closed, discovery was not permitted, and no further briefing would be permitted.

7  Hearing Transcript for February 8, 2022, Case Dkt. 1453 at 140:4-7 ("All right. The -- just to be

8  perfectly clear, the evidence is closed.  The matter is submitted.  There should be no more briefing.

9  There should be no more submissions.  There should be no discovery.  The matter is submitted").

10     On February 18, 2022, the Debtor and Antognini filed a notice of appeal from what they

11  describe as this Court's "oral order denying debtor and creditor's demands for discovery in

12  connection with their Motion to Remove the Chapter 7 trustee, and in connection with the First

13  Interim Application of Brutzkus Gubner Counsel for the Chapter 7 Trustee for Compensation of

14  Fees and Expenses."  Case Dkt. 1448.  On April 4, 2022, the BAP dismissed that appeal.  BAP Case

15  No. 22-1021, Dkt. 6.  The Debtor and Antognini have appealed to the Ninth Circuit, where their

16  appeal remains pending.

17     **L.  Pending Appeals Relevant to the Motion.**

18     The Debtor and Antognini have appealed from nineteen orders entered in this case and

19  related adversary proceedings.  Of those, there are three pending appeals that relate to the issues

20  raised in the Motion or in oral arguments on the Motion:

21     - Appeal from the Compromise Order, affirmed by the BAP, currently pending before

22       the Court of Appeals, case number 21-60045;

23     - Appeals related to Antognini's objections to the Amended Wells Fargo POC and

24       BONYM's proof of claim no. 10 (1:19-ap-01134-MB), affirmed by United States

25       District Court, currently pending before the Court of Appeals, case number 21-56000;

26       and

27     - Interlocutory appeal by the Debtor and Antognini regarding the Court closing

28       evidence on this Motion at the conclusion of argument at the February 8 Hearing,

1   dismissed by the BAP, currently pending before the Court of Appeals, case number

2   22-60011.

3                                            **II.**

4                                    **LEGAL ANALYSIS**

5   **A.  Criminal Referral Request**

6       **1.  Statutory Standing**

7       The Debtor and Antognini request criminal referrals of the Trustee, Wells Fargo and Former

8   Counsel to Wells Fargo pursuant to 18 U.S.C. § 3057.  The statute provides as follows:

9           (a)  Any judge, receiver, or trustee having reasonable grounds for believing

10          that any violation under chapter 9 of this title or other laws of the United States

11          relating to insolvent debtors, receiverships or reorganization plans has been

12          committed, or that an investigation should be had in connection therewith, shall report

13          to the appropriate United States attorney all the facts and circumstances of the case,

14          the names of the witnesses and the offense or offenses believed to have been

15          committed. Where one of such officers has made such report, the others need not do

16          so.

17          (b)  The United States attorney thereupon shall inquire into the facts and

18          report thereon to the judge, and if it appears probable that any such offense has been

19          committed, shall without delay, present the matter to the grand jury, unless upon

20          inquiry and examination he decides that the ends of public justice do not require

21          investigation or prosecution, in which case he shall report the facts to the Attorney

22          General for his direction.

23   18 U.S.C. § 3057.

24       Courts repeatedly have held that although this statute imposes a duty on the bankruptcy court

25   to make a criminal referral when it has "reasonable grounds for believing" that a bankruptcy crime

26   has occurred, the statute does not confer standing on litigants to request such a referral from the

27   court.  *See In re Inglewood Woman's Club, Inc.*, 2017 WL 2492530 at *4 n.3 (9th Cir. B.A.P. May

28   18, 2017); *Virginia Hosp. Ct. v. Akl (In re Akl)*, 2010 WL 1667294 (Bankr. D.C. April 23, 2010); *In*

*re Barkal*, 397 B.R. 905, 905-06 (Bankr. N.D. Ind. 2008); *In re Walker*, 2006 WL 3483480 at *2-3 (Bankr. S.D. Fla. 2006); *In re Valentine*, 196 B.R. 386, 386-388 (Bankr. E.D. Mich. 1996).  The Court finds these cases persuasive, and in particular Judge Rhoades' analysis of this issue in *In re Valentine.*

As a threshold matter, nothing in section 3057—nor any other language in titles 11 or 18 of the United States Code or the Federal Rules of Bankruptcy Procedure—expressly authorizes a party to seek this kind of relief.  *See* 18 U.S.C. § 3057; *In re Valentine*, 196 B.R. at 387.  The text speaks only to the obligation of a judge, receiver, or trustee to make a referral if there are reasonable grounds for believing that a criminal violation has occurred, or that an investigation should be had. In other words, the statute commands: "If you see something, say something."  The statute says nothing about the making of a referral *upon the request of a party in interest*.  *See U.S. v. Wells,* 519 U.S. 482, 496 (1997) ("we have frequently cautioned that it is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law") (internal quotations omitted).[14]

The Debtor and Antognini nevertheless argue that what the statute does not expressly prohibit must necessarily be permitted.  The Court is not persuaded.

Congress knows how to authorize a party to seek judicial relief when Congress intends to do so.  In some instances, the statutory text specifically uses the term "motion" or refers to a "request" of a party in interest.  *See, e.g.,* 11 U.S.C. § 105(a) ("The court, on its own motion or on the request of a party in interest" may hold status conferences and enter orders implementing provisions of the Bankruptcy Code); 18 U.S.C. § 3553(d) ("Upon motion of the defendant or the Government, or on its own motion, the court shall" permit the certain statements or evidence to be received as part of the presentencing procedure).  In most other instances, the statute permits action with the express "approval" of the court, or the implicit approval of the court after "notice and hearing."  *See, e.g.,* 11 U.S.C. § 365 ("the trustee, subject to the court's approval, may assume or reject any executory

---

[14]  Congress has imposed a similar duty on the United States Trustee to refer potential crimes for investigation using language that likewise does not require or provide for a request by a party in interest.  *See* 28 U.S.C. § 586(a)(3)(F); *In re Valentine*, 196 B.R. at 387.

contract or unexpired lease of the debtor"); § 363(b) ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . .").

But in all these examples, the statutory text indicates—explicitly or implicitly—an intent by Congress that the courts authorize, direct, or mandate certain actions or legal consequences.  Courts do so through *orders*.  *See* Black's Law Dictionary (6th ed. 1990) at 1096 (defining "order" as "[a] mandate; precept; command or direction authoritatively given; rule or regulation" and also as a "[d]irection of a court or judge made or entered in writing, and not included in a judgment, which determines some point or directs some step in the proceedings."  Moreover, the filing of a "motion" is how an order is requested.  *See* Fed. R. Bankr. P. 9013 (a request for an order is generally made by motion); Black's Law Dictionary at 1096 ("[a]n application for an order is a motion").

Here, it is clear from the text of 18 U.S.C. § 3057 that the objective of the statute is not the issuance of any order of the court authorizing, directing, or mandating anything.  Instead, the statute identifies the circumstances under which a judge, among others, is under a legal duty to make a "referral" to the United States attorney for further investigation.  A referral is not an order.  It is a communication to the appropriate authority that cause may exist to investigate a matter further, but it is not a mandate to do so.  Whether and to what extent an investigation takes place is entirely within the purview of the United States attorney, in accordance with section 3057(b).  *See also In re Inglewood Woman's Club, Inc.*, 2017 WL 2492530 (9th Cir. B.A.P. May 18, 2017) (bankruptcy court lacks jurisdiction to compel a criminal investigation).

Moreover, the text of the statute imposes the same legal duty to make referrals on "[a]ny judge, receiver, *or* trustee."  18 U.S.C. § 3057(a) (emphasis added).  Although judges hear and grant motions, receivers and trustees do not.  Because Congress chose text that put these officers on the same footing and drew no distinction between them, it must be concluded that the statute was intended to function the same with respect to each of them.  Congress surely could have drafted language indicating that, in the case of judges, a referral could be made upon the presentation of a motion by a party in interest.  But that is not what Congress drafted.

Beyond the text of the statute, there are other important reasons to reject the Debtor's and Antognini's argument.

1    First, a procedural mechanism for parties in interest to seek a criminal referral by motion is

2    simply not necessary. *In re Valentine*, 196 B.R. at 387-88. Parties in interest—indeed all persons—

3    already have the unfettered right to report potential bankruptcy crimes for investigation directly to

4    the United States attorney. No court order or referral is necessary. It makes no sense to infer from

5    the statute an intent to permit parties to file a motion seeking a court order or referral when none is

6    required.

7    Second, it appears from the legislative history that section 3057 "was intended primarily as

8    an administrative measure—a congressional directive to the district offices of the United States

9    Attorneys to become more active in the prosecution of bankruptcy fraud cases." *In re Valentine*, 196

10    B.R. at 387-88 (quoting *United States v. Filiberti*, 353 F. Supp. 252, 253 (D. Conn. 1973) (citing and

11    quoting legislative history)). Imposing a legal duty on certain court officers to make a criminal

12    referral under appropriate circumstances clearly advances this objective. Creating an unnecessary

13    procedural mechanism for parties to request such a referral would not.

14    Third, the BAP has held that a creditor has no due process right to or an opportunity to be

15    heard before a criminal referral is made. *Seidel v. Durkin (In re Goodwin)*, 194 B.R. 214, 223 (9th

16    Cir. B.A.P. 1996). It would make little sense (and violate due process) to authorize a party to

17    publicly file a motion seeking a criminal referral when the subject of that motion has no right to

18    respond.

19    Fourth, recognition of a private right to seek a criminal referral by motion would "upset the

20    delicate balance of the rights expressly articulated by the Congress in the Bankruptcy Code." *In re*

21    *Valentine*, 196 B.R. at 387. In *In re Valentine,* the moving party seeking a criminal referral from the

22    bankruptcy court was a creditor. Here, the Debtor and a creditor (her attorney) are seeking a

23    criminal referral of another creditor and the chapter 7 trustee. But the point made in *In re Valentine*

24    is still instructive. As explained further below, permitting parties in interest to make accusations of

25    criminal wrongdoing and force respondents to defend against a criminal referral would upset the

26    balance of rights and remedies established by Congress in connection with the liquidation of a

27    bankruptcy estate by giving parties a bludgeon with which to leverage others. *See Hurlburt v. Black*,

28    925 F.3d 154, 176 (4th Cir. 2019) (en banc) (J. Wynn, dissenting) ("It is ultimately Congress's

province to strike the "delicate balance" between the various interests in bankruptcy.  Bankruptcy is a field rife with unintended consequences when that 'delicate balance' is disturbed") (citing *Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1415 (2017)).

Fifth,  permitting a motion requesting a criminal referral would upend the principles that inform the federal grand jury process and the protections it provides the accused.  What the Debtor and Antognini effectively argue is that Congress—by implication—has sanctioned the public filing of a motion accusing parties of criminal wrongdoing, required the accused to publicly respond to those accusations, and required a public *adjudication* by the bankruptcy court whether reasonable grounds exist to conclude that a crime has been committed.  Such a procedure would be inconsistent with the federal grand jury process, which is structured to protect individuals who are investigated for criminal wrongdoing but whom a grand jury ultimately determines not to indict.  It also would exceed the scope of this Court's jurisdiction, which is limited to a narrow universe of "civil proceedings."  *See* 28 U.S.C. § 1334(b).

A person who "knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as or through an agent, proxy, or attorney" shall "be fined under this title, imprisoned not more than 5 years, or both."  18 U.S.C. § 152(4).  Thus, the crime of which the Trustee and Wells Fargo are accused in the Motion is a felony, which may only be prosecuted by indictment.  *See* U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury. . .");  Fed. R. Crim. P. 7(a)(1)(B) (an offense is a felony if it is punishable by imprisonment of more than one year).  Only a federal grand jury may issue an indictment, and only if 12 members of the grand jury concur.  Fed. R. Crim P. 6(f).

"The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed." *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991).  The grand jury is "convened as a body of laymen, free from technical rules, acting in secret, pledged to indict no one because of prejudice and to free no one because of special favor." *Costello v. United States*, 350 U.S. 359, 362 (1956).  It has the power to issue subpoenas and "compel the production of evidence or the testimony of witnesses

1   as it considers appropriate. . . ." *United States v. R. Enters., Inc.*, 498 U.S. at 298.  "[Its] singular

2   role [is] in finding the probable cause necessary to initiate a prosecution for a serious crime." *Kaley*

3   *v. United States*, 571 U.S. 320, 328 (2014) (citing *Costello v. United States*, 350 U.S. at 362).  This

4   is an important and powerful gatekeeping role, given "the economic, reputational, and personal harm

5   [that commencement of a criminal prosecution] entails." *Id.* at 329.

6          Not surprisingly, the work of the grand jury is generally protected from public disclosure.

7   *See* Fed. R. Crim. P. 6(e).  "One of the several interests promoted by grand jury secrecy is the

8   protection of the innocent accused from disclosure of the accusations made against him before the

9   grand jury." *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 237 n.8 (1979).  Secrecy protects

10  the "innocent accused who is exonerated from disclosure of the fact that he has been under

11  investigation, and from the expense of standing trial where there was no probability of guilt." *Id.* at

12  237 n.10 (quoting *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681-82 n.6 (1958)).

13         To be sure, a criminal referral by a bankruptcy judge under section 3057 is not itself an

14  indictment.  Section 3057(a) directs a bankruptcy judge who has "reasonable grounds for believing"

15  that a bankruptcy crime has occurred to refer matter to the United States Attorney.  Section 3057(b)

16  then directs the United States Attorney to "inquire into the facts . . . and if it appears probable that

17  any such offense has been committed, shall without delay, present the matter to the grand jury. . . ."

18         But nothing in the text of section 3057 suggests or requires that a criminal referral by a

19  bankruptcy judge be made publicly.  As soon as a referral is transmitted to the United States

20  Attorney, it becomes subject to Department of Justice policies that preclude its public disclosure.

21  *See* Justice Manual, § 1-7.400 (policy not to confirm or deny the existence of any investigation or

22  comment thereon prior to the public filing of criminal charges); *see also* Justice Manual, § 1-7.100

23  (general policy not to disclose sensitive, non-public information).  If the matter is thereafter

24  presented to the grand jury for investigation, it becomes subject to the secrecy restrictions of Federal

25  Rule of Criminal Procedure 6(e).

26         By contrast, permitting a party in interest to request a criminal referral by motion is

27  inherently public.  The filing of a referral motion constitutes a formal, public accusation of criminal

28  wrongdoing—outside the grand jury process—that poses potential economic, reputational, and

personal harm to the accused.  By its very nature, such a motion seeks a public adjudication by the bankruptcy court that there are "reasonable grounds" to believe that a bankruptcy crime has been committed.  Such a motion performs an end-run around the ordinarily secret grand jury process, which involves the non-public investigation of potential crimes and the generally non-public determination whether there is probable cause to pursue a federal criminal prosecution.

If a bankruptcy court entertains and grants a motion seeking a criminal referral, but the grand jury decides not to indict, there is little solace for the exonerated party.  The damage is already done.  Irrespective of a grand jury's ultimate decision not to indict (which is non-public), the motion itself has exposed the respondent to public accusations of criminal wrongdoing, the threat of potential prosecution, the costs of opposing the motion, and the emotional toll associated with the entire ordeal.  There is nothing in the text or structure of section 3057 to suggest that Congress intended such a result.  Further, nothing in the statute expresses an intent to invest the bankruptcy court with investigative powers or to subject its discretion in making criminal referrals to the adversarial process.

For these reasons, permitting parties in interest in bankruptcy to litigate over a criminal referral is an invitation for mischief.  As noted, the Bankruptcy Code reflects a delicate balance of rights and obligations among the parties in a bankruptcy case.  Allowing a party to litigate whether the bankruptcy judge should make a criminal referral gives the party making the accusations leverage in the bankruptcy case that Congress did not intend.  It does not matter whether the bankruptcy judge ultimately finds cause to make the referral.  The unfairness is in permitting the motion to be filed.  Doing so imposes on the respondent an undue burden, having to publicly litigate allegations of criminal wrongdoing—in the bankruptcy court of all places—without the procedural protections of the grand jury process.

This is precisely why the California Rules of Professional Conduct for Attorneys prohibit the making of criminal allegations to gain advantage in civil matters.  *See* Cal. Rules of Prof. Conduct, Rule 3.10(a) (A lawyer shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute).  Indeed, a motion seeking a criminal referral is worse than a mere threat.  A motion requesting a criminal referral is public and seeks a public finding by the

1    bankruptcy court that there are "reasonable grounds" to conclude the respondent has committed a

2    crime.  That the making of such a motion is likely aimed at gaining advantage in the bankruptcy case

3    is underscored by the fact that it is not necessary.  A party in interest who believes a crime has been

4    committed may report the alleged crime without the intervention of the court.

5    The two cases cited by the Debtor are not persuasive.  In *Narumanchi v. Abdelsayed (In re*

6    *Narumanchi)*, 471 B.R. 35, 44-45 (D. Conn. 2012), the district court found that the bankruptcy court

7    did not err in exercising its discretion to not refer a matter to the United States attorney.  Although

8    the district court noted the decision in *In re Valentine* concluding that no standing exists to seek a

9    referral, the court did not analyze the issue.

10    The decision in *Alix v. McKinsey & Co., Inc.*, 23 F.4th 196 (2d Cir. 2022) is even less

11    helpful.  There, the Second Circuit Court of Appeals reversed the district court's dismissal of a RICO

12    lawsuit based on allegations of misconduct in various bankruptcy cases.  The district court had

13    dismissed the complaint on the ground that it did not adequately plead proximate cause.  As part of

14    its own proximate cause analysis, the court of appeals found that the defendant had not demonstrated

15    that any party other than plaintiff was "better situated to sue." *Id.* at 208.  The case did not involve

16    18 U.S.C. § 3057 or address the issue of whether this statute grants parties in interest a procedural

17    right to request a criminal referral.

18    In short, the Court has a duty under 18 U.S.C. § 3057 to refer a matter for further

19    investigation by the appropriate authorities where it finds "reasonable grounds for believing" that a

20    bankruptcy crime has occurred, but parties in interest do not have statutory standing to request such

21    a referral or demand a ruling on that request.

22    **2.  Merits**

23    Considering the foregoing, the Court is reluctant to address the merits of whether there are

24    "reasonable grounds for believing that" Wells Fargo, its Former Counsel, and the Trustee may have

25    committed a bankruptcy crime.  18 U.S.C. § 3057.  By addressing the merits, the Court runs the risk

26    of inadvertently rewarding the Debtor and Antognini for filing a motion that section 3057 does not

27    authorize.  Regardless of the outcome, permitting the movants to litigate the potential criminal

28

liability of the respondents in the bankruptcy court, and requiring those parties to defend themselves in the bankruptcy court, is itself injurious.

But the Court recognizes there is no *binding* case law in this Circuit prohibiting the filing of a motion for a criminal referral under section 3057. The Court also recognizes that public accusations of criminal wrongdoing—such as those that are contained in the Motion—may have serious personal reputational and economic consequences for the respondents. For these reasons, the Court is compelled to address the merits of those accusations, even though the Court firmly believes that the movants do not have standing to insist upon such an adjudication.[15]

As explained below, the Court concludes that a criminal referral is not warranted. The Court finds no "reasonable grounds for believing" that either Wells Fargo, its Former Counsel or the Trustee violated 18 U.S.C. § 152(4) with respect to the Amended Wells Fargo POC.

### a. The Criminal Statute: 18 U.S.C. § 152(4)

In pertinent part, section 152(4) of title 18 of the United States Code provides that "A person who—knowingly and fraudulently presents any false claim for proof against the estate of a debtor, or uses any such claim in any case under title 11, in a personal capacity or as or through an agent, proxy, or attorney. . . shall be fined under this title, imprisoned not more than 5 years, or both." 18 U.S.C. § 152(4).

The elements of the crime are: (1) bankruptcy proceedings must have been commenced; (2) a proof of claim was willfully presented; (3) the proof of claim was false as to a material matter; and (4) the defendant knew the proof of claim was false at the time and acted knowingly and fraudulently. Tighe, *A Guide To Making A Criminal Law Referral*, 6 Am. Bankr. Inst. L. Rev. 409, 427 (Winter 1998) (citing *United States v. Connery*, 867 F.2d 929 (6th Cir. 1989) and *United States v. Overmyer*, 867 F.2d 937, 950 (6th Cir. 1989)).

That the proof of claim must be "false" and filed "knowingly and fraudulently" are key to defining this criminal offense:

---

[15] If, as, and when this decision is appealed to the Ninth Circuit Court of Appeals, the Court respectfully requests that the Court of Appeals address definitively the issue of standing under section 3057 to prevent the future misuse of this statute.

A proof of claim is false if it is untrue when it's made known to be untrue by the person making it or willfully causing it to be made.  A proof of claim is not false merely because it may be inaccurate or erroneous in any or all respects.  The claim may be asserted by a creditor in good faith even though the moneys being sought are thereafter successfully disputed by the debtor or disallowed by the Bankruptcy Court.  Instead, a proof of claim is false if the statements contained therein are intentionally inaccurate and submitted without any good faith basis for the claim and are not the result of some mistake or clerical error or inadvertent omission.

*United States v. Overmyer*, 867 F.2d 937, 950 (6th Cir. 1989) (quoting jury instructions with approval).

Accordingly, "[g]ood faith is an absolute defense. . . . [A] claim even if erroneous, made with a good faith belief in its accuracy, does not amount to a false proof of claim and is not a crime." *Id.*  Accordingly, to be criminally false, the proof of claim must be knowingly and intentionally false.  *Id.*; *see also United States v. Diorio*, 451 F.2d 21, 23 (2nd Cir. 1971) ("fraudulently means with intent to deceive").

**b.  Filing of the Amended Wells Fargo POC**

On June 4, 2012, Wells Fargo filed the Original Wells Fargo POC, asserting a claim under the Henderson Note, as of the Petition Date, in the amount of $801,712.98.  On July 16, 2017, Wells Fargo filed the Amended Wells Fargo POC, revising the amount asserted under the Henderson Note to $839,944.84, as of the Petition Date.  The Debtor and Antognini contend that the Amended Wells Fargo POC was "false" within the meaning of the 18 U.S.C. § 152(4) because, on or about April 1, 2019, the Henderson Note was returned to the Debtor and her husband stamped "PAID IN FULL," and thereby rendered unenforceable by Wells Fargo.  The Debtor and Antognini further contend that the Amended Wells Fargo POC was "false" because Wells Fargo allegedly concealed in the proof of claim that the Henderson Note had been returned.

These arguments fail to persuade this Court that there are "reasonable grounds" to believe that the Amended Wells Fargo POC is a "false" claim or that it was filed "knowingly and fraudulently" within the meaning of 18 U.S.C. § 152(4).

1    First, Debtor's arguments conflate the concept of a claim that is "false" for purposes of the

2    criminal statute with a claim that is simply "subject to disallowance." *See United States v.*

3    *Overmyer*, 867 F.2d at 950 ("A proof of claim is not false merely because it may be inaccurate or

4    erroneous in any or all respects").  Assuming for the sake of argument that Wells Fargo lost its right

5    to enforce a debt based on the Henderson Note when the note was returned marked "PAID IN

6    FULL," that circumstance would not render the Amended Wells Fargo POC "false."  At most, it

7    would render the proof of claim potentially subject to disallowance.  There is nothing in the record to

8    suggest that the Henderson Note was a fabrication or that a debt based on the Henderson Note did

9    not exist as of the Petition Date.  This is in stark contrast to the archetypal false claim described in

10   *United States v. Overmyer,* in which a commonly controlled affiliate of the debtor filed a proof of

11   claim premised on an elaborate set of sham transactions and accounting entries, for a debt that did

12   not exist.  *See id.* at 939-49, 951-55.

13   The distinction between claims that are "false" and those that are "unenforceable" is a

14   distinction that the United States Supreme Court recently highlighted in *Midland Funding, LLC v.*

15   *Johnson*, 137 S. Ct. 1407 (2017).  In *Midland Funding*, the Supreme Court held that the filing of a

16   proof of claim based on a time-barred debt did not constitute the assertion of a "false, deceptive, or

17   misleading representation" to collect a debt under the Fair Debtor Collection Practices Act

18   ("FDCPA").  *Id.* at 1411-13. The debtor argued that the creditor's claim was false because the claim

19   was barred by a statute of limitations.  In other words, the debtor argued that the claim was false

20   because the claim was not enforceable.  The Supreme Court rejected this argument:

21       The word "enforceable" does not appear in the [Bankruptcy] Code's definition of

22       "claim."  *See* 11 U.S.C. § 101(5). . . .  [It] is difficult to square Johnson's

23       interpretation with our . . . statement that "Congress intended to adopt the broadest

24       possible interpretation of 'claim.'"  *Johnson v. Home State Bank,* 501 U.S. 78, 83, 111

25       S. Ct. 2150, 115 L. Ed. 2d 66 (1991).  It is still more difficult to square Johnson's

26       interpretation with other provisions of the Bankruptcy Code.  Section 502(b)(1) of the

27       Code, for example, says that if a "claim" is "unenforceable," it will be disallowed.  It

28       does not say that an "unenforceable" claim is not a "claim."  Similarly, § 101(5)(A)

1    says that a "claim" is a "right to payment," "whether or not such right is . . . fixed,

2    contingent, … [or] disputed."  If a contingency does not arise, or if a claimant loses a

3    dispute, then the claim is unenforceable.  Yet this section makes clear that the

4    unenforceable claim is nonetheless a "right to payment," hence a "claim," as the Code

5    uses those terms.

6    *Id.*  Although *Midland Funding, LLC* did not involve the application of 18 U.S.C. § 152(4), the

7    Supreme Court's analysis is instructive because it considers what it means for a proof of claim in a

8    bankruptcy case to be "false" in the context of the statute that enables parties to file such claims, i.e.,

9    the Bankruptcy Code.  This decision underscores that a "false" claim is something more than a claim

10    subject to disallowance in the bankruptcy process.

11        Second, the Debtor and Antognini fail to identify any statement in the proof of claim that is

12    false.  They appear to contend that by filing the Amended Wells Fargo POC on July 16, 2019, Wells

13    Fargo was asserting that it was entitled to assert a claim under the Henderson Note *as of July 16,*

14    *2019*.  They contend that this was a false assertion.  But the factual premise of their argument is

15    incorrect.  The Amended Wells Fargo POC uses Official Form 410, which instructs the filer to "Fill

16    in all the information about the claim *as of the date the case was filed*."  *See* Claim 7-2 (emphasis

17    added); *see also* Official Form 410: Instructions for Proof of Claim.  Thus, although the Amended

18    Wells Fargo POC was filed on July 16, 2019, it actually amended the claim asserted by Wells Fargo

19    *as of the Petition Date*.  Whatever arguments the Debtor and Antognini may have about the impact

20    of the return of the Henderson Note on the enforceability of Wells Fargo's claim, the proof of claim

21    itself does not make any statement (false or otherwise) about the enforceability of the Henderson

22    Note *as of July 16, 2019*.

23        Third, Wells Fargo did not conceal that there was an issue of potential legal significance

24    regarding the disposition of the Henderson Note and the related deed of trust.  In connection with its

25    summary calculation of the claim amount, the Amended Wells Fargo POC contains the following

26    prominent caveat:

27        *The claim amount at this time is estimated and subject to revision for the following

28        reasons.  This loan was previously secured by a deed of trust against the real property

1    located at 2240 Village Walk Dr., Unit 2311, Henderson NV 89052.  On April 11,

2    2019, the deed of trust was conveyed due to the payoff of the secured portion of the

3    principal balance of the loan under Debtor's Chapter 11 plan.  Creditor is still in the

4    process of reviewing the legal effect of the April 29, 2019 conversion of this case to

5    Chapter 7 and reconciling the accounting of the loan based on the conversion.

6    Claim No. 7-2, Part 2 at 1.

7         Almost two weeks *prior* to filing this statement, Wells Fargo filed a pleading explaining in

8    greater detail that: (i) Wells Fargo had received payment of certain amounts following the sale of the

9    Henderson Property, (ii) the Henderson Note had been returned, (iii) the related deed of trust on the

10    property had been released, (iv) the Debtor was contending that those events legally extinguished

11    Wells Fargo's entitlement to payment on its unsecured claim, (v) Wells Fargo disagreed with the

12    Debtor's legal conclusions, and (vi) Wells Fargo might nevertheless seek payment on its unsecured

13    claim.  Case Dkt. 1002 at 5 (pleading filed July 3, 2019).

14         One day after Wells Fargo filed its amended proof of claim, on July 17, 2019, counsel for

15    Wells Fargo appeared in Court, on motions pending in this case, explained that it had amended its

16    claim, and made the same acknowledgments.  *See* Hearing Transcript for July 17, 2019, Case Dkt.

17    1020 at 77:10-78:10 ("we reconveyed the deed of trust and released the note back to her . . . it was

18    done in error, and we, have case law to back that up.  So we are going to assert that that essentially is

19    an unsecured claim that should be paid, including the massive amount attorney's fees she's incurred

20    on it, including the fee award, which is separate and independent of the note itself, and that was

21    never paid.")

22         Viewed together with Wells Fargo's written submission on July 3, 2019, and the statements

23    of its counsel in open court on July 17, 2019, the Court is not persuaded that Wells Fargo

24    "concealed" any material facts, let alone concealed facts that would render the proof of claim a

25    "false" claim under 18 U.S.C. § 152(4).[16]

26    

27    [16] The Court likewise is not persuaded that the Amended Wells Fargo Proof of Claim was even
28    *misleading*.  The Debtor and Antognini appear to argue that the proof of claim is misleading because
it does not contain each and every fact they believe is relevant to its potential disallowance.  But that
does not make the proof of claim misleading.  In addition to Wells Fargo's court filing on July 3,

1   Fourth, the totality of the circumstances does not suggest that the Amended Wells Fargo

2   POC was filed with fraudulent intent.  The amended proof of claim modified the amounts Wells

3   Fargo asserted were due from the Debtor under the Henderson Note, as of the Petition Date.  A

4   comparison with the Original Wells Fargo POC shows that Wells Fargo: (i) decreased the principal

5   balance it claimed was due by over $27,000, (ii) eliminated $122,469 in interest previously asserted,

6   (iii) adjusted upward by approximately $20,000 the amount for fees and charges other than attorneys'

7   fees and costs, (iv) added the Wells Fargo Fee Award of $50,620.76, which the Court had already

8   allowed as a prepetition claim, and (v) added $107,220.96 for "unliquidated post-September 30,

9   2016 attorneys' fees and costs for prosecuting appeals and actions taken in bankruptcy case."

10  *Compare* Claim 7-1 at 4 *with* Claim 7-2, Part 2 at 1.  Whether ultimately disallowed or not, these

11  appear to be the types of modifications a lender might make based on additional information and

12  analysis, and by the liquidation of claims that had not been liquidated at the time the original claim

13  was filed.  *See* 11 U.S.C. § 101(5) (a "claim" includes unliquidated debts).

14  Further, the Amended Wells Fargo POC reclassifies the claim as unsecured rather than

15  secured, to reflect the sale of the Henderson Property and the reconveyance of the deed of trust.

16  *Compare* Claim 7-1 at 1 with Claim 7-2 at 2.  While it is not clear whether this modification was

17  legally necessary (i.e., because a proof of claim is always stated as of the Petition Date and the deed

18  of trust was a matter of record at the time of the Petition Date), this change evinces an intent by

19  Wells Fargo to candidly acknowledge that there was no longer collateral securing its debt.  The

20

21  ─────────────────────────

22  2019, the Debtor had already made numerous filings advising the Court that the Henderson Note had
    been returned and the deed of trust released.  *See* Case Dkt. 984 at 11 & Ex. A (June 4, 2019); Case

23  Dkt. 1004 at ¶ 5 (July 3, 2019).  In this context, the Court finds that the text of the Amended Wells
    Fargo POC was adequate to highlight to the Court, the Trustee and the Debtor a potential legal issue

24  regarding enforcement of the claim based on the partial payment of the debt and the disposition of
    the Henderson instruments.  Given the sophistication of the parties, the abundance of information

25  already in the Court record, and the likelihood that the Trustee would examine the proof of claim and
    investigate the relevant circumstances, the Court does not find the Amended Wells Fargo POC was

26  misleading in any way. *See Midland Funding, LLC v. Johnson*, 137 S. Ct. at 1413 ("Indeed, to
    determine whether a statement is misleading normally 'requires consideration of the legal

27  sophistication of its audience.'"); *id.* (proof of claim asserting debt subject to statute of limitations
    defense was not misleading where trustee was charged with examining and potentially bringing an

28  objection to such proof of claim).

1    Court discerns no fraudulent intent in Wells Fargo modifying its original claim to make any of these

2    changes.

3         Finally, the legal premise of the Debtor's argument—i.e., that the return of the Henderson

4    Note extinguished all claims Wells Fargo might assert in this case—is far from certain.  For one

5    thing, Wells Fargo has cited authority to the Court suggesting that when a note is cancelled and

6    returned in error, it nevertheless may be recovered and does not discharge the debt.  *See* Case Dkt.

7    1389 at 9-11 and cases cited therein.  For another, in the unusual circumstance presented here, in

8    which an individual chapter 11 plan is confirmed but the case is later converted to chapter 7, it is

9    unclear whether the status of the original note even matters.[17]  Moreover, irrespective of the

10   principal amount outstanding under the Henderson Note, this Court had already issued the Wells

11   Fargo Fee Award, granting Wells Fargo a prepetition claim for $50,630.76.  After an unsuccessful

12   appellate effort, the Wells Fargo Fee Award is final.  Thus, irrespective of the return of the

13   Henderson Note, there was a good faith basis for Wells Fargo to modify its existing proof of claim

14   and assert its continued entitlement to a claim in this case.  For these additional reasons, the Court

15   does not find "reasonable grounds for believing" that the Amended Wells Fargo POC was a "false"

16   claim or that its filing otherwise satisfied the requirements of 18 U.S.C. § 152(4).

17

18

19

20

21

22

23

24   [17] Of late, including in her supplemental brief in support of this Motion, Debtor has argued that the
     confirmed chapter 11 plan controls the allowance and treatment of claims in this chapter 7 case.
25   Case Dkt. 1425 at 7-14.  ("Controlling law is that a confirmed chapter 11 plan is a contract, between
     debtor and creditors, that creates a new debt owed by debtor to creditor, pursuant to the plan and
26   which eliminates the prepetition (old debt) owed to that creditor… the obligation created by the
     confirmed Chapter 11 plan **replaces** the preconfirmation obligation …") (emphasis in original).
27   Ironically, if this argument is correct, it should not matter what happens to the Henderson Note itself
     or, for that matter, how Wells Fargo amends its proof of claim.
28

### c.  Use of the Amended Wells Fargo POC

The Debtor and Antognini argue not only that Wells Fargo and its counsel are criminally liable under 18 U.S.C. § 152(4) for filing the Amended Wells Fargo POC, but that the Trustee is criminally liable for his "use" of what they contend was a "false" claim.  *See* 18 U.S.C. § 152(4).  The Debtor and Antognini contend that that the Trustee "used" the Amended Wells Fargo POC by compromising that claim under the Rental Lender Settlement.   As the foregoing analysis demonstrates, however, the Court is not persuaded that this claim was a "false" claim for purposes of this criminal statute.  If the proof of claim was not a "false" claim within the meaning of the statute, there can be no crime.  Thus, the Court does not find "reasonable grounds to believe" that the Trustee committed the crime of "using" a "false claim" under 18 U.S.C. § 152(4).

To the extent the Debtor and Antognini are arguing—irrespective of any alleged criminal offense—that the Trustee did something improper by entering into the Rental Lender Settlement, the Court disagrees.  They both had the opportunity to object to the Rental Lender Settlement.  The Debtor did so and the Court overruled those objections when it entered the Compromise Order.  Among other things, the Court found that the "settlement was negotiated in good faith and at arms' length" and that the Trustee had demonstrated that the settlement was "in the best interests of the Estate and that entering in the Agreement [was] a proper exercise of his business judgment."  Case Dkt. 1272 at 10-11, 13.  The Court acknowledged the Debtor's arguments that the claim of Wells Fargo was unenforceable but noted that the Trustee had determined to settle rather than litigate those issues.  *Id.* at 18.

The Debtor appealed from the Compromise Order and the BAP affirmed.  *See Baroni v. Seror (In re Baroni)*, 2021 WL 3011907, *7-8 (9th Cir. B.A.P., Jul. 13, 2021).  The Debtor has appealed to the Ninth Circuit Court of Appeals, and the appeal remains pending.  To the extent the Debtor is seeking to reargue here matters that are on appeal to the Court of Appeals, the Court respectfully declines to entertain such argument.  The Debtor's effort to try to revisit that decision by recharacterizing the settlement as the object of a federal crime is, as explained above, entirely without merit.

**B. Removal of the Trustee**

Section 324(a) of the Bankruptcy Code provides that the court, after notice and a hearing, may remove a trustee . . . for cause.  11 U.S.C. § 324(a).  The Bankruptcy Code does not define "cause" and "it is left for the courts to determine on a case by case basis." *Dye v. Brown (In the Matter of AFI Holding, Inc.),* 530 F.3d 832, 845 (9th Cir. 2008) (*quoting* 3 Collier on Bankruptcy ¶ 324, 02, at 324–3 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006)).  In *In the Matter of AFI Holding*, the Ninth Circuit provides an illustrative (but not exhaustive) list of examples of "cause" including "trustee incompetence, violation of the trustee's fiduciary duties, misconduct or failure to perform the trustee's duties, or lack of disinterestedness or holding an interest adverse to the estate." *Id.*  The "party seeking removal" bears the burden of proof and meets this burden by providing evidence of "specific facts" warranting removal. *Id.*

In *In the Matter of AFI Holding*, the chapter 11 trustee failed to disclose that she had previously represented one of debtor's former investors in a dispute between the investor and the debtor. *Id*. at 841.  Although the trustee brought numerous preference actions, she failed to bring a preference action (or any other claims) against her former client. *Id*. at 842.  The trustee failed to disclose the extent of her relationship with the former client until after deposition testimony of the debtor's insiders revealed the connection. *Id*.  The bankruptcy court removed the trustee for lack of disinterestedness, which was upheld by the Ninth Circuit. *Id*. at 852.  In *In re Vega*, the chapter 7 trustee solicited $50,000 from a lender, ostensibly to fund a lawsuit related to the bankruptcy, and instead invested the funds in certificates of deposit, which he used to secure his own personal loan obligation. *In re Vega*, 102 B.R. 552, 553-54 (Bankr. N.D. Tex.1989). The bankruptcy court determined this was a breach of the trustee's fiduciary duty, and cause for dismissal from all cases in which he was serving as trustee. *Id.* at 554.

In *Matter of Schoen Enterprises*, despite the case converting to chapter 7 more than one year earlier, the chapter 7 trustee had failed to examine under oath any corporate officers of the debtor, made no attempts to obtain the books and records of the debtor, failed to investigate the "turbulent and highly suspicious activities" of the debtor prepetition and during the chapter 11 case and exhibited a "total lack of interest" in the case. *Matter of Schoen Enter., Inc.*, 76 B.R. 203, 204-05

(Bankr. M.D. Fla. 1987). The bankruptcy court found cause to remove the trustee for utterly failing

to perform his statutory duties under section 704 of the Bankruptcy Code. *Id*. at 206.

In *In re IFS Financial Corporation*, the bankruptcy court removed a chapter 7 trustee for

billing the estate for travel expenses for a five-day trip to New Orleans for the trustee, his attorney

(who was also his wife) and the couple's twins, finding a pattern of the trustee placing the interests of

his law firm above those of the estate and a "clear and unmistakable" breach of his fiduciary duty.

*In re IFS Fin. Corp.*, 2013 WL 2018540, at *9-10 (Bankr. S.D. Tex. May 13, 2013).

As detailed below, cause does not exist to remove the Trustee. The Motion falls woefully

short of the standard necessary to establish that the Trustee has breached his fiduciary duty to the

estate. The Debtor and Antognini have failed to present any evidence demonstrating such cause.

Their principal arguments against the Trustee are nothing more than a collateral attack on the

Compromise Order, which is currently before the Court of Appeals on appeals filed by the Debtor

and Antognini. Additionally, many of the allegations advanced by the Debtor and Antognini are

premised on reckless misrepresentations of the procedural history of this case and therefore are

without merit. The Motion will be denied and the Trustee will not be removed from this or any other

case.

### 1. Debtor's Standing to Seek Removal of the Trustee

"Standing represents a jurisdictional requirement which remains open to review at all stages

of the litigation." *In re Cambridge Land Co. II, LLC*, 626 B.R. 319, 323 (9th Cir. B.A.P. 2021)

(*quoting Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994)). It is a "threshold

question in every federal case, determining the power of the court to entertain the suit. " *Veal v.*

*Am. Home Mortg. Serv. Inc. (In re Veal)*, 450 B.R. 897, 906 (9th Cir. B.A.P. 2011) (*quoting Warth*

*v. Seldin*, 422 U.S. 490, 498 (1975)). "In essence the question of standing is whether the litigant is

entitled to have the court decide the merits of the dispute or of particular issues. This inquiry

involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its

exercise." *Warth*, 422 U.S. at 498.

Constitutional standing concerns whether the plaintiff's personal stake in the lawsuit is

sufficient to make out a concrete "case" or "controversy" to which the federal judicial power may

extend under Article III, § 2. *Id.*  To have constitutional standing, a plaintiff must show "an injury in fact that is caused by or fairly traceable to some conduct, and which the requested relief will likely redress." *In re Baroni*, 2021 WL 3011907, at *5 (9th Cir. B.A.P. 2021) (*citing Veal*, 450 B.R. at 906, *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008)).  In the bankruptcy context, "the prudential standing doctrine or the 'person aggrieved test' provides that '[o]nly those persons who are directly and adversely affected pecuniarily by an order of the bankruptcy court ... have standing to appeal that order.'" *In re Palmdale Hills Property, LLC*, 654 F.3d 868, 874 (9th Cir. 2011) *quoting Fondiller v. Robertson (Matter of Fondiller)*, 707 F.2d 441, 442 (9th Cir.1983).[18]

In *Fondiller*, the Ninth Circuit determined that the chapter 7 debtor carries the burden of demonstrating that the debtor satisfies the "person aggrieved" test; this requires a showing that the debtor "was directly and adversely affected pecuniarily by the order of the bankruptcy court." *Fondiller*, 707 F.2d at 443.  The Circuit concluded that "a hopelessly insolvent debtor does not have standing to appeal orders affecting the size of the estate" because such orders do not "diminish the [debtor]'s property, increase his burdens, or detrimentally affect his rights." *Id.*  Indeed, "chapter 7 debtors rarely have a pecuniary interest . . . because how the estate's assets are disbursed by the trustee has no pecuniary effect on the debtor." *See In re Eisen*, 2006 WL 6810928, at *4 (9th Cir. B.A.P., Dec. 28, 2006).

Following the principles established in *Fondiller*, courts in the Ninth Circuit have determined that, unless they demonstrate a pecuniary interest in the bankruptcy estate or in the asset or debt at issue, chapter 7 debtors lack standing to:

- object to claims.  *Heath v. Am. Express Travel Related Servs., Inc. (In re Heath)*, 331 B.R. 424, 429 (9th Cir. B.A.P. 2005); *In re Cheng*, 308 B.R. 448, 454 (9th Cir. B.A.P. 2004), *aff'd* 160 Fed. Appx. 644 (9th Cir. 2005);

---

[18]  Principles of prudential standing articulated in appellate cases regarding standing to appeal guide the bankruptcy court's analysis; if a party lacks standing to appeal from a bankruptcy court order, it lacked standing to litigate the entry of that order in the bankruptcy court. *See In re Sheridan*, 2009 WL 631355, at *3 (Bankr. D. Idaho, Mar. 12, 2009) (*quoting In re Simplot*, 2007 WL 2479664, *9 (Bankr. D. Idaho, Aug. 28, 2007)).

1    •    object to the sale of assets of the estate.  *In re Benham*, 678 Fed. Appx. 474,

2    475–76 (9th Cir. 2017);

3    •    object to the chapter 7 trustee's settlement of estate claims.  *In re Giordano*,

4    202 F.3d 277, *2 (9th Cir. 1999) ("The debtors failed to provide sufficient evidence that they

5    would not be insolvent even if the outcome of their suit against CLS turned out to be as

6    lucrative as they might have realistically hoped; they failed to show, therefore, that they

7    would reap any residual benefit from the prosecution of their suit against CLS and that they

8    were thus pecuniarily affected by its settlement"); *In re Caroselli*, 57 F.3d 1076, *1 (9th Cir.

9    1995) ("Although the Carosellis allege that the compromise undervalues the claims against

10    First Interstate, they have not demonstrated that the district court's finding that 'this case

11    never had any value at all' was clearly erroneous. Thus, the Carosellis have failed to establish

12    a likelihood that they would benefit personally from a higher settlement figure even if we

13    were to reverse the district court's order approving the compromise");

14    •    object to a chapter 7 trustee's decisions regarding the allocation of property to

15    pay administrative claims, classification of claims as community or separate and payment of

16    claims.  *In re Reiff*, 33 Fed. Appx. 878, *880 (9th Cir. 2002) ("Appellant is hopelessly

17    insolvent . . . because the contested order does not increase or affect in any way the total

18    amount of debt faced by Appellant-debtor, it does not increase her burdens or affect

19    detrimentally her rights");

20    •    enjoin the payment of fees awarded to a chapter 7 trustee and his

21    professionals.  *In re Mark Tech. Corp*., 2021 WL 5993518, at * 2 (C.D. Cal., Sep. 24, 2021)

22    ("Additionally, because this is a Chapter 7 case, and it appears that the debtor's debts far

23    outweigh its assets, Jones has not established that the payments approved in the Final Fee

24    Order diminish assets that would otherwise benefit Jones"); and

25    •    object to a chapter 7 trustee's statutory fees.  *In re Blancato*, 2022 WL

26    3016544, *2 (9th Cir. B.A.P., Jul. 19, 2022) ("Blancato's standing to appeal is uncertain

27    given Trustee's representation that this is not a surplus estate.") (*quoting Fondiller v.

28    Robertson (In re Fondiller)*, 707 F.2d 441, 442 (9th Cir. 1983)).

While the Ninth Circuit has not yet addressed whether the debtor of an insolvent chapter 7 estate has standing to seek removal of a trustee pursuant to section 324(a), the BAP for the Eighth Circuit has held that chapter 7 debtors lack standing where their estate is insolvent.  *In re Levitt*, 632 B.R. 527, 530 (8th Cir. B.A.P. 2021), *reh'g denied* (Dec. 6, 2021).  Similarly, in *In re Martin*, the bankruptcy court determined that the chapter 7 debtor lacked standing to sue the trustee for breach of fiduciary duty and to object to the trustee's administration of assets where the claims against the estate exceeded the value of its assets by tens of millions.  *In re Martin*, 201 B.R. 338, 343-44 (Bankr. N.D.N.Y. 1996).  In each of these cases, the courts focused on whether the chapter 7 debtor was a "person aggrieved" just as the Ninth Circuit reasoned in *Fondiller*.

The Debtor has been on notice for nearly three years that, as a chapter 7 debtor, she lacks standing to challenge the Trustee's administration of the estate unless she provides admissible evidence that she has a pecuniary interest in the estate or in the specific asset or claim at issue.  In 2019, this Court ruled that the Debtor lacks standing to conduct discovery regarding the Amended Wells Fargo POC, or to object to that claim, unless she submits sufficient evidence to establish a pecuniary interest in the estate.  Case Dkt. 1084 at 3-4.  In 2020, the Court expressly ruled that the Debtor lacked standing to object to the Trustee's compromise with the Rental Lenders pursuant to *Fondiller* and its progeny.  Case Dkt. 1272 at 17, ¶ 13.  At the December 9, 2020 hearing on the Trustee's motion to sell the Carmel Property (and the Debtor's motion to stay that order), the Court expressly ruled that "Mrs. Baroni did not have standing to object to the sale order, and does not . . . have standing to object to the sale order under the Ninth Circuit's cases *Fondiller* or *Benham* or *Matter of Point Center Financial, Inc.*" and therefore was unlikely to prevail on her appeal from the order.[19]  Hearing Transcript for December 9, 2020, Case Dkt. 1284 at 44:19-46:15.  The BAP decision affirming the Carmel Sale Order, in its discussion of the Debtor's standing, noted that she had conceded in her appellate briefs "that the bankruptcy estate is likely insolvent." *Baroni*, 2021

---

[19]  *Matter of Point Ctr. Fin., Inc.*, 890 F.3d 1188, 1191 (9th Cir. 2018) ("All circuits, including this one, limit standing to appeal a bankruptcy court order to "person[s] aggrieved" by the order. . . . Under this prudential standing doctrine, only a 'person aggrieved,' that is, someone who is 'directly and adversely affected pecuniarily' by a bankruptcy court's order, has standing to appeal that order. *Fondiller v. Robertson (In re Fondiller)*, 707 F.2d 441, 443 (9th Cir. 1983)").

WL 3011907, *6.[20]  Because the Debtor has dismissed her appeal from the Carmel Sale Order, that

order and the Court's ruling that the Debtor lacked standing to object to the Carmel sale are final.

They are now law of the case.  *Id.* at n.8 ("[The law] of the case . . . doctrine ordinarily precludes a

court 'from reexamining an issue previously decided by the same court, or a higher court, in the same

case.'")  (*quoting Delannoy v. Woodlawn Colonial, L.P. (In re Delannoy)*, 615 B.R. 572, 583 (9th

Cir. B.A.P. 2020)").

   Despite multiple rulings that she is required to establish that she has standing to be heard in

this chapter 7 case, and despite *Fondiller* being black-letter law in this Circuit for nearly 40 years,

the Debtor inexplicably fails to brief standing in her Motion.  The Debtor's 270-page Motion fails to

offer even a scintilla of evidence that this is a surplus estate or that the Debtor has any pecuniary

interest in the Trustee's administration of the estate.  Based on the foregoing, the Court concludes

that the Debtor lacks standing to seek removal of the Trustee based on his administration of the

estate in general (including her complaints about estate funds being deposited in non-interest-bearing

accounts), his administration of the Carmel Property, or statements by the Trustee or his counsel out

of court or in filed pleadings (except to the extent they directly involve his communications with the

Debtor).  The Debtor did, however, have standing to object to the Turnover Order and to move for

dismissal of the chapter 7 case.  Because the gravamen of her complaint about the ex parte

communication with Jessica Bagdanov is that it swayed the Court to rule against her on turnover and

dismissal, the Debtor has standing to bring this Motion to the extent it is based on that ex parte

communication.

   Because Antognini is a creditor of the estate, and therefore has a pecuniary interest in it, he

has standing.  As he filed only a two-sentence joinder however, Antognini's efforts to remove the

Trustee suffer the same deficiencies as the Debtor's.  As detailed below, the Motion is without merit

and must be denied, even if the Debtor had standing to seek such relief.

---

[20]    The Panel declined to dismiss the Debtor's appeal for lack of standing to avoid a "potential
domino effect" in the event the Court of Appeals reversed this Court on the Turnover Order.  *Id.*  On
June 8, 2022 the Court of Appeals affirmed the Turnover Over and that decision became effective on
July 21, 2022.  *In re Baroni*, 36 F.4th 958, 973 (9th Cir. 2022); 9th Cir. Case No. 21-55076, Dkt. 39.

**2. Trustee's Alleged "Abuse of Power"**

    **a. The Letter of October 3, 2019, Directing the Tenants of the Carmel Property to Pay Rent to the Trustee.**

    The Debtor and Antognini allege the Trustee "flagrantly abused his power" by trying to collect rent from the tenants of the Carmel Property on October 8, 2019; they assert he had no authority to do so until he filed his motion to operate the Carmel Property on October 30, 2019.[21] Case Dkt. 1378 at 22-23. They argue that this conduct "taken alone requires removing Seror for cause." *Id*. at 23. Their argument, however, depends on their gross mischaracterization of the procedural history of this case. On August 30, 2019 — more than 30 days before the Trustee demanded rental payments from the tenants of the Carmel Property — the Court entered its Interim Turnover Order which stated the following regarding the Carmel Property:

> IT IS HEREBY ORDERED that, **upon entry of this Order**, the Debtor is immediately directed to turn over to the Trustee the following property as it constitutes property of the bankruptcy estate:
>
> 1. That certain real property located at 3435 Rio Road, Carmel, California 92321 (the "Carmel Property") **and all rents and proceeds derived therefrom** from the conversion date **and continuing thereafter**;

Case Dkt. 1057 at 2 (emphasis added). The Court determined at the August 29, 2019 hearing that the Carmel Property and its rents were property of the chapter 7 estate and memorialized that ruling in the Interim Turnover Order. As of August 30, 2019 (at the latest), the Court had determined the Carmel rent was property of the estate. Pursuant to section 704(a)(1) it was the Trustee's duty to collect the Carmel rent. 11 U.S.C. § 704(a)(1).

    The Debtor and Antognini allege the Trustee "did not file a Motion to operate Baroni's properties until 10/30/19." Case Dkt. 1378 at 22:2-3. This statement is patently incorrect. The

---

[21] The Motion, and the attached Hess declaration, describe the Trustee's letter as "dated October 8, 2019." Case Dkt. 1378 at 22:19-20, 45, ¶ 3. The Trustee attaches a copy of this letter to his opposition to the Motion and it is dated October 3, 2019. Case Dkt. 1392 at 27.

1   Trustee filed his First Motion to Operate (which requested entry of an order "authorizing the Trustee
2   to collect rents directly from the Camarillo Tenants and Carmel Tenants" and authority to operate the
3   Rental Properties as of September 9, 2019) on October 9, 2019 — ***less than one week after*** the
4   Trustee's October 3, 2019 letter to the Carmel tenants directing them to send their monthly rental
5   payments to him.  Case Dkt. 1086 (First Motion to Operate) at 7; 1378 (Motion), declaration of April
6   Hess, at 45, ¶ 3.  The Court granted the First Motion to Operate, expressly authorizing the Trustee to
7   operate the Carmel Property and collect rent from the tenants as of September 9, 2019.  Case Dkt.
8   1110.  His letter of October 3, 2019, to the tenants was authorized by the Court and mandated by
9   section 704(a)(1).  The Debtor and Antognini's misrepresentation of the facts in this case is
10  inexcusable. Their argument that the Trustee's October 3, 2019 letter directing the tenants to pay rent
11  to him constitutes a "flagrant abuse of power" is specious and utterly devoid of merit.

12                **b.  Broker Request on January 8, 2020 to Inspect the Carmel Property.**

13          The Debtor and Antognini assert it was an "abuse of power" for the Trustee's real estate
14  broker to contact the tenants on January 8, 2020, to request access to the Carmel Property for a
15  walkthrough inspection because the Trustee did not file the broker's employment application until
16  February 6, 2020.  Case Dkt. 1378 at 22, 46, ¶ 7.  They fail to cite any authority in support of the
17  proposition that a trustee's broker cannot inspect property of the estate until the filing of an
18  employment application.  In this Court's experience, nearly all professionals employed by the estate
19  begin rendering some services before the filing of their employment applications.  Here, the
20  Trustee's broker made a request for access on January 8, 2020, signed a listing agreement with the
21  Trustee on January 22, 2020, to assist him with the sale of both the Carmel and Camarillo Properties,
22  and the Trustee filed his *Application For Authority To Employ Real Estate Broker* on February 6,
23  2020.  Case Dkt. 1116 and listing agreement attached thereto at 18-22.  Nothing about this timeline
24  is unusual, inappropriate or an "abuse of power."

25              **3.  Trustee's Dispute with the Former Tenants of the Carmel Property**

26          The Debtor and Antognini alleged that the Trustee's harassment and "illegal" treatment of the
27  tenants drove them away and caused the estate to lose $75,000 in rental payments.  Case Dkt. 1378
28  at 22, 24.  In support of his opposition to the Motion, the Trustee provides an email dated December

10, 2019 from the tenants ending their tenancy and stating they would move out by January 19,
2020.  Case Dkt. 1392 at 29.  The only conduct alleged by the Debtor and Antognini occurring prior
to December 10, 2019, was the October 3, 2019 letter regarding payment of rent and, in the Hess
declaration, a vague statement that sometime between October 15, 2019 and December 15, 2019 the
Trustee rejected the Hesses' purchase offer for the Carmel Property.  Case Dkt. 1378 at 46, ¶ 6.
Neither action constitutes misconduct or "illegal" treatment of the tenants.  All of the other conduct
complained of by the Debtor and Antognini regarding utility deposits and security deposits occurred
(if at all) after the tenants had vacated the Carmel Property and after their December 10, 2019 notice
terminating the tenancy.[22]  The argument that the Trustee caused the tenants to vacate, therefore, is
illogical and without merit.

Because the Debtor and Antognini have failed to demonstrate any misconduct by the Trustee
causing the Hesses' to terminate the tenancy on December 10, 2019, their complaints are nothing
more than a recycled version of the Hesses' complaints to the United States Trustee in a letter dated
more than fifteen months after they vacated the Carmel Property.  *See* Hesses' April 22, 2021 letter
to the United States Trustee, Case Dkt. 1378 at 52-64.  Even if true, it was the tenants, not the
bankruptcy estate, injured by the alleged conduct.  Neither the Debtor nor Antognini has standing to
complain about alleged injuries to the tenants.[23]

---

[22]   The Trustee states he returned these deposits to the tenants despite the Debtor's failure to turn
over the security deposit to the Trustee.  Case Dkt. 1392, declaration of David Seror, at 19, ¶ 13.

[23]   Equally important, the United States Trustee already investigated the Hesses' complaints and
"found no evidence of misconduct related to the Chapter 7 Trustee's actions relating to his
administration of the Carmel Property . . . I do not believe that your claims against the Chapter 7
Trustee are well taken."  United States Trustee July 7, 2021 Letter, Case Dkt. 1426 at 28-33.
Notably, April Hess' declaration in support of the Motion includes her April 22, 2021 letter to the
United States Trustee but fails to disclose the United States Trustee's July 7, 2021 response.  Case
Dkt. 1378 at 45-50.

### 4.  Trustee's Alleged Mismanagement

#### a.  Marketing of the Carmel Property

The Debtor and Antognini contend the Trustee must be removed for gross mismanagement of the estate.  They assert that the Trustee's "poor listing strategy" of the Carmel Property caused losses to the estate of $400,000 to $800,000.  Case Dkt. 1378 at 26-28.  This argument is a collateral attack on the Carmel Sale Order, which expressly found that "[t]he Property was adequately marketed.  The Trustee did not receive any qualified overbids prior to the hearing, and no overbidders participated in the sale hearing."  Case Dkt. 1287 at 5, ¶ J.  As detailed above, the Debtor appealed from the Carmel Sale Order, the BAP affirmed, and, because the Debtor dismissed her Ninth Circuit appeal, the Carmel Sale Order is now final.  *In re Baroni*, 2021 WL 3011907 at *8; 9th Cir. Case No. 21-60046, Dkt. 33.  Antognini neither opposed the sale nor appealed from the Carmel Sale Order.  The Court's finding that the Trustee adequately marketed the Carmel Property is law of the case.  *In re Baroni*, 2021 WL 3011907 at n.8 (*quoting In re Delannoy*, 615 B.R. at 583).  Neither the Debtor nor Antognini is permitted to collaterally attack the final sale order and therefore they cannot seek removal of the Trustee based on his marketing and sale of the Carmel Property.  *See In re Grantham Bros*., 922 F.2d 1438, 1442 (9th Cir. 1991) (chapter 11 debtor's complaint seeking removal of the trustee was an impermissible collateral attack on final sale order authorizing the trustee to sell debtor's real property).

#### b.  Deposit of Estate Funds in Non-Interest-Bearing Accounts

The Debtor and Antognini allege that the Trustee violated United States Trustee guidelines by failing to deposit $652,000 in interest-bearing accounts.  Case Dkt. 1378 at 30-31.  As a threshold matter, the Debtor and Antognini fail to cite any case in which a court removed a trustee for noncompliance with United States Trustee guidelines.  At the February 8, 2022 hearing on the Motion, the Assistant United States Trustee for this region appeared and stated that the "U.S. Trustee has not been enforcing the requirement that estate funds be placed in an interest bearing account, obviously, because of market conditions . . . the [Chapter 7 Trustee] manual does say that, but from a practical point of view, banks aren't giving interest these days, and so, that requirement has been suspended, and all I could say is that the manual will be updated in the next few months to provide correct guidance."  Hearing Transcript for February 8, 2022, Case Dkt. 1453 at 137:19-22, 139:11-

16. On March 15, 2022, the Executive Office for United States Trustees amended the handbook for chapter 7 trustees to provide that the "trustee may maintain money of the estate in a non-interest-bearing checking account."  "*List of Changes and Updates to the Handbook for Chapter 7 Trustees and Supplementary Materials*," March 2022 and June 2022, at 4, ¶ E.1.c.[24]  The Trustee's use of non-interest-bearing accounts is permitted and is not a basis for removal.

### c.  Business Decisions Regarding the Carmel Property

The remainder of the allegations of "gross mismanagement" are nothing more than criticism of the Trustee's business judgment decisions.  The Debtor and Antognini complain that the Trustee did not relet the Carmel Property in 2020, spent too much to repair the roof on the Carmel Property, replace a garage door and a water heater, and changed the insurance on both the Carmel and Camarillo properties.  It is evident that the Debtor and Antognini disagree with the Trustee's business management, but they do not cite any cases under the Bankruptcy Code in which a court removed a trustee based on a court second guessing his business decisions.[25]  Generally, bankruptcy courts have held that removal is not warranted even if a trustee's business decisions prove mistaken or improvident.  See *In re Consol. Indus. Corp.*, 330 B.R. 712, 715 (Bankr. N.D. Ind. 2005) ("cause to remove a trustee cannot be found in actions that fall within the proper scope of the trustee's discretion and which do not represent some type of misconduct. If the trustee's actions are appropriate when measured by the proper standard, there is no cause to remove the trustee"); *In re Carvalho*, 578 B.R. 1, 12 (Bankr. D.D.C. 2017) ("no removal is warranted if [the trustee's] exercise of business judgment was discretionary and reasonable under the circumstances. *See* 3 Collier on Bankruptcy ¶ 324.02[3], at 324–6 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.)"); *In re Miller*, 302 B.R. 705, 709 (10th Cir. B.A.P. 2003) ("A trustee should not be removed for mistakes in

---

[24]  https://www.justice.gov/ust/page/file/1483111/download.

[25]  The Debtor and Antognini rely on cases from 1902 and 1923 under the Bankruptcy Act in which trustees were removed for failure to comply with a referee's direction to sell assets and for failing to maintain any books and records of an operating business and failing to account for assets.  *United States v. Union Surety & Guar. Co.,* 118 F. 482 (S.D.N.Y. 1902);  *In Judith Gap Comm'l,* 291 F. 792 (D. Mont. 1923) *rev'd* 298 F. 89 (9th Cir. 1924).  No courts interpreting Bankruptcy Code section 324 have relied on these authorities.

1  judgment where that judgment was discretionary and reasonable under the circumstances") (*citing In*

2  *re Haugen Const. Serv., Inc.*, 104 B.R. 233, 240 (Bankr. N.D. 1989), *In re Lundborg*, 110 B.R. 106,

3  108 (Bankr. D. Conn. 1990)).

4         Here, the Debtor and Antognini attack decisions the Trustee was authorized to make.

5  Whether to lease the Carmel Property, how to insure the properties, and how much to spend to

6  replace a roof, a water heater and a garage door are all decisions within the Trustee's discretion.

7         The Trustee contends he did not immediately re-let the Carmel Property when the prior

8  tenants vacated in January 2020 because the poor condition of the property would require

9  renovations before finding new tenants; he decided to market and sell the property rather than re-

10 letting it.  Case Dkt. 1392 at 18, ¶ 8.  The Court notes the COVID-19 pandemic began shortly

11 thereafter.  In February 2021, after the United States District Court issued a stay in the appeal from

12 the Turnover Order, the Trustee decided to make the necessary repairs to lease the Carmel Property

13 and entered into a lease with new tenants in April 2021.  *Id*. at 18, ¶ 9; Case Dkt. 1426 at 34-41.  The

14 Debtor and the Trustee sharply disagree regarding the reasons for the Trustee changing the insurance

15 policies on the Carmel and Camarillo Properties.  *Compare* Case Dkt. 1392 at 18, ¶ 10 *with* Case

16 Dkt. 1431 at 57, ¶ 14.  But there is no credible evidence that the Trustee has left the properties

17 uninsured.   More importantly, the Debtor and Antognini fail to cite any authority in which a trustee

18 was removed because he spent too much to insure property of the estate.

19        The Trustee's explanations and decisions on these issues are not patently unreasonable and

20 his business judgment is entitled to deference as these are all issues withing his discretion.  In fact,

21 the Debtor and Antognini's complaints about the sums spent to insure the properties, and to repair

22 the roof, garage door and water heater likely have caused more administrative fees to be incurred by

23 the estate than the alleged damages caused by any improvidence in the Trustee's decision-making on

24 these matters.

25            **5.  Alleged False Statements by the Trustee and His Counsel**

26        The Debtor and Antognini contend the Trustee must be removed based on allegedly false

27 statements made by the Trustee and his counsel in pleadings filed in this case and in emails

28

1    exchanged among counsel for the parties.  Case Dkt. 1378 at 14, 19-21.  The Court is simply not

2    persuaded.

3                              **a.   The Trustee's Opposition to the Debtor's Motion to Dismiss**

4            The Debtor and Antognini contend the following statement in the Trustee's opposition to the

5    Motion to Dismiss filed by the Debtor qualifies as a "false statement:"

6                      To the best of the Trustee's knowledge, the Debtor has failed to pay

7                      the following . . . (c) all amounts owed to the Class 6 secured creditor

8                      [Carmel property] including claim amount of at least $2 million.

9    Case Dkt. 1003 at 3-4.  They also contend that the Trustee's counsel made a false statement in an

10   email sent to the Debtor's counsel stating:

11                     Your client's sale of the Henderson property without filing a motion

12                     was a material default under the plan.  Your client represented in the

13                     plan that the "Debtor will continue to lease [the Henderson] property"

14                     and a "critical" plan provision regarding the source of funds to pay

15                     creditors was the "income received from Debtor's rental properties."

16                     Because the Henderson property was property of the chapter 11 estate,

17                     the proceeds of its sale are property of the chapter 7 estate.  Local

18                     Bankruptcy Rule 3020-1(d).  *See also, In re Kenny G Enterprises,*

19                     *LLC*, 2014 WL 4100429 *12-13 (9th Cir. BAP 2014) (citing similar

20                     local bankruptcy rule in Nevada in a case where a debtor sold a piece

21                     of property in violation of the plan terms without seeking a

22                     modification of the plan, and holding that the proceeds from the sale

23                     were property of the estate upon conversion to chapter 7 … "[n]o

24                     provision was made in the Plan for anything other than this default

25                     rule.  Accordingly, KGE's assets became property of the chapter 7

26                     estate upon conversion of the case").

27   *Id*. at 16-17.

28

The Debtor correctly argues that at the time the case converted to chapter 7, Nationstar's Class 6 secured claim had not yet become an allowed claim, and therefore Nationstar was not yet entitled to distributions.  It was inaccurate for the Trustee to say the Debtor "had failed to pay" Nationstar.  The Court, however, was not misled by this statement.  The Trustee's opposition was filed on July 3, 2019, approximately two months after his appointment on April 30, 2019.  The Court was more familiar with the terms of the confirmed Plan and the procedural status of the Nationstar adversary than the Trustee and his counsel and was not misled or influenced by this incorrect statement.

More importantly, whether the Debtor had tendered payments to Nationstar was not relevant to the Court's denial of the Motion to Dismiss.  The principal issue on the Motion to Dismiss was what assets (if any) vested in the chapter 7 estate upon conversion; the Debtor argued the estate had no assets and therefore the case served no purpose and should be dismissed.  The issue of what assets vested in the chapter 7 estate was also the principal issue on the Trustee's Turnover Motion (heard concurrently with the Motion to Dismiss) and the reason why the Court required supplemental briefing on this issue in connection with both motions.  The Court denied the Motion to Dismiss because it determined there were assets in the chapter 7 estate, the Debtor failed to pay BONYM (which was the material default under the Plan warranting conversion of the case) and there were unpaid *unsecured* creditors.  Hearing Transcript for August 29, 2019, Case Dkt. 1059 at 70:10-72:7.  Neither the Court's *Findings of Fact Regarding Order Denying Debtor's Motion to Dismiss Chapter 7 Case,* nor the order denying the Motion to Dismiss, made any findings regarding payments to Nationstar or discussed the status of such payments.  Case Dkt. 1144, 1149.[26]  Whether payments were made to Nationstar on its secured claim simply was not relevant to the Court's analysis.

The statement in the email from the Trustee's counsel to the Debtor's counsel regarding the sale of the Henderson Property is not a factual statement.  It is clearly a legal argument.  It is clear counsel intended the statement to be treated as a legal argument because she included a citation to a

---

[26]  Neither the Debtor nor Antognini appealed from the order denying the Debtor's Motion to Dismiss.  That order and the Court's findings and conclusions are final.

1   local bankruptcy rule and quoted *In re Kenny G Enters., LLC*, 2014 WL 4100429 (9th Cir. B.A.P.

2   2014).[27]  Accordingly, there is no false statement of fact.  Moreover, the legal argument based on *In*

3   *re Kenny G Enters., LLC,* was—at the very least—a colorable argument.  The Court finds no cause

4   here to remove the Trustee.

5                          **b.  The Trustee's Motion for Turnover**

6         The Debtor and Antognini also assert the Trustee made two false statements in his Motion

7   for Turnover:

8               To the best of the Trustee's knowledge, no Secured Creditor has yet

9               received the treatment that the Plan provided for it even though at least

10              one of them now has a final, non-appealable order allowing its claim.

11   Case Dkt. 991 at 4.

12               On June 19, 2019, the Debtor turned over $533,307.62 in funds to me

13               that she alleges were segregated under the Plan for the Disputed

14               Secured Creditors. I did not receive an accounting with respect to these

15               funds.

16   *Id.* at 14, ¶ 13.

17         The Debtor and Antognini contend the first statement regarding payments to secured

18   creditors is false because the Debtor transferred funds from a reserve account to OneWest Bank,

19   FSB (the holder of the first deed of trust on the Debtor's residence in Calabasas) in 2018 and

20   thereafter made payments directly to OneWest (or the loan servicer).  Case Dkt. 1378 at 20.  The

21   Debtor is correct that the Trustee's statement is not accurate.  The Trustee filed his Turnover Motion

22   less than two months after his appointment and it is evident that he and his counsel made some

23

24   [27]   In *In re Kenny G Enterprises*, the reorganized debtor made the same argument now advanced by
the Debtor and Antognini – that reorganized debtors are free to sell revested property without a court

25   order.  *Id.* at 5 ("KGE argued . . . because the Property vested in KGE upon confirmation, . . . the
post-confirmation sale of the Property, . . .  did not require notice or court authority and was in

26   compliance with the Plan.")  The Panel disagreed, reasoning that "[c]ontrary to KGE's position, the
Plan did not provide for the sale of its only asset and the payment of claims out of any sale proceeds.

27   Thus, the sale of the Property contradicted the terms of the Plan, thwarted its essential purpose of
reorganization and constituted a material default with respect to the confirmed Plan under

28   § 1112(b)(4)(N)."  *Id*. at 12.

factual errors as they familiarized themselves with a chapter 11 case that had been pending for more than seven years.

But again, the Court was not misled by this statement.  The Court was aware that (i) in 2017, the Ninth Circuit affirmed the judgment entered in favor of Wells Fargo, and (ii) in 2018, the Ninth Circuit affirmed the judgment entered in favor of OneWest.  The Debtor paid One West but refused to pay Wells Fargo.  As detailed above, Wells Fargo moved to convert the case, the Court determined the Debtor was in material breach of her Plan and set a drop-dead date for her to cure the default, which she did.  While the Trustee's statement was inaccurate, the facts and procedural history of this case are exceedingly familiar to the Court.

Moreover, the misstatement was irrelevant to the matter before the Court.  As detailed above, the key issue on the Turnover Motion was what assets revested in the chapter 7 estate upon conversion, not the status of plan payments to OneWest.  The Court's *Findings of Fact and Conclusions of Law Regarding Order Granting Trustee's Turnover Motion* and the Turnover Order make no findings regarding payments to OneWest or Wells Fargo.  Case Dkt. 1146, 1148.  Whether payments were made to OneWest on its secured claim simply was not relevant to the Court's analysis of the Turnover Motion.

Regarding the Trustee's testimony that he did not receive an accounting from the Debtor when she turned over the Disputed Funds to him, the Debtor and Antognini complain that this is a false statement because the Debtor's Motion to Dismiss stated "[p]ursuant to the Plan, Baroni paid $4,083.33 for 60 months and $4,583.33 thereafter into one account and $3,339.58 for 60 months and $3,839.58 therefore into the other." Case Dkt. 1378 at 21.  But the Debtor appears to concede that the Trustee was truthful when he claimed he received the funds but no accounting on June 19, 2019.

She points to a statement in a pleading she filed six days later, on June 25, 2019.  But what the Debtor provided fell far short of an "accounting."  First, the Debtor provided the amount of monthly payments made after month 61, but did not specify how many months of payments were made.  (How many months, exactly, is "thereafter"?)  Based on the information provided in the Debtor's statement, it was not possible to calculate the amount of the Disputed Funds payable to Nationstar or the amount payable to BONYM.

1   Second, the Plan required the Debtor to make payments into a reserve account for Class 9

2   general unsecured claims, including BONYM's $256,460 unsecured claim and Nationstar's $80,705

3   unsecured claim.  The Debtor's so-called "accounting" in her Motion to Dismiss completely failed to

4   address what payments were made on account of these unsecured claims.[28]

5   Third, it also failed to offer any tracing evidence regarding the rents collected from the

6   properties.  The proofs of claim filed by BONYM and Nationstar attached deeds of trusts with

7   assignment of rents riders, giving them a lien on any rent collected by the Debtor from the tenants of

8   the Camarillo Property and the Carmel Property, respectively.  POC No. 10-1 (BONYM re

9

10  ─────────────────────

11  [28]   The Debtor's declarations in support of this Motion argue that she made all plan payments to
    Class 9 general unsecured creditors pre-conversion. Case Dkt. 1431 at 60, ¶ 24; 1432 at 28, ¶¶ 9-11.
12  The Court did not find the Debtor's evidence in support of her Motion to Dismiss to be credible and
    made specific findings to the contrary:

13
       With respect to the Debtor's argument that all creditors required to be paid under the
14     Plan have been paid under the Plan, **the Court did not find the Debtor's evidence**
       **credible**, specifically the declarations of the Debtor filed in support of the Motion to
15     Dismiss [Doc. #989] and the *Declaration of Allana Baroni Re Supplement to*
       *Amended Rule 1019 Report* [Doc. #1042], as well as the statements and arguments
16     made in the moving papers themselves. For example, in the Motion to Dismiss, the
       Debtor stated that Class 8 creditors "received part of the $50,000 that the Debtor paid
17     to classes 8 and 9 through the plan." Motion to Dismiss, p. 7:9-11. However, the
       Court has not seen any conclusive proof that $50,000 was paid to Class 8 and Class 9
18     as the Debtor stated in her declarations. Hrg. Tr. p. 69:5. The Debtor has offered
       charts of payments attempting to substantiate her statement, but never provided actual
19     backup documents (i.e., bank statements, cancelled checks, etc.) to the Court, or,
       apparently, to the Trustee. In fact, the Debtor could not adequately explain the
20     payments she made (or did not make) to her creditors. Hrg. Tr. pp. 36:19- 38:22;
       39:10-41:18. When the Court analyzed the chart included in the *Declaration of*
21     *Allana Baroni Re Supplement to Amended Rule 1019 Report* [Doc. #1042] (re-filed
       and attached as Exhibit A to the *Debtor's Reply to Supplemental Brief of the Trustee*
22     *Re Turnover of Property of the Estate and the Effect of Conversion on Property of the*
       *Estate; and to Joinder of Wells Fargo Bank to Trustee's Supplement* [Doc. #1046]),
23     **the Debtor conceded that the chart did not reflect that $50,000 had been paid to**
       **unsecured creditors because she did not make payments to all of the Class 9**
24     **claimants.** Hrg. Tr. pp. 36:19-38:22; 39:10-41:18. Thus, the record before the Court
       does not establish that all payments required to be made under the Plan have, in fact,
25     been made. Hrg. Tr. p. 41:13-17.

26
27
28  Case Dkt. 1144 at 7, ¶ M (emphasis added).  The Debtor did not appeal from the order denying the
    Motion to Dismiss.   That order, and the Court's findings, are therefore final.

Camarillo Property) at 24-28; POC No. 9-1, Part 2 (Nationstar re Carmel Property) at 29-31. The Trustee could reasonably expect the Debtor to provide some evidence tracing the rents for each property into segregated reserve accounts and evidence that the rents were not commingled with unencumbered funds. But no such detail or evidence was provided in the Motion to Dismiss (or otherwise).

Accordingly, the Trustee's testimony in support of the Turnover Motion that the Debtor failed to provide him with an accounting of the Disputed Funds was not false and does not provide cause for his removal.

### c.  The Compromise Motion

The Debtor and Antognini allege the Trustee made false statements and "concealments" in the Trustee's Compromise Motion, incorporating by reference their arguments that the Trustee perpetrated a fraud on the Court regarding the Amended Wells Fargo POC. For all the reasons detailed above in Section II.A.2, these allegations are without merit. Accordingly, they do not provide cause to remove the Trustee.

### 6.  Ex Parte Communication by Counsel

The Debtor and Antognini contend that Trustee's counsel had a "completely illegal" ex parte communication with the Court on February 6, 2020, in which counsel allegedly lied to the Court about the Debtor and falsely stated that members of the Debtor's family had been harassing the Trustee's real estate broker. Case Dkt. 1378 at 15-19. They contend this ex parte communication prejudiced the Court against the Debtor and caused the Court to rule against the Debtor on her Motion to Dismiss and on the Trustee's Turnover Motion. *Id.* at 18-19. They also argue that (i) counsel should have disclosed to the Court that at the time of the alleged harassment, the Trustee's real estate broker was without authority to do anything with the Carmel Property because she had not been employed by the estate and the Trustee had no authority to operate the Carmel Property, and (ii) the Court erred by not instructing the Trustee to immediately file an emergency motion requesting a hearing to address the situation. *Id.* at 16-18.

As a threshold matter, the Debtor and Antognini fail to provide any authority holding that a trustee can be removed based on the action (even if improper) of his counsel. The focus of their

1  argument is that the ex parte communication influenced and prejudiced the Court against the Debtor

2  and her family, resulting in the denial of her Motion to Dismiss and the granting of the Trustee's

3  Turnover Motion.

4        Even so, the Debtor and Antognini's argument depends on their gross mischaracterization of

5  the procedural history of this case.  It is undisputed that the ex parte communication occurred on

6  February 6, 2020.  *See* the Court's *Notice of Ex Parte Communication and Order Setting Deadline*

7  *for Any Responses Thereto*, Case Dkt. 1118; Adv. 1:19-ap-01134-MB, Dkt. 34.  But the Court

8  denied the Debtor's Motion to Dismiss and granted the Trustee's Turnover Motion on August 29,

9  2019 — ***five months before*** the ex parte communication.  Hearing Transcript for August 29, 2019,

10  Case Dkt. 1059 at 72:8-73:6 ("I'm going to deny the motion to dismiss the case . . . at the time the

11  case was converted, the proceeds of the Henderson property were property of the estate, and I'm

12  going to order those turned over . . . as well as the three other properties and the rents that are

13  derived from those properties"); *see also Interim Order Directing Turnover of Property of the*

14  *Estate*, Case Dkt. 1057 (entered August 30, 2019).[29]

15        Both the Debtor and Antognini were present in the courtroom for the August 29, 2019,

16  rulings on those motions, and therefore had first-hand knowledge of the Court's rulings.  *See* Hearing

17  Transcript for August 29, 2019, Case Dkt. 1059 at 3:19-20 ("Ms. Baroni is present in the

18  courtroom"), 5:3-5:5 ("Richard Antognini on behalf of the Debtor in items six and seven").  Their

19

20

---

21  [29] The final orders, and findings of fact and conclusions of law, on the Turnover Motion and the

22  Motion to Dismiss were entered on March 31, 2020.  As detailed above, at the time of the hearing on
the Turnover Motion, the Debtor disputed that she still had $315,078 of the Net Henderson Proceeds

23  as of the conversion of the case on April 29, 2019.  This prevented the Court from specifying the
exact amount to be turned over to the Trustee.  Following a further hearing on this issue on October

24  7, 2019, and once the Court set a December evidentiary hearing on the issue, the Debtor capitulated
and agreed to a finding that $315,078 remained on the conversion date.  With this issue resolved the

25  Court entered the final Turnover Order.  Because the Turnover Motion and the Motion to Dismiss
shared the same key issue – what assets vested in the chapter 7 estate upon conversion – the Court

26  delayed entry of the order on the Motion to Dismiss until entry of the Turnover Order to ensure the
Court's findings and conclusions on the same issue were consistent in each order.  But the Court's

27  ruling that rents from the Carmel Property constituted property of the estate subject to turnover was
contained in the interim order and did not change in the final order.

28

1    argument that the February 6, 2020 ex parte communication caused, or influenced, the Court's

2    rulings on those motions is patently unfounded.

3         The ex parte communication did not prejudice the Court against the Debtor or her family

4    members.  In the Court's first ruling following the February 6, 2020 ex parte communication, the

5    Court actually granted James Baroni's *Motion for Enlargement of Time* and continued the hearing on

6    the Trustee's Compromise Motion from March 3, 2020 to April 3, 2020.  Case Dkt. 1140.  At the

7    hearing held April 3, 2020, the Court gave James Baroni a further extension of time to exercise his

8    § 363(i) rights with respect to the settlement.  Hearing Transcript for April 3, 2020, Case Dkt. 1265

9    at 78:7-16 ("I also understand that the Trustee is eager to move along and not -- and not see further

10   delay, and I know that the creditors are eager to move along and not see further delay, but I can

11   guarantee everyone, absent some sort of a truly global settlement, that in the long run, it is better if

12   this Court is careful to recognize everybody's statutory and other legal rights and to be in a position

13   where if ultimately I approve the settlement, it's after having formally given an opportunity to Mr.

14   Baroni to exercise his rights under 363(i)").

15        The Debtor and Antognini further contend that counsel's "representation [to the Court] were

16   (1) **false** about Bagdanov having a confrontation with Baroni the hallway (there was none), (2) **false**

17   that Baroni was instructed to cease recording video by Court Security (no such instruction)."  Case

18   Dkt. 1378 at 17 (emphasis in original).  The Debtor's accusations about what counsel said to the

19   Court are belied by the unofficial transcript she attached to the Motion.  Counsel for the Trustee did

20   not represent that a "confrontation" had occurred with the Debtor and she made no representations

21   regarding what the Court Security Officer said to the Debtor regarding her video recording.

22        Instead, Counsel said she was "having an altercation with" litigants in a case before Judge

23   Kaufman (not the Debtor) and then she "turned around and Allana Baroni was in the area and I

24   perceived her to be videotaping me. . . I perceived her to be videotaping me with her iPhone up and

25   then when the marshal turned around and saw what she was doing, she kind of scurried out of the

26   courtroom and I felt the need to put that on the record somewhere before you." Case Dkt. 1378 at

27   100-101.  The Court notes that the Court Security Officer's "Court Facility Incident Report"

28   generally corroborates counsel's statements to the Court on the record.  The altercation was between

counsel and litigants in another case, not between counsel and the Debtor, described by the Security

Officer as a "loud conversation" between Hossein Fatehmaresh and Reza Fatehmaresh, on the one

hand, and Jessica Bagdanov, on the other and that during "this exchange of words, it appeared that

the result might end in a physical altercation."  Case Dkt. 1126 at 2.  The Officer noticed the Debtor

"filming the encounter with her cell phone" and "attempted to contact Ms. Baroni re: the policy on

filming in the building.  However, she had made her way downstairs and out of the building before I

could do so."  *Id*.  The Debtor and Antognini misstate what the Trustee's counsel said to the Court on

the record and then label those statements (which never occurred) as "false" and grounds for removal

of the Trustee.  Their argument is without merit.

Likewise, their contention that it was "illegal" or improper for the Trustee's counsel *not* to

inform the Court during the ex parte communication that the Trustee had no authority to operate the

Carmel Property or have his broker inspect the property is also without merit.  For all of the reasons

detailed above, the Court had authorized the Trustee to operate the Carmel Property as of September

9, 2019, and there was nothing improper or unusual about the broker inspecting the property in

January 2020.

Finally, the Debtor and Antognini argue the Court erred by not instructing counsel for the

Trustee to file an emergency motion, requesting a hearing on 48-hours' notice, regarding the

incident.  They complain that her "attorneys were not given any opportunity to correct Bagdanov's

multiple **false statements** to the Court."  Case Dkt. 1378 at 16, 75, ¶ 18 (original emphasis). This is

simply incorrect.  The ex parte communication occurred on February 6, 2020.  The Court filed the

*Notice of Ex Parte Communication* on February 7, 2020.  Case Dkt. 1118; Adv. 1:19-ap-01134-MB

Dkt. 34.  That notice expressly invited written responses from "[a]ny party that wants to address the

Court in response to the above-referenced statements of Jessica Bagdanov" and provided twenty-one

days for parties to do so.  During that time, the Debtor obtained an audio recording of the ex parte

communication and filed a detailed declaration describing her version of the events described in Ms.

Bagdanov's statement to the Court.  *See* Case Dkt. 1328 at 106 (date of certification of unofficial

transcript); 1127.  If the Debtor believed she needed and was entitled to some form of emergency

relief, she could have filed her own emergency motion.  She chose not to do so.

1    In the final analysis, the Debtor was provided notice of the communication, she was provided

2    ample opportunity to present her version of what happened, and the communication did not result in

3    any adverse consequence for the Debtor.  It simply does not provide cause to remove the Trustee

4    under Bankruptcy Code section 324(a).

5              **7.   The Debtor's Belated Request to Conduct Discovery in Support of this Motion**

6    At the initial December 8 Hearing on the Motion, the Court stated that the principal argument

7    advanced in the Motion was implausible and that the Motion was fatally flawed for failing to submit

8    any evidence of criminal intent by the Trustee, Wells Fargo or its Former Counsel.  *See* Hearing

9    Transcript for December 8, 2021, Case Dkt. 1411 at 75:25-76:5.  In response, the Debtor requested

10   an opportunity to depose Wells Fargo and the Court denied this request.  *Id.* at 73:10-22 ("[Y]ou

11   could have filed this motion, set it for three months from now, and done your own discovery,

12   because you'd have a pending contested matter.  You didn't choose to do that, and I'm not going to

13   reward the Debtor, in its planning, or lack of planning or diligence, with respect to this motion").

14   Despite the Court's denial of the Debtor's request to conduct discovery, the Debtor and Antognini

15   forged ahead, noticing three depositions and propounding twelve sets of written discovery on the

16   Trustee, his firm, Wells Fargo and its Former Counsel.  Case Dkt. 1413 at 141-232.

17   This obstinate attempt to conduct discovery was improper for multiple reasons.[30]  First, the

18   Court expressly denied the Debtor's oral request to conduct discovery.  She and Antognini proceeded

19   with discovery anyway.  Second, in denying the Debtor's oral request, the Court explained that

20   waiting until the hearing is underway to request discovery to support the motion is procedurally

21   improper.  Even where the party requesting discovery opposes the motion (and therefore had no

22   control over when the motion was filed or set for hearing), waiting until the hearing to request

23

24   [30]   On February 18, 2022, Debtor and Antognini filed a notice of appeal from the Court's oral ruling
     denying the Debtor's request to conduct discovery.  Case Dkt. 1448.  On April 4, 2022, the BAP
25   dismissed their appeal; Debtor and Antognini appealed to the Ninth Circuit, where their appeal
     remains pending.  While the general rule is that the filing of a notice of appeal divests the trial court
26   of the matters related to the appeal, defective notices of appeal do not divest the court of its
     jurisdiction.  *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012)
27   (premature appeal from minute order "had no operative effect" and jurisdiction remained in the trial
     court to enter its final written order).
28

1   discovery is simply too late. *In re Khachikyan*, 335 B.R. 121, 127 (9th Cir. B.A.P. 2005) ("As a

2   strategic matter, where one wants discovery in a contested matter, it is generally too late to wait to

3   the day of the hearing on the merits to request to conduct discovery in the future. . . .  In this

4   instance, the debtor did nothing until the day set for the hearing on the merits and then asked for

5   discovery in the future without articulating what factual issues requiring discovery might make a

6   difference in the outcome of the contested matter. This was too late and too little to be persuasive");

7   *Coachella Vineyard Luxury Park, LLC v. Lev Invs., LLC*, 2022 WL 2438356, at *4 (C.D. Cal., Jul. 1,

8   2022) ("a party seeking discovery in a contested matter is not entitled to wait until the day of the

9   hearing to make the request"); *In re Verity Health Sys. of Cal., Inc*., 2019 WL 2461688, at *18

10   (Bankr. C.D. Cal., Jun. 11, 2019) ("Motions seeking class certification filed in Bankruptcy Court are

11   routinely contested by debtors-in-possession. Given that Movants knew they were required to prove

12   the class certification elements and had the ability to obtain such proof through Rule 2004, waiting

13   until reply briefing to assert the need for discovery was too late").

14        Similarly, even where the rules expressly permit a party to request time to conduct discovery

15   before filing a substantive pleading — such as Federal Rule of Civil Procedure 56(d) for

16   nonmovants in connection with a summary judgment motion — the request to conduct discovery

17   must be made before the hearing. *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th

18   Cir. 2002); *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 520 (9th Cir. 1990); *Nieves-Romero v. United*

19   *States*, 715 F.3d 375, 381 (1st Cir. 2013) ("A party cannot have two bites at the cherry: he ordinarily

20   cannot oppose a summary judgment motion on the merits and, after his opposition is rejected, try to

21   save the day by belatedly invoking Rule 56(d)").  As the Court noted at the December 8 Hearing, as

22   a matter of procedure, the Debtor could have set her Motion for hearing several months after she

23   filed it, conducted discovery and supplemented her Motion 21 days before the hearing.  The Debtor's

24   argument that she had no way of knowing whether the Trustee opposed her Motion until the

25   opposition deadline (fourteen days before the hearing) is not persuasive.  Her Motion seeks removal

26   of the Trustee from this case, and all cases in which he serves as trustee.  It is utterly implausible that

27   the Trustee would concede to the relief requested in her Motion.  A contested matter exists

28   "[w]henever there is an actual dispute, other than an adversary proceeding, before the bankruptcy

1    court . . . " Fed. R. Bankr. P. 9014, Advisory Committee Notes.  Nothing in Rule 9014 or the

2    advisory committee notes states that a matter becomes  contested only when formal opposition is

3    filed.

4         Generally, movants can use Rule 2004 to conduct discovery before filing their motions for

5    relief.  At the December 8 Hearing, the Debtor complained that "2004 motions didn't work very well

6    with you, your Honor, because you denied Baroni's 2004 motion.  So how, exactly, would she get

7    information?"  Case Docket 1411 at 56.  But the complaint rings hollow.  On August 20, 2019, the

8    Debtor filed a Rule 2004 application seeking information regarding the Amended Wells Fargo POC.

9    The Court denied the application, *without prejudice*, because the Debtor failed to demonstrate that,

10   as a chapter 7 debtor, she had "standing to prosecute matters on behalf of the bankruptcy estate,

11   including any objection to the amended Wells Fargo" claim.  The Court left open the possibility of a

12   renewed motion but explained that it would have to include sufficient evidence to "establish a

13   pecuniary interest in the estate" either by showing "that there is a surplus estate or that there is a

14   sufficient possibility that disallowance of Amended POC 7 will produce a surplus estate."  Case Dkt.

15   1084 at 3-4.  The Debtor never renewed her application, either to seek information about the

16   Amended Wells Fargo POC or any other matter complained of in the Motion now before the Court.

17        This illustrates the final reason why the discovery propounded by the Debtor and Antognini

18   on December 10, 2021 was improper.  The discovery related to the Amended Wells Fargo POC and

19   their contentions that it is a false claim, violative of 18 U.S.C. § 152(4).  As detailed above, (i) the

20   Debtor and Antognini lack standing to request a criminal referral, (ii) there is no rational basis for

21   their assertions that the Trustee, Wells Fargo or its Former Counsel violated 18 U.S.C. § 152(4), (iii)

22   their assertion that the Trustee is criminally liable for settling the Amended Wells Fargo POC is

23   unfounded and an impermissible collateral attack on the Compromise Order (which is unstayed, but

24   pending before the Court of Appeals) and (iv) both the Debtor and Antognini lack standing to object

25   to the Amended Wells Fargo POC.[31]

26

27   _____

28   [31]   The Debtor lacks standing because she is a chapter 7 debtor, for the reasons detailed above.
     Antognini lacks standing for the reasons stated in the Court's multiple orders denying him leave to
     object, including that the Trustee has settled the claim.  Case Dkt. 1224; Adv. 1:19-ap-01134-MB

1    Based on the foregoing, the Court concludes that the belated request of the Debtor and

2   Antognini to conduct discovery of the Motion is improper and should be denied.

3

4                                    **III.**

5                                **CONCLUSION**

6    Based on the foregoing, the Court will enter a separate order DENYING the Motion.[32]

7                                   # # #

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Date: August 9, 2022

                                    Martin R Barash
25                                  United States Bankruptcy Judge

26   ─────────────────────────────────────────────────────

27   Dkt. 61.  Antognini's appeals from those orders are pending before the Court of Appeals, Case No. 21-56000.

28   [32] The Trustee's request for sanctions is denied without prejudice.  The Trustee may file a separate motion for such relief.