

FILED & ENTERED

JUL 21 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
By Cetulio          DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Case No. 1:12-bk-10986-MB |
| ALLANA BARONI, | Chapter 7 |
| Debtor. | MEMORANDUM OF DECISION RE: |

**[1] CHAPTER 7 TRUSTEE'S MOTION TO: (1) APPROVE SALE OF REAL PROPERTY FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES WITH SUCH LIENS, INTERESTS, CLAIMS, AND ENCUMBRANCES TO ATTACH TO PROCEEDS PURSUANT TO 11 U.S.C. § 363(b) AND (f); (2) APPROVE OVERBID PROCEDURES; (3) HOLD HOMESTEAD EXEMPTION FUNDS IN ESTATE PENDING REINVESTMENT PURSUANT TO CCP       § 704.720(b); AND (4) DETERMINE THAT BUYER IS ENTITLED TO PROTECTION PURSUANT TO 11 U.S.C. § 363(m)
[CASE DKT. 1830]; and**

**[2] MOTION OF THE DEBTOR AND JAMES BARONI FOR AN ORDER OF THIS COURT COMPELLING TRUSTEE SEROR TO ABANDON THE BARONIS' CALABASAS RESIDENCE (3339 VIA VERDE COURT, CALABASAS, CA) TO BARONIS, PURSUANT TO 11 USC §554(b), PER JAMES BARONI'S 'PAY ESTATE $150,000 FOR ABANDONMENT' OFFER MADE IN JAMES' DECL. TO OPP. TO SEROR MOTION TO SELL
[CASE DKT. 1859]**

The chapter 7 trustee, David Seror (the "Trustee"), has filed his *Motion to: (1) Approve Sale of Real Property Free and Clear of all Liens, Interests, Claims, and Encumbrances with Such Liens, Interests, Claims, and Encumbrances to Attach to Proceeds Pursuant to 11 U.S.C. § 363(b) and (f); (2) Approve Overbid Procedures; (3) Hold Homestead Exemption Funds in Estate Pending Reinvestment Pursuant to CCP § 704.720(b); and (4) Determine that Buyer Is Entitled to Protection Pursuant to 11 U.S.C. § 363(m)* regarding the Trustee's agreement to sell property of the estate in Calabasas (the "Sale Motion" and the "Sale Agreement"). Case Dkt. 1830.  The chapter 7 debtor, Allana Baroni (the "Debtor"), and her non-debtor spouse, James Baroni, oppose the Sale Motion and have filed their own *Motion for an Order of this Court Compelling Trustee Seror to Abandon the Baronis' Calabasas Residence (3339 Via Verde Court, Calabasas, CA) to Baronis, pursuant to 11 U.S.C. § 554(b), per James Baroni's "Pay Estate $150,000 for Abandonment" Offer Made in James' Decl. to Opp. to Seror Motion to Sell* (the "Abandonment Motion").  Case Dkt. 1859.

## I.  JURISDICTION, ADJUDICATIVE AUTHORITY & VENUE

The Court has jurisdiction over the Sale Motion and the Abandonment Motion because both of the matters arise under provisions of title 11 of the United States Code, i.e., the Bankruptcy Code. 28 U.S.C. § 1334(b).  For the same reason, the Court's consideration of the Sale Motion and the Abandonment Motion are both constitutionally "core" matters over which the Court has the adjudicative authority to enter final orders.  *See Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665 (2015).  Venue is proper under 28 U.S.C. § 1409(a).

## II.  THE SALE MOTION

Bankruptcy Code section 363(b) authorizes a trustee "after notice and a hearing, [to] sell…, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  "The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances."  *In re Lahijani*, 325 B.R. 282, 288–89 (B.A.P. 9th Cir. 2005).  Courts also look to whether there is an adequate business justification for the sale and whether it is "in the best interest of the estate, *i.e.* it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and that it is an 'arms-length' transaction."  *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal.

1   1991). "Ordinarily, the position of the trustee is afforded deference, particularly where business

2   judgment is entailed in the analysis or where there is no objection." *In re Lahijani*, 325 B.R. at 289.

3          Here, the record demonstrates the Trustee has exercised sound business judgment in entering

4   into the Sale Agreement, and proceeding with the sale transaction is in the best interests of the estate.

5   First, as discussed in Section IV below, the Baronis' real property located at 3339 Via Verde Court,

6   Calabasas, California (the "Calabasas Property") is community property.  Because community

7   property is property of the estate, see 11 U.S.C. § 541(a)(2), the Trustee is authorized to sell it.

8   Second, the Trustee's decisions to market the Calabasas Property and enter into the Sale Agreement

9   satisfy the Trustee's contractual obligations under his settlement agreement with CIT (the "CIT

10  Settlement Agreement").[1]  Among other things, the CIT Settlement Agreement provides: (i) the CIT

11  secured claim against the Calabasas property is allowed as a fully secured claim in the amount of

12  $2,561,235.85, as of September 30, 2022,[2] (ii) the Trustee will market and sell the Calabasas

13  Property, (iii) upon the close of escrow, "CIT shall receive payment in the amount of $1,800,000 and

14  a general unsecured claim in the amount of $255,829 in full satisfaction of the CIT secured Claim,"

15  and (iv) "[t]he difference between the CIT Secured Claim and the $1,800,000 actually paid to CIT

16  from escrow shall be deemed avoided and preserved for the benefit of the bankruptcy estate."  Case

17  Dkt. 1577 at 23-24.

18         Third, the economics of the CIT Settlement—approval of which was not appealed and is now

19  final[3]—were very favorable to the estate.  Pursuant to the CIT Settlement, CIT agreed to reduce the

20  secured portion of its claim from approximately $2.6 million to $1.8 million, permit the estate to

21  receive the balance of the proceeds of the sale in excess of $1.8 million,[4] and retain only an

---

[1]  The CIT Settlement Agreement is attached as Exhibit 1 to the *Chapter 7 Trustee's Motion for Approval of Compromise with CIT Bank, N.A. etc.*, Case Dkt. 1577.

[2]  Because it appears that the value of the Calabasas Property exceeds the amount of CIT's claim, and CIT alleges that the Baronis have ceased making monthly amortized payments as of January 12, 2023, *see* case docket 1827 at 2:5-7, additional postpetition interest is accruing on the claim.  *See* 11 U.S.C. § 506(b).

[3]  *See Order on Trustee's Motion for Approval of Compromise With CIT Bank, N.A., and LoanCare LLC Pursuant to Federal Rule of Bankruptcy Procedure 9019.* Case Dkt. 1756.

[4]  *See* Transcript of Hearing on January 25, 2023, Case Dkt. 1734 at 54:25-55:11 ("the Court finds that the approval of the settlement results in an initial recovery to the estate of at least $761,235,

unsecured claim for $255,829.  The unsecured claim will be entitled to a pro rata distribution of whatever funds may be available after administration of the estate, together with the holders of all other unsecured claims.  *See generally* 11 U.S.C. § 726.  In approving the CIT Settlement, the Court found that it was "negotiated in good faith and at arm's length between the trustee and his counsel and CIT and its counsel."  Case Dkt. 1734 at 55:22-23.  The Court also found that the CIT Settlement was "in the best interest of the estate and a proper exercise of [the Trustee's] business judgment."  Case Dkt. 1734 at 57:7-8.

Fourth, the Trustee is exercising reasonable business judgment *again* by fulfilling his contractual obligation to sell the Calabasas Property under the approved CIT Settlement.  By fulfilling his obligations under the CIT Settlement, the Trustee will avoid breaching that agreement and incurring any administrative claim in favor of CIT for damages arising from that breach.  Further, and perhaps most importantly, the Trustee will unlock, for the benefit of the estate, the substantial value promised by CIT under the agreement.  The Sale Agreement, moreover, is itself fair, reasonable and in the best interests of the estate.  The record establishes that (i) the property was adequately marketed, (ii) the transaction was negotiated and proposed in good faith, (iii) the purchaser is proceeding in good faith, and (iv) the sale is an "arms-length" transaction.

The Trustee marketed the Calabasas Property with the assistance of Marc Shevin, a licensed California real estate broker, specializing in the marketing and sale of real estate properties in Calabasas and Hidden Hills markets of California.  Declaration of Marc Shevin, Case Dkt. 1830 at 25:3-25:4.  On February 5, 2023, Shevin listed the Calabasas Property on the local multiple listing service ("MLS"), which feeds other cooperating regional multiple listing services, for $3,395,000.  *Id.* at 25:13-16.  The property also was listed on Realtor.com, Zillow.com, Redfin.com and Shevin's website.  *Id.* at 25:16-18.  Shevin called and emailed local agents to inform them of the new listing

---

representing the difference between the full amount of CIT's secured claim on a future closing date of the sale of the Calabasas property.  We don't know exactly what that is, but it was, you know, 2.561 million as of September 30, 2022, and a $1.8 million CIT agrees to accept in full satisfaction of its secured claim.  Because CIT's secured claim appears to be oversecured, interest continues to accrue. And therefore, the estate's recovery upon a sale would be greater than $761,235.")

1   and a broker's open house; he also advertised the broker's open house on the MLS.  *Id.* at 25:18-21,

2   25:23-24.

3          Following the listing on the MLS, Shevin received numerous inquiries about the home and

4   began showings on February 9, 2023.  Case Dkt. 1830 at 25:22-23.  Shevin held his broker's open

5   house on February 14, 2023.  *Id.* at 25:23-25.  Before the process was over, Shevin showed the

6   house to 27 potential buyers and nine real estate agents.  *Id.* at 25:22-25, 26:20-21.

7          On February 24, 2023, Shevin received, on behalf of the Trustee, the first purchase offer,

8   which was from the Purchaser.[5]  Case Dkt. 1830 at 26:1-2.  The initial offer was $3,000,000.  *Id.*  On

9   February 27, 2023, Shevin received additional offers from two other potential purchasers, for

10  $2,549,000 and $2,900,000.  *Id.* at 26:1-4.  Following receipt of these offers, Shevin called the

11  agents for other parties who had viewed the properties or expressed an interest to advise that the

12  Trustee had received multiple offers and would be making multiple counteroffers.  *Id.* at 26:5-7.

13  Thereafter, the Trustee did not receive offers from any other potential purchaser.  *Id.*

14         On February 27, 2023, the Trustee made a multiple counteroffer to the three bidders that had

15  made offers.  Case Dkt. 1830 at 26:8-9.  All of the Trustee's counteroffers were at the price of

16  $3,200,000.  *Id.*  The following day, Shevin received responses on behalf of the Trustee.  *Id.* at

17  26:10-14.  The Purchaser delivered a counteroffer in the amount of $3,115,000, which was presented

18  as a "best and final" offer.  *Id.* at 26:10-11.  The same day, Shevin received a counteroffer from the

19  second potential purchaser in the amount of $3,100,000.  *Id.* at 26:11-12.  The third potential

20  purchaser declined to make a counteroffer, indicating informally that the maximum they would pay

21  was $3,000,000.  *Id.* at 26:12-14.

22         On March 1, 2023, the Trustee made counteroffers to the two remaining bidders, each in the

23  amount of $3,150,000.  Case Dkt. 1830 at 26:15-16.  The following day, the Purchaser sent Shevin

24

25  _____

26  [5]  The purchaser is Clausen Development Co., Inc. (the "Purchaser").  Case Dkt. 1830 at 5.  The
    Magic Man Trust, through its trustee James R. Clausen, made the initial offer and subsequent
27  counteroffers and then designated Clausen Development Co., Inc. to be the purchaser.  Case Dkt.
    1841 at 46 (representative capacity signature disclosure for buyer representatives), 74 (buyer counter
28  offer no. 1), 77 (addendum no. 2 to February 24, 2023 purchase agreement designating Clausen
    Development Company as the buyer), 92 (amended escrow instructions designating Clausen
    Development Company as the assignee buyer).

1  an acceptance of the Trustee's counteroffer—notwithstanding the labeling of the Purchaser's prior

2  offer as a "best and final" offer. *Id.* at 26:16-18.  The Trustee accepted the Purchaser's signed

3  acceptance and proceeded to open an escrow with the Purchaser. *Id.* at 26:18.  The Trustee did not

4  receive any other offers or accepted counteroffers. *Id.* at 26:18-19.

5         The final offer of the Purchaser, which was accepted by the Trustee, was the best offer

6  received for the Calabasas Property. *Id.* at 21:10-11; 26:20-21.  Shevin testified that he did not

7  believe further marketing would result in a higher or better offer. *Id.* at 26:21-22.  The Trustee

8  testified that, in his business judgment, the purchase price he negotiated with the Purchaser was a

9  fair and reasonable price. *Id.* at 24:1-2.  Neither Shevin nor the Trustee had any connection to the

10 Purchaser prior to engaging in the foregoing negotiations.

11        Based on the evidentiary record, the Court finds and concludes that the Calabasas Property

12 has been adequately marketed and the value of that property maximized for the benefit of the estate.

13 The marketing effort undertaken by Shevin on behalf of the Trustee was reasonably calculated to

14 yield the highest price for the Calabasas Property under the circumstances presented and did so.  The

15 Sale Agreement provides optimal value to the estate for the Calabasas Property.  Further, the Court

16 finds and concludes that the Trustee engaged in negotiations to sell the Calabasas Property, and

17 proposed the sale pursuant to the Sale Agreement, in good faith, following arms' length negotiations

18 with the Purchaser and other potential purchasers.

19        Under all of these circumstances, the Court concludes that entering into and consummating

20 the Sale Agreement is a reasonable exercise of the Trustee's business judgment and should be

21 approved.

22        **A.  Benefit to the Estate**

23        The Baronis contend otherwise, arguing that consummation of the Sale Agreement will result

24 in a net loss to the estate.  If the sale results in a net loss to the estate, they argue, the Trustee's

25 business judgment is not reasonable.  The Baronis' argument, however, is wrong.  Even after

26

27

28

1  deducting the estimated costs of sale and other expenses resulting directly from the sale, it is clear

2  that the sale will yield substantial positive value for the estate.[6]

3      There is no dispute among the parties regarding certain deductions from the gross sales

4  proceeds of $3,150,000 that should be considered in evaluating the benefit to the estate of

5  proceeding with the sale:

6      Sale Price         $3,150,000

7        Closing Costs (estimated at 1.5% of Sale Price)     -$47,250

8        Broker's Commission (5% of Sale Price)     -$157,500

9        Real property tax lien (2023)     -$10,494

10        Real property tax liens (2019-2020)     -$20,085

11        CIT lien (per Settlement Agreement)     -$1,800,000

12        Federal tax lien[7]     -$40,723

13        Debtor's homestead exemption[8]     -$100,000

14      Net Proceeds to Estate     $973,948

15  *See* Case Dkt. 1884 at 13-14; 1830 at 9-10.

16      Applying the foregoing deductions to the proposed sale price yields net sales proceeds of

17  $973,948, which constitutes a substantial benefit to the estate and irrefutable evidence of the

18  Trustee's reasonable business judgment.  The Baronis, however, urge the Court to make additional

19

20

21  [6] Relying on *In re KVN Corp., Inc.*, 514 B.R. 1 (B.A.P. 9th Cir. 2014), and various policy statements promulgated by the Office of the United States Trustee, the Baronis suggest that the Trustee must demonstrate the proposed sale will benefit unsecured creditors, rather than simply the

22  estate.  But *KVN* has no application here.  By its express terms, that decision applies to the sale of *fully encumbered* assets.  *In re KVN Corp., Inc.*, 514 B.R. at 6-8; *see also* Case Dkt. 1835 at 7-8

23  (Baroni brief referring to the United States Trustee's policy regarding "the sale of fully encumbered assets").  The Calabasas Property is not fully encumbered. The proposed sale price is $3,150,000 and

24  the secured claim of CIT is approximately $2,600,000, the Los Angeles County tax lien is approximately $30,000 and the disputed Internal Revenue Service tax lien is approximately $41,000.

25  [7] The Trustee disputes this lien and seeks to sell the Calabasas Property free and clear of it, but acknowledges it appeared on a preliminary title report obtained by the Trustee.

26

27  [8] The Trustee argues that this exemption is subject to defeasement under California law if the funds are not reinvested into a qualifying homestead within six months of the sale.  Nevertheless, the Court assumes for the sake of this analysis that the funds are properly reinvested and that this amount will not inure to the benefit of the estate.

28

deductions and reach the opposite conclusion. *See* Case Dkt. 1835 at 10-13; Case Dkt. 1884 at 13-14.  Ultimately, the Court concludes that doing so would be analytically incorrect and unfair to the estate. [9]

### 1.    Administrative Expenses

The Baronis contend that the Court should deduct $700,000 in estimated expenses that have been incurred in the administration of this chapter 7 case.  Case Dkt. 1884 at 14.  The Baronis do not offer a breakdown of this amount and concede it is merely an estimate of certain administrative expenses borrowed from the Trustee's capital gains tax analysis.  Case Dkt. 1884 at 14; *see also* Case Dkt. 1869 at 16.[10]  The Baronis establish no connection between these expenses and the proposed transaction, and offer no explanation why these amounts ought to be treated as a "cost" of moving forward with the proposed transaction.  Indeed, irrespective of whether the Court approves or disapproves the proposed sale, it appears that these administrative expenses *already* have been incurred.

Likewise, the Court is not persuaded by the Baronis' alternative argument, i.e., that an estimated $190,000 should be deducted for professional fees specifically related to the Sale Motion and the Abandonment Motion.  Again, the Baronis provide no factual basis for this estimate or any reason why professional fees that already have been incurred by the estate should be considered an avoidable cost of not going forward with the transaction.  Denying the Sale Motion will not eliminate these administrative expenses.

Moreover, consideration of the professional fees incurred in connection with the sale would unfairly reward the Baronis for their aggressive litigation tactics in opposing the sale.  Pursuant to the CIT Settlement Agreement, the Trustee has an obligation to market and sell the Calabasas

---

[9]  The Baronis also argue how the sale proceeds should be applied and the benefit to the estate should be calculated in the event James Baroni were treated as a joint tenant in the Calabasas Property.  *See* Case Dkt. 1884 at 14-21.  It is not necessary to respond to these calculations and arguments because, as discussed in Section IV below, James Baroni's interest in the Calabasas Property is a community property interest.

[10]  Ironically, although the Baronis' argument depends on the existence of this $700,000 in administrative expenses, the Baronis object to the admission of testimony regarding these administrative expenses, complaining that the Trustee's accountant did not provide enough detail on the nature of the expenses.    Case Dkt. 1867 at 10.

Property.  In furtherance of that obligation, the Trustee negotiated the Sale Agreement and filed the Sale Motion.  The Trustee could not have done so without incurring *some* professional fees.  But those fees undoubtedly have multiplied exponentially because of the Baronis' fierce opposition to the Sale Motion, and their additional effort to derail the sale by way of their Abandonment Motion— which the Court concludes below has no merit.  These efforts have included excessive briefing, a barrage of meritless evidentiary objections, and an effort to conduct discovery that the Court concluded was unnecessary, disproportionate, irrelevant and harassing.  That the Baronis have chosen to pursue this course, and thereby increase the administrative expenses of the estate, should not fairly be considered in assessing the benefits of the sale transaction or the reasonableness of the Trustee's business judgment.  To do so would unfairly reward the Baronis for their litigation tactics.

### 2.    CIT Unsecured Claim

The Baronis contend that the $255,000 unsecured claim retained by CIT pursuant to the CIT Settlement Agreement, following consummation of the sale, reduces the amount that will be realized by the estate.  But the argument is a non sequitur.  The unsecured claim to be retained by CIT is not a deduction from what will be realized by the estate from the sale.  It represents an entitlement to a pro rata distribution *from* the entirety of the estate, together with all other holders of unsecured claims, after the estate has been fully administered.  *See* 11 U.S.C. § 726.  That distribution will be made at the end of the case, if there are funds available, after distributions are made to the holders of administrative expenses and other priority claims.  *Id*.  Payment of CIT's unsecured claim is not guaranteed and the dividend that will be available on that claim is presently unknown.  It therefore is inappropriate to deduct it when assessing whether the Sale Agreement is beneficial to the estate.

By contrast, courts typically *do* deduct the amount of a secured claim, i.e., a claim secured by a lien in the property, when assessing the benefit to the estate of a proposed sale.  This is because a lien constitutes an interest *in the property*.  Upon the sale of property, the court is obligated to "prohibit or condition such . . . sale . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Courts typically do this by authorizing satisfaction of the lien from the sales proceeds or, when a lien is disputed, by requiring the trustee to hold the funds until the dispute is adjudicated.  Unless the lien is ultimately determined invalid, the proceeds attributable to

1  the lien are paid to the lienholder and never realized by the estate.  But again, the foregoing applies

2  to *secured* claims, not the unsecured claim that CIT will retain under the CIT Settlement Agreement

3  as a result of the sale.[11]

4  **3.    Trustee's Statutory Compensation**

5  The Baronis contend that the Court should consider the Trustee's statutory fee under

6  Bankruptcy Code section 326(a), which the Baronis estimate will be $117,750 in respect of the sale.

7  The Baronis argue that this fee should be deducted from the sale proceeds in assessing whether the

8  sale is beneficial to the estate.  Case Dkt. 1884 at 14.  The Court disagrees.  Bankruptcy Code

9  section 330 provides that a court "may award to a trustee . . . reasonable compensation for actual,

10  necessary services rendered by the trustee. . . ."  11 U.S.C. § 330(a)(1)(A).  The statute further

11  instructs that in determining such reasonable compensation, the court "shall treat such compensation

12  as a commission, based on section 326."  *Id.* at 11 U.S.C. § 330(a)(7).

13  Bankruptcy Code section 326(a) is a "fee cap statute," describing the *maximum* fee that may

14  be awarded to a chapter 7 trustee.  *See Matter of East Coast Foods, Inc.*, 66 F.4th 1214, 1217 (9th

15  Cir. 2023).  The statute calculates this maximum based on the aggregate amount distributed or

16  turned over by a trustee to parties in interest *over the course of the entire case*:

17  In a case under chapter 7 or 11, other than a case under subchapter V

18  of chapter 11, the court may allow reasonable compensation under

19  section 330 of this title of the trustee for the trustee's services, payable

20  after the trustee renders such services, not to exceed 25 percent on the

21  first $5,000 or less, 10 percent on any amount in excess of $5,000 but

22  not in excess of $50,000, 5 percent on any amount in excess of

23  $50,000 but not in excess of $1,000,000, and reasonable compensation

24  _____

25  [11] The Baronis' argument also elides over the fact that CIT's agreement to accept a $1.8 million payment and a $255,000 unsecured claim, in satisfaction of its claims, is contingent on

26  consummation of the proposed sale.  Under the CIT Settlement Agreement, CIT will retain the entirety of its lien, in excess of $2,561,235.85, if a sale is not approved.  This is likely a far worse

27  outcome than CIT's retention of a $255,000 unsecured claim, which may or may not ever be paid. Because CIT already has been granted relief from the automatic stay with respect to the Calabasas

28  Property, Case Dkt. 908, CIT has the option to exercise its rights under state law to foreclose on the property, leaving absolutely nothing for the estate.

1          not to exceed 3 percent of such moneys in excess of $1,000,000, upon

2          all moneys disbursed or turned over in the case by the trustee to parties

3          in interest, excluding the debtor, but including holders of secured

4          claims.

5  11 U.S.C. § 326(a).  As the foregoing illustrates, a trustee's compensation is not calculated with

6  reference to any particular transaction, but rather the overall results of the case in terms of moneys

7  disbursed and turned over.

8        With the exception of payments authorized at the time of an asset sale (e.g., in satisfaction of

9  liens and transaction costs), disbursement to parties in interest typically occurs at the conclusion of

10  the case, after submission of the trustee's final report and proposed distribution of funds (the

11  "Trustee's Final Report").  The Court usually considers the trustee's final compensation application

12  in connection with the Trustee's Final Report.  *See generally* LBR 2016-2(c)(4).   This enables the

13  Court to assess the trustee's compensation request in light of the overall results of the case.

14        The Ninth Circuit Bankruptcy Appellate Panel has held under Bankruptcy Code sections 326

15  and 330, unless "extraordinary circumstances" are present, "a trustee's request for compensation

16  should be presumed reasonable as long as the amount requested does not exceed the statutory

17  maximum calculated pursuant to § 326."  *In re Ruiz*, 541 B.R. 892, 896 (B.A.P. 9th Cir. 2015)

18  (citing *In re Salgado-Nava*, 473 B.R. 911, 921 (B.A.P. 9th Cir. 2012).  Thus, although the fee cap

19  amount is presumed reasonable, courts retain the discretion to determine whether there are

20  extraordinary circumstances present and whether the compensation requested by the trustee is

21  reasonable.

22        Ultimately, consummation of the Sale Agreement will increase the base amount on which the

23  Trustee's maximum fee is calculated under section 326(a).  If the Trustee collects more on behalf of

24  the estate, he will eventually disburse more.  But at this point, the amount the Trustee will actually

25  request as compensation for this case, and the amount the Court will award, are uncertain.  If past is

26  prologue, the Debtor is likely to object to the Trustee's final fee request—whatever the amount—and

27  the Court will consider the request and any objection at the appropriate time.  Given these

28  uncertainties, the Court is not persuaded that its assessment of whether the Sale Agreement is a

1   reasonable exercise of business judgment and beneficial to the estate must "deduct" from anticipated

2   sales proceeds any portion of the compensation that ultimately may be awarded to the Trustee under

3   Bankruptcy Code section 326(a).

4   **4.    Capital Gains Tax Liability**

5   The Baronis argue that the Trustee is not exercising reasonable business judgment because

6   consummation of the sale would result in $667,740 in capital gains tax liability to the estate.  Case

7   Dkt. 1884 at 13.  Together with their other asserted "deductions," the Baronis contend that this

8   renders the transaction a net negative to the estate.  But their argument is unavailing for two

9   independently adequate reasons.

10   First, even if the Court assumes the Baronis' tax analysis is correct, the estate will still realize

11   a net benefit of $306,208 from the sale of the Calabasas Property (i.e., $973,948 in net sale proceeds

12   minus $667,740 in alleged capital gains tax liability) because the other asserted "deductions"

13   (discussed above) are meritless.  A net recovery of over $300,000 is a substantial benefit and more

14   than adequate to demonstrate reasonable business judgment.

15   Second, the Court finds (i) the Trustee's reliance on the tax analysis of his accountant, Sam

16   Leslie, of LEA Accountancy, LLP, is reasonable, and (ii) such reliance supports the finding that the

17   Trustee is exercising reasonable business judgment.  The Trustee testified that he was informed by

18   Leslie "that there will be no adverse tax consequences as a result of the sale (i.e., no tax will be owed

19   by the Estate)."  Case Dkt. 1830 at 23-25 (Seror Declaration).  In two expert witness declarations,

20   Leslie describes his qualifications, the documents he reviewed (all of which were made available to

21   the Baronis), the methodology he employed, his calculations and the reasons for his conclusions.

22   *See* Case Dkt. 1830 at 28-31 (Leslie Declaration); Case Dkt. 1848 (Supplemental Leslie Declaration)

23   & Exhibit 2 thereto.  Leslie's analysis acknowledges a gross capital gain on the sale of the Calabasas

24   Property of $1,972,500, but demonstrates offsets that would render the gain a loss and result in no

25   tax liability.  The Court finds Leslie's testimony and analysis persuasive.

26   The Baronis challenge the Trustee's reliance on Leslie's analysis by attempting to

27   demonstrate that the analysis is incorrect, relying on expert and non-expert testimony and legal

28   argument.  But the Court is not persuaded.  As discussed below, it appears that the flaws alleged by

the Baronis in Leslie's analysis are based on incorrect legal and factual assumptions.  Moreover,

assuming for the sake of argument that there is some uncertainty about whether the estate might owe

tax as a result of the sale transaction or precisely how much, the Court is nevertheless satisfied that

both Leslie's analysis of that potential liability, and the Trustee's reliance on that analysis, are

reasonable.  It is not the role of the Court to adjudicate the estate's tax liability under Bankruptcy

Code section 363(b), but rather to assess the Trustee's *business judgment*.

Relying on the testimony of Scott Brown, an attorney specializing in tax consulting and tax

issues, the Baronis argue that the estate is unable to utilize suspended passive activity losses against

the capital gain resulting from the sale of the Calabasas Property, because the Calabasas Property is

not itself a passive-income property.  Case Dkt. 1835-2 at 1-4.  As Leslie explains in his second

declaration, however, his analysis does not assume the Calabasas Property is passive-income

property.  Case Dkt. 1848 at 28:8-21.  Although typically passive losses may be offset only against

passive gains, Internal Revenue Code section 469 "unlocks" those losses upon the disposition of any

interests in passive activity, thereby permitting the passive losses to be applied against non-passive

gains.  *See* 26 U.S.C. § 469(g)(1); *Langille v. C.I.R.*, 2010 WL 1009979, at *12 (U.S. Tax Ct. Mar.

18, 2010) *aff'd* 447 Fed. Appx. 130, 134 (11th Cir. 2011).  The triggering event here was the sale of

the last of the estate's passive-income properties, the Camarillo Property, which sale occurred earlier

this year.  *See* Case Dkt. 1774 (sale order); 1802 (Trustee's sale report).

Relying on the testimony of A. Lavar Taylor, an experienced tax attorney, the Baronis argue

that passive activity losses are not available to the estate to offset capital gains because those tax

attributes belong to the Baronis, not the estate.  Case Dkt 1835-3 at ¶¶ 8-24.  Under the Internal

Revenue Code, the estate of the debtor succeeds to the tax attributes of the debtor.  26 U.S.C.

§ 1398(g).  The debtor may thereafter succeed to the tax attributes of the estate, but only if the estate

is terminated.  26 U.S.C. § 1398(i); *see also* Treasury Regulation § 1.1398-1(e).  The Baronis appear

to concede that the estate succeeded to the Debtor's tax attributes in 2012, when this case was

commenced.  They contend, however, the Debtor succeeded to the estate's tax attributes in 2013,

when the Debtor confirmed her chapter 11 plan.  Further, they argue these attributes remain with the

1  Debtor because the Trustee never sought "turnover" of those tax attributes, as the Trustee did with

2  respect to the rental properties the Debtor managed in Carmel and Camarillo.

3        The Baronis' arguments are based on a false legal premise.  The Baronis contention that the

4  estate terminated upon confirmation of the Debtor's plan is in direct conflict with an opinion of the

5  Ninth Circuit Court of Appeals *in this case*.  *See In re Baroni*, 36 F.4th 958, 970-71, 973 (9th Cir.

6  2022).   The Debtor argued in that appeal that confirmation of the plan vested "all property of the

7  Chapter 11 estate in her, leaving the Chapter 11 estate terminated or empty," such that upon

8  conversion of the case six years later, the chapter 7 estate had no assets.  *Id.* at 971.  The Ninth

9  Circuit rejected this argument, holding "that the assets did not revest in Baroni at plan confirmation"

10  and that she did not receive those assets "'free and clear of all claims and interest of creditors' at

11  confirmation."  *Id.* at 973.  The only inference compatible with this holding is that the estate's tax

12  attributes (like all other estate assets) did not revest in the Debtor upon confirmation, but instead

13  remained in the estate.  Thus, there is no need for the Trustee to seek or obtain "turnover" of any tax

14  attributes from the Debtor.

15        Taylor attempts to bolster the Baronis' argument by citing to *Benton v. Comm'r of Internal*

16  *Revenue*, 122 T.C. 353 (2004), *supplemented by* 92 T.C.M. (CCH) 280 (T.C. 2006).  But the case is

17  inapposite.  The debtor in *Benton* argued the estate in his case terminated for purposes of section

18  1398(i) when his chapter 11 plan was confirmed, he was discharged, and nearly all of his assets were

19  transferred to a liquidating trust for the benefit of creditors.  *Id.* at 353.  Emphasizing that its holding

20  was specific to the facts presented, the tax court concluded that the estate terminated for purposes of

21  section 1398(i) when all but two of the estate's assets were transferred to a liquidating trust pursuant

22  to the confirmed chapter 11 plan.  *Id.* at 364-65.  At that point the estate lacked the "potential for the

23  incidence of tax or use of tax losses" and the debtor was "being released for the purpose of

24  rehabilitation."  *Id.*

25        The circumstances presented in this case are significantly different than those in *Benton*.  At

26  the time *Benton* was decided, individual debtors in chapter 11 were eligible for a discharge upon

27  plan confirmation.  Thus, upon plan confirmation, the debtor in *Benton* was discharged and

28  "released" into the world unencumbered by the debtor's prepetition liabilities.  In 2005, Congress

1  enacted the Bankruptcy Abuse Prevention and Consumer Protection Act, which introduced the

2  concept of a delayed discharge in individual chapter 11 cases.  *See First Nat'l Bank of Oneida, N.A.*

3  *v. Brandt,* 597 B.R. 663, 667 (M.D. Fla. 2018); 11 U.S.C. § 1141(d)(5)(A) ("confirmation of the plan

4  does not discharge any debt provided for in the plan until the court grants a discharge on completion

5  of all payments under the plan").  Unlike the debtor in *Benton*, the Debtor here was not discharged

6  upon confirmation of her chapter 11 plan and has yet to receive a discharge.  Moreover, the plan here

7  did not divest the estate of all interest in the assets treated under the plan.  The Debtor argued here

8  that all assets were transferred to her upon plan confirmation without the estate retaining any interest

9  in them.  The Ninth Circuit disagreed.  *Benton,* therefore, is simply not persuasive.

10      Finally, relying on the testimony of Richard Antognini, one of their lawyers in this

11  bankruptcy case, the Baronis offer their own calculation of the estate's capital gains tax liability

12  resulting from the sale, which Antognini estimates will be at least $666,068.  Case Dkt. 1835-6 at 1-

13  2.  The Baronis contend that Antognini's calculation of this liability is correct and Leslie's

14  calculation (i.e., zero) is wrong.  There are multiple problems with this argument.  As a threshold

15  matter, Antognini provides no foundational testimony to qualify him as an expert witness under

16  Federal Rule of Evidence 702.  His testimony is therefore not admissible.

17      But even if the Court considers Antognini's calculation in the nature of legal argument, the

18  Court does not find it persuasive. As explained in Leslie's second expert declaration, which the Court

19  does find persuasive, Antognini's calculation fails to: (i) deduct cost-of-sale expenses that are

20  allowed as an expense to reduce capital gain, (ii) apply the $500,000 exclusion applicable to the sale

21  under 26 U.S.C. § 121 because the Calabasas Property is the Baronis' primary residence, they are on

22  title, and have lived there for at least two of the last five years, (iii) consider the deduction available

23  to the estate for incurred but not yet deducted administrative expenses available pursuant to IRS

24  Publication 908 (estimated at $700,000), and (v) account for the standard deduction of $12,950.  *See*

25  Case Dkt. 1848 at 28:22-29:22.  These adjustments to the capital gain resulting from the proposed

26  sale *are* reflected in Leslie's calculation, which shows a resulting *negative* taxable income of

27

28

1    $393,605.  Case Dkt. 1848 at 59 (Exhibit 2).  In other words, after applying these adjustments, Leslie

2    concludes that there will be no taxable capital gain, and therefore no tax owing.[12]

3              The Baronis fail to persuade the Court that Leslie's analysis is wrong, or that the Trustee's

4    reliance on that analysis is unreasonable.  A projection of potential tax liability is, like all

5    projections, subject to some level of uncertainty.  But the Court is persuaded that Leslie's approach

6    to analyzing the estate's potential liability for capital gains taxes resulting from the sale, and his

7    conclusion that the estate likely will not have such liability, are sound.  Moreover, the Court finds

8    that the fact that the Trustee sought and obtained professional advice on the potential tax

9    consequences of the sale is further evidence that he is exercising reasonable business judgment.

10            **B.  Miscellaneous Objections**

11            The Baronis raise several other objections, separate and apart from whether there is a benefit

12    to the estate from proceeding with the sale.  First, the Baronis argue that the Court should not

13    approve the sale because the Trustee has not provided admissible evidence that the Purchaser (i) has

14    placed into escrow the $94,000 earnest money deposit required by the real estate sales contract, or

15    (ii) has obtained a loan commitment to fund the balance of the purchaser price.

16            These arguments are a red herring.  Nothing in Bankruptcy Code section 363(b) or case law

17    requires the Trustee to prove that a deposit or any other condition to closure of a sale agreement has

18    been satisfied as a condition to approval of the sale.  The Trustee is required to submit the terms and

19    conditions of the proposed sale to the Court for approval, which the Trustee has done.  The issue

20    presented is whether the terms of the sale transaction should be approved under section 363(b).  The

21    Trustee has represented to the Court that he believes the deposit is in escrow, Case Dkt. 1830 at 6:8-

22    9, but he is under no legal obligation to prove that fact in order to obtain approval of the transaction.

23

24

25    [12]  The Baronis contend that the $500,000 capital gains exemption provided under 26 U.S.C. § 121 is
a "one time exemption" that is not available to the estate.  They also argue that there is no basis to
26    use James Baroni's "half" of that exemption because the Calabasas Property is not community
property.  Case Dkt. 1867 at 7.  Both of these contentions are incorrect.  The section 121 exemption
27    was changed years ago from a "once-in-a-lifetime provision . . . to once-every-two-years."  *In re St.
Francis*, 232 B.R. 518, 520 (Bankr. N.D. GA 1999)) *citing* H.R. Rep. 105-148, 105th Cong., 1st
28    Sess. 1997.  Moreover, as discussed in Section IV below, the Calabasas Property is community
property.

1    Likewise, it is not necessary for the Trustee to prove the Purchaser's wherewithal to close the

2   transaction.  Any loan contingency that may have been part of the sale transaction has since been

3   removed.  *See* Case Dkt. 1830 at 18:10 (Seror Declaration); Case Dkt. 1841 at 6 (¶ 3) (agreement of

4   the parties contemplating that the Sale Motion would be filed after all contingencies had been

5   removed).  If the conditions to closing are satisfied, and the Purchaser is unable to close, the

6   Purchaser risks losing a substantial earnest money deposit.  Under the totality of the circumstances,

7   it is within the Trustee's reasonable business judgment to seek approval of and proceed with the sale

8   transaction, irrespective of whether the Purchaser has obtained (or proven that it has obtained) a loan

9   commitment.

10    Second, the Baronis argue that notice of the sale was inadequate because the Notice of Sale,

11   Local Rules Form F 6004-2.NOTICE.SALE with respect to this transaction was allegedly not posted

12   on the Court's website.  Under Local Bankruptcy Rule 6004-1(f), whenever a trustee is required to

13   give notice of a sale under Fed. R. Bankr. P. 6004 and 2002(c), the trustee is required to submit a

14   completed F 6004-2.NOTICE.SALE to the clerk for purposes of posting the notice on the Court's

15   website.  The Court posts these notices to help increase exposure of pending estate property sales, in

16   addition to all of the other efforts undertaken by trustees and debtors in possession to market estate

17   assets.

18    The Baronis' argument is without merit.  The Trustee complied with Local Bankruptcy Rule

19   6004-1(f) by filing an F 6004-2.NOTICE.SALE and an amended F 6004-2.NOTICE.SALE with the

20   Clerk of the Court.  Case Dkt. 1832, 1865.  The Court has reviewed its electronic records of sale

21   notices posted to its website and confirmed that the Trustee's first sale notice, Case Dkt. 1832, was

22   posted to its website by Court staff on May 3, 2023.  The second notice, Case Dkt. 1865, was posted

23   to the Court's website on May 19, 2023.  *See* Exhibit 1 to this Memorandum.  On each of those

24   dates, the posting of the sale notice also was announced through the Court's official Twitter account,

25   with links to each notice.  *Id.*  Notices of sale typically are removed from the Court's website the

26   evening of the specified sale date (i.e., the hearing date), although it is not clear when these

27   particular notices were removed.

28

More importantly, irrespective of whether the notices were posted on the website (which is in the exclusive control of Court staff), the Trustee complied with the rule by filing the notices of sale on May 3, 2023 and May 19, 2023.  The posting of the notice on the Court's website is out of the Trustee's control and not itself a prerequisite to approval of a sale under any provision of the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure.  In the end, the record here amply demonstrates the property was adequately marketed prior to the filing of the Sale Motion, potentially interested parties were advised of the overbid opportunity, and the Court supplemented these efforts by advertising the bidding opportunity on its website and Twitter account.

**C.  Sale Free and Clear of Liens under Section 363(f)**

The Bankruptcy Code provides that the "trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate," if at least one of five specified conditions is satisfied.  11 U.S.C. § 363(f).  Here, the Trustee seeks relief under section 363(f) with respect to two liens of record against the Calabasas Property.  For the reasons set forth below, this relief is appropriate.

The first lien is the deed of trust held by CIT.  Pursuant to the Settlement Agreement, CIT will receive $1.8 million of the purchase price, the estate will receive the balance, and CIT's lien will be deemed satisfied.  It is not entirely clear that the Trustee needs "free and clear" relief under section 363(f), although it is not uncommon for a trustee to request it under these circumstances.  To the extent this relief is necessary, it is appropriate for two reasons.  First, CIT has consented.  11 U.S.C. § 363(f)(2).  Second, the CIT deed of trust "is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property."  11 U.S.C. 363(f)(3).  The sale price of $3,150,000 is far in excess of the CIT lien of approximately $2,600,000 and the disputed tax lien (discussed below) in the approximate amount of $40,000.

The second lien is a tax lien that turned up in the Trustee's preliminary title search.  It was not previously disclosed by the Debtor.  The lien appears to have been recorded by the Internal Revenue Service ("IRS") on October 29, 2018 and is being investigated by the Trustee.  As set forth in the Sale Motion, which was served on the IRS, the Trustee disputes the validity of the tax lien.  Under section 363(f)(4), a trustee may sell property free and clear of an interest that is subject to a

bona fide dispute.  No one has challenged the Trustee's position that the IRS lien is the subject of a

bona fide dispute and the Court so finds.  Moreover, the Court finds that the IRS is deemed to have

consented pursuant to section 363(f)(2) because it was served with the Sale Motion, given notice that

the Trustee intends to sell the Calabasas Property free and clear of the IRS lien, and provided an

opportunity to object and be heard.  The IRS did not object.[13]

### D.  Overbidding Procedures

The Sale Motion proposed a series of routine procedures for parties interested in offering an

overbid for the Calabasas Property to do so in advance of the hearing on the Sale Motion.  Case Dkt.

1830 at 12-13.  Among other things, the procedures required any overbidder to provide notice by

email of their intention to do so no later than one day before the commencement of the hearing on

the Sale Motion, along with a deposit of $94,500 and evidence of the bidder's financial wherewithal.

The procedures required (i) the initial overbid be at least $3,200,000 with subsequent bidding

increments of $10,000, and (ii) the successful bidder be bound to close the transaction on the same

terms as the Purchaser (other than the sale price, which would be subject to a 5% commission),

subject to a liquidated damages provision.   Although there were no overbidders for the Calabasas

Property, the Court finds that these procedures were reasonable, appropriate, and reasonably

calculated to provide parties with an interest in overbidding on the Calabasas Property an

opportunity to do so.

### E.  Good Faith Purchaser Under Section 363(m)

The Trustee requests a finding that the Purchaser is a "good faith" purchaser within the

meaning of Bankruptcy Code section 363(m).  This provision states:

> The reversal or modification on appeal of an authorization under
>
> subsection (b) or (c) of this section of a sale or lease of property does

---

[13]  Although there was no objection by the IRS, and no request by the IRS for adequate protection
under Bankruptcy Code section 363(e), the Court will order the IRS' lien to attach to the proceeds of
sale, in the amount of such lien outstanding at the time the sale is closed, pending the adjudication or
consensual resolution of the dispute.  *See* 11 U.S.C. § 363(e).  The IRS lien shall remain subject to
any and all potential defenses and grounds for avoidance.  The Court finds that the attachment of the
IRS lien to the proceeds of sale will provide the IRS with adequate protection of the IRS' interest in
the Calabasas Property, if any.

1    not affect the validity of a sale or lease under such authorization to an

2    entity that purchased or leased such property in good faith, whether or

3    not such entity knew of the pendency of the appeal, unless such

4    authorization and such sale or lease were stayed pending appeal.

5    11 U.S.C. § 363(m).

6         The Court finds there is ample evidence to support the conclusion that the Purchaser is a

7    "good faith" purchaser.  The record reflects the Purchaser did not have any prior connection to the

8    Trustee or his real estate broker.  The Purchaser came to the attention of the real estate broker

9    through a comprehensive marketing process involving multiple listing services, online advertising,

10   open houses and showings.  These efforts generated substantial interest and ultimately multiple bids.

11   The Purchaser ultimately was selected by the Trustee because the Purchaser increased its proposed

12   purchase price more than the other competing bidders.  The process was fair, competitive, and

13   conducted at arms' length.  The winner in that process, the Purchaser, is a good faith purchaser for

14   purposes of section 363(m).

15   **F.  James Baroni's Matching Right Under Section 363(i)**

16        Bankruptcy Code section 363(i) provides as follows:

17   Before the consummation of a sale of property to which subsection (g)

18   or (h) of this section applies, or of property of the estate that was

19   community property of the debtor and the debtor's spouse immediately

20   before the commencement of the case, the debtor's spouse, or a co-

21   owner of such property, as the case may be, may purchase such

22   property at the price at which such sale is to be consummated

23   11 U.S.C. § 363(i).

24        As discussed in Section IV below, the Calabasas Property is community property.

25   Accordingly, section 363(i) applies and James Baroni, as the Debtor's spouse, has the right to match

26   the purchase price of $3,150,000.  In the Sale Motion, the Trustee requested that James Baroni be

27   required to (i) appear at the hearing, (ii) express his intent to exercise his section 363(i) right at the

28   hearing, (iii) provide the Trustee and the Court with evidence that he has the ability (via readily

available funds) to close at the final sale price, and (iv) provide a cashier's check to the Trustee in the amount of the Deposit, $94,500.00.

James Baroni has not indicated any intention to exercise his section 363(i) rights, but objects to these proposed procedures, arguing they are inconsistent with the plain language of the statute. Relying on the language of the statute providing that a non-debtor spouse may match the purchase price "before the consummation of" the sale, James Baroni contends that he should not be required to exercise his section 363(i) rights any sooner than the statute permits. The Trustee disagrees, arguing that the language of the statute leaves room for the Court to fashion procedures to facilitate a smooth and orderly sale closing process.

The Court agrees that the statute leaves room for the Court to fashion procedures to make the exercise of section 363(i) rights orderly. *See, e.g., In re Alisa Partnership,* 14 B.R. 54 (Bankr. D. Del. 1981). The Court approved such procedures earlier in this case, with respect to the sale of the Carmel Property. But the Court declines to approve here the same sort of procedures that it adopted in connection with the sale of the Carmel Property. First, James Baroni did not appear and timely object to the proposed procedures with respect to the Carmel Property. Here, although he stops short of indicating any intention to match the purchase price of $3,150,000, he has appeared through counsel and requested that he have the period of time provided by the statute to do so. The Court concludes that the deadlines and procedures proposed by the Trustee would unduly and unnecessarily curtail his statutory rights.

However, to avoid confusion and facilitate an orderly closing process, the Court adopts the following instructions and procedures for how section 363(i) should be applied in this case:

    a.    The purchase price that James Baroni must match is $3,150,000 (the "Matching Amount").

    b.    In order to exercise his right to purchase the Calabasas Property, he must transmit to the Trustee, and the Trustee must receive before consummation of the sale to Purchaser, funds in the full Matching Amount. The Trustee shall promptly provide James Baroni wire instructions to one of the Trustee's accounts for this purpose.

1

2

    c.  The term "consummation of the sale to Purchaser" means the commencement of the closing process.

3

4

5

6

    d.  Unless the Court's order granting the Sale Motion is stayed, the escrow company may close the sale to Purchaser.  In commencing the closing process, the escrow company may rely on the Trustee's certification that, as of the date and time of such certification, the Trustee has not received the Matching Amount.

7

8

    e.  If, as and when the Trustee receives the Matching Amount, the Trustee shall immediately notify the escrow company.

9

10

11

12

13

14

    (i)  If the escrow company already has commenced or completed the closing process at the time it receives such notification, the escrow company shall so advise the Trustee. The Trustee, in turn, shall advise James Baroni and return to him the Matching Amount. If the escrow company has commenced the closing process at the time it receives notification of the Trustee's receipt of the Matching Amount, it should nevertheless complete the closing process.

15

16

17

18

19

    (ii) If the escrow company has not commenced the closing process at the time it receives such notification, the escrow company shall not do so.  Instead, it shall return to the Purchaser its deposit.  Additionally, the Trustee shall open a separate escrow for the purpose of transferring the Calabasas Property to James Baroni and transmit the Matching Amount into that separate escrow.

20

21

22

23

24

25

Under the foregoing procedures, as the text of section 363(i) contemplates, James Baroni bears the risk of any delay in the receipt of the Matching Amount by the Trustee.  The funds must be received by the Trustee, and notice of such receipt by the Trustee received by the escrow company, before the process of closing the transaction *begins*.[14]   Otherwise, the transaction will close.  The

26

27

28

---

[14]  The Court recognizes that the closing of a sale transaction involves multiple steps, such as the transfer of funds and the recordation of instruments.  Although typically described as simultaneous, these steps may not actually all happen at the same moment in time.  To provide clarity and avoid future disputes, the Court's procedure contemplates that the escrow company will not be required to stop the process of closing if it has already commenced the closing process when it receives notification from the Trustee that the Matching Amount has been received.

Court believes this is a reasonable accommodation of both James Baroni's right to match the price

under section 363(i), and the need for an orderly process.[15]

### G. Distribution of the Sales Proceeds and the Debtor's Homestead Exemption

The Sale Motion requests that the Court approve certain distributions upon the closing of

escrow, as follows:

(1) Payment of normal closing costs to the parties entitled thereto, including but not limited
    to, the seller's share of escrow charges, the cost of a standard coverage title insurance
    policy, recording fees, documentary transfer taxes, and other normal and customary
    charges, prorations, costs and fees;

(2) Payment of all outstanding real property taxes (including prorated real property taxes)
    and any delinquent homeowners' association dues;

(3) Payment to the real estate brokers of a commission equal to 5% of the sale price;

(4) Payment of $1,800,000 to CIT pursuant to the CIT Settlement Agreement;

(5) The payment of the Debtor's $100,000 homestead exemption to the Trustee, pending
    reinvestment by the Debtor in a qualified homestead investment;

(6) Payment of the balance of the funds to the Trustee, on behalf of the estate.

The Baronis contend that the Trustee's proposed treatment of the Debtor's $100,000 homestead

exemption amount is inappropriate.

The parties agree that the Debtor is entitled to a homestead exemption of $100,000 upon the

sale of the Calabasas residence.  They also agree California law provides that the exemption may be

---

[15]  As noted, James Baroni has not indicated his intention to match the purchase price of $3,150,000.  Nevertheless, if James Baroni intends to exercise his right under section 363(i), the Court respectfully suggests that he do so as soon as possible.  Pursuant to the Court's forthcoming order on partial summary judgment for turnover of the Calabasas Property, the Court intends to give the Baronis 30 days to vacate the Calabasas Property.  Pursuant to the Sale Agreement, a condition to the Purchaser's obligation to close the transaction is that the Calabasas Property be vacant. The Court finds that this condition is reasonable and appropriate. As a practical matter, this means that if James Baroni waits too long to tender the Matching Amount, the Baronis may be obligated to vacate the Calabasas Property before James Baroni's matching right under section 363(i) expires.  If James Baroni exercises his 363(i) rights after vacating the premises, he and his family can certainly return to the premises, but the disruption will already have occurred.  Ultimately, it is within James Baroni's power to avoid this scenario by transmitting the Matching Amount to the Trustee well before the Baronis are required to vacate the property.

lost if the Debtor does not reinvest this amount in a new homestead property within six months.  *See In re Jacobson*, 676 F.3d 1193, 1193-1202 (9th Cir. 2012).   The dispute is over *who* will hold the funds in the meantime.  The Trustee contends that the Debtor cannot be trusted to return the funds if she ultimately loses the exemption.  He cites to several outstanding judgments he holds against the Debtor that are unpaid and overdue.  The Debtor counters that there is no authority for the Trustee to maintain control of funds that are exempt and therefore not property of the estate.

On this issue, the Court concludes that the Debtor has the better of the arguments.  Neither *Jacobson* nor any other authority cited by the Trustee specifically authorizes the Trustee to hold the exempt funds pending reinvestment.  Although the Court recognizes the Trustee holds a contingent reversionary interest in the funds, in the event they are not timely and properly reinvested, the Court is not persuaded it has the jurisdiction or authority to order retention of those funds by the Trustee in the interim because they are not property of the estate.  *See* 28 U.S.C. § 1334(e) (bankruptcy jurisdiction over property of the estate).   Upon the closing of the sale, therefore, the homestead exemption funds will not be property of the estate and should be remitted to the Debtor.  If the Debtor does not timely and properly reinvest the homestead funds, the estate will have a claim for repayment of the $100,000 amount.

Accordingly, the Court will approve the proposed distribution of sales proceeds as requested by the Trustee and summarized above, with the exception of the Trustee's proposed distribution of the Debtor's $100,000 homestead exemption amount.  That amount must be remitted to the Debtor upon the closing of escrow.  However, the Court will order the Debtor to file with the Court documentation of the reinvestment of $100,000 homestead amount no later than 10 days after the closing of the transaction in which such funds are reinvested.  This is a modest procedural requirement to impose upon the Debtor, rather than requiring the Trustee to obtain such information through formal discovery.

## III.  ABANDONMENT MOTION

In an effort to derail the Trustee's sale process, and retain the Calabasas Property without having to match the Purchaser's purchase price under Bankruptcy Code section 363(i), i.e., $3,150,000, the Baronis filed the Abandonment Motion.  The Abandonment Motion seeks an order

1   compelling the trustee to abandon the Calabasas Property under Bankruptcy Code section 554(b).

2   That statute provides: "On request of a party in interest and after notice and a hearing, the court may

3   order the trustee to abandon any property of the estate that is burdensome to the estate or that is of

4   inconsequential value and benefit to the estate." 11 U.S.C. § 554(b).

5          "In order to approve a motion to abandon property, the bankruptcy court must find either that

6   (1) the property is burdensome to the estate or (2) of inconsequential value and inconsequential

7   benefit to the estate." *In re Viet Vu*, 245 B.R. 644, 647 (B.A.P. 9th Cir. 2000) (citing 11 U.S.C. §

8   554(b) and *Morgan v. K.C. Mach. & Tool Co. (In re K.C. Mach. & Tool Co.)*, 816 F.2d 238, 245

9   (6th Cir.1987)).  Further, inconsequential value and inconsequential benefit are two separate

10  elements that must both be satisfied.  *In re K.C. Mach. & Tool Co.* 816 F.2d at 245.  Critically, "an

11  order compelling abandonment is the exception, not the rule." *In re Viet Vu*, 245 B.R at 647.

12  (*quoting Morgan v. K.C. Mach. & Tool Co*., 816 F.2d at 246).

13         The Baronis do not really argue or demonstrate that the Calabasas Property is burdensome to

14  the estate.  They do argue, however, that the sale of the Calabasas Property will generate

15  inconsequential value for the estate.  Relying on the same unpersuasive mathematics they rely upon

16  to oppose the Sale Motion, the Baronis contend that the sale of the Calabasas Property will generate

17  a net loss to the estate.  They contend that after all of their proposed deductions are applied,

18  approximately $974,000 in net sales proceeds that the Trustee is expected to receive from escrow

19  will become a net liability of several hundred thousand dollars.

20         Further, the Baronis make what can best be described as a "settlement offer."  They propose

21  that in exchange for an order of abandonment with respect to the Calabasas Property, they will

22  (i) pay CIT the sum of $1.8 million (i.e., the amount CIT will receive pursuant to the CIT

23  Settlement) and (ii) pay the estate the sum of $150,000.  The Baronis argue that this offer is better

24  for the estate than the proposed sale, and urge this Court to order abandonment on these terms rather

25  than approve the sale.  They even offer evidence that they have lined up a mortgage loan in the

26  amount of approximately $2.3 million to effectuate this proposal.

27         The Baronis' arguments, however, lack merit.  First, for all the reasons discussed in Sections

28  II.A.1-4 above, none of the Baronis' proposed deductions to the net sales proceeds are appropriate in

assessing the value to the estate of consummating a sale of the Calabasas Property.  There is a buyer

and a signed sale agreement under which the estate will receive approximately $974,000 from the

sale.  The Baronis' contentions that the Court should deduct from that sum amounts on account of

administrative expenses in the chapter 7 case, the CIT Unsecured Claim, the Trustee's compensation,

and capital gains tax liability are all without merit.  The Calabasas Property is clearly of

*consequential* value to the estate and this requirement of abandonment cannot be satisfied.

Second, the Baronis' arguments ignore the separate requirement that the subject property be

of inconsequential "benefit" to the estate.  They undoubtedly elide over this requirement because

they cannot satisfy it.  By virtue of the CIT Settlement Agreement, which was approved pursuant to

an order that is now final, sale of the Calabasas Property is the key to unlocking the value promised

by CIT under that agreement.  By selling rather than abandoning the Calabasas Property, the estate

succeeds to the difference in value between CIT's secured claim of approximately $2.6 million and

the negotiated sum of $1.8 million.  Further, by selling the Calabasas Property, the Trustee will

satisfy his contractual commitment to CIT to do so and avoid breaching the CIT Settlement

Agreement (and incurring unknown administrative damage liabilities).  These are clearly

*consequential* benefits to the estate—demonstrating that the other requirement for abandonment is

not satisfied.

Third, the Baronis' arguments are premised on the fanciful notion that they have a right to

compel CIT (and the estate) to accept their "settlement offer."  Nothing in Bankruptcy Code section

554(b), or any other statute, authorizes the Court to impose this arrangement over CIT's (or the

estate's) objection.  CIT is under no legal obligation to accept $1.8 million from the Baronis in

exchange for the estate's abandonment of the Calabasas Property.  Pursuant to the CIT Settlement

Agreement, CIT agreed that it would accept $1.8 million and permit the estate to receive the balance

of the value to which CIT is entitled on its secured claim, *only if* the Trustee sold the property.

Absent consummation of the kind of transaction contemplated in the Settlement Agreement (e.g., the

sale proposed in the Sale Motion), CIT's allowed secured claim will remain in an amount in excess

of $2.6 million.  The Court has no authority to force CIT to accept payment other than in the manner

to which it agreed in the CIT Settlement Agreement.  Likewise, the Court cannot force the estate to

1  accept $150,000, where it would otherwise receive approximately $974,000 from the sale.  That's

2  just not how abandonment works under section 554(b).  There is a standard to compel abandonment

3  and the Baronis have not met the standard.  Accordingly, the Abandonment Motion will be denied.

4  ### IV.   THE CALABASAS PROPERTY IS PROPERTY OF THE ESTATE

5         The Baronis contend in their opposition to the Sale Motion (and in the Abandonment

6  Motion) that they hold the Calabasas Property as joint tenancy property, rather than as community

7  property.  Case Dkt. 1835 at 19:21-22   Based on this premise, they argue: (i) only 50% of the

8  Calabasas Property is property of the estate, (ii) the Trustee must satisfy the requirements of

9  Bankruptcy Code section 363(h) in order to sell the Calabasas Property, (iii) the Trustee must initiate

10 an adversary proceeding in order to do so, in accordance with Federal Rule of Bankruptcy Procedure

11 7001(3), and (v) the distribution of the sale proceeds under the circumstances of a joint tenancy

12 generates no net proceeds and therefore no benefit to the estate.

13        These arguments, however, are a collateral attack on multiple orders entered in this eleven-

14 year-old case and an attempt to litigate a legal issue that already has been settled.  As detailed below,

15 the status of the Calabasas Property as community property: (i) is res judicata, binding on both the

16 Debtor and James Baroni, pursuant to the Second Amended Plan of Reorganization of Allana Baroni

17 (the "Plan"), Case Dkt. 376, and the *Order Confirming Debtor's Second Amended Plan of*

18 *Reorganization* (the "Plan Confirmation Order"), Case Dkt. 423, and (ii) is law of the case, by virtue

19 of the *Order Granting Trustee's Turnover Motion* (the "Turnover Order"), Case Dkt. 1148, and a

20 subsequent appellate decision declaring the Turnover Order to be law of the case.  For these and

21 other reasons, the Baronis are barred from now contending that the Calabasas Property is anything

22 other than community property.

23        **A.  The Plan and Plan Confirmation Order**

24        A confirmed chapter 11 plan is binding on the debtor and all interested parties with notice

25 and an opportunity to participate in the plan confirmation process.  *See* 11 U.S.C. § 1141(a); *Trulis v.*

26 *Barton*, 107 F.3d 685, 691 (9th Cir. 1995) ("Once a bankruptcy plan is confirmed, it is binding on all

27 parties and all questions that could have been raised pertaining to the plan are entitled to res judicata

28 effect"); *In re Pardee*, 193 F.3d 1083, 1086 (9th Cir. 1999) ("If a creditor fails to protect its interests

1   by timely objecting to a plan or appealing the confirmation order, it cannot later complain about a

2   certain provision contained in a confirmed plan, even if such a provision is inconsistent with the

3   Code . . . This court has recognized the finality of confirmation orders even if the confirmed

4   bankruptcy plan contains illegal provisions"); *see also Espinosa v. United Student Aid Funds, Inc.*,

5   553 F.3d 1193, 1199 (9th Cir. 2008) ("Were the rule otherwise, no judgment would ever be

6   conclusive, as a party aggrieved by it could endlessly re-litigate errors supposedly committed by the

7   trial court"), *aff'd*, 559 U.S. 260 (2010).

8          The Plan implicitly and explicitly treats 100% of the Calabasas Property as property of the

9   estate (i.e., community property).  First, the liquidation analysis in the Plan lists the full $2,275,000

10  value of the Calabasas Property as available to a chapter 7 trustee in the event of a hypothetical

11  liquidation.  Plan, Case Dkt. 376, Exh. 3 at 58.  This necessarily implies that the Calabasas Property

12  is community property and that James Baroni's interest is a community property interest.  If held in

13  joint tenancy, only 50% the value would be available to the chapter 7 trustee in a liquidation.

14  Second, the Plan's list of encumbrances on the Calabasas Property includes "$71,705.40 (Husband's

15  community property interest)," which explicitly and unequivocally describes James Baroni's interest

16  as a community property interest.  *Id.*  Third, the very same valuation and language appears in each

17  of the Debtor's prior versions of the plan, demonstrating the characterization was intentional and not

18  a mere oversight or scrivener's error.  Case Dkt. 155, Exh. 3 at 10; Case Dkt. 222, Exh. 3 at 16; Case

19  Dkt. 283, Exh. 3 at 59.[16]

20  _____

21  [16]  The characterization of the Calabasas Property as community property in the Plan is
    consistent with the characterization of that property in the Debtor's amended Schedules of Assets
22  and Liabilities ("Amended Schedules").  Case Dkt. 160, 161.  Although the Amended Schedules do
    not expressly state the Calabasas Property is community property, they list the value of the
23  Calabasas Property as $2,275,000, see Case Dkt. 161 at 6, and the value of the Debtor's interest in
    the property as $2,275,000.  Case Dkt. 160 at 2.  This can only be possible if the property is the sole
24  separate property of the Debtor under Bankruptcy Code section 541(a)(1) (which would leave James
    Baroni with no interest—something no one contends), or if the property is community property
25  under Bankruptcy Code section 541(a)(2).  Further, if the Baronis held the Calabasas Property as
    joint tenants, the Schedules would have listed the value of the Debtor's interest at 50% of the total
26  value of the property, or $1,137,500.  They did not.  Because the Amended Schedules were the
    schedules on file and in effect when the Plan was confirmed, the Debtor is now estopped from
27  contradicting them.  *In re Gadbois*, 2023 WL 4234388, *4 (B.A.P. 9th Cir. Jun. 28, 2023)
    (confirmation of a plan is based on the debtor's schedules of assets and liabilities in effect at the time
28  of confirmation; post-confirmation, debtor cannot assert facts regarding his assets that are
    inconsistent with those schedules).

1    Upon confirmation, the Plan became binding on both the Debtor (who proposed it) and

2 James Baroni (who had actual notice of the plan but did not object to it).  That James Baroni had

3 actual notice of the Plan is clear from the fact that he filed *three* declarations pledging his financial

4 support for the Plan.  Case Dkt. 285, 325, 378; *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S.

5 260, 272 (2010) ("Here, United received actual notice of the filing and contents of Espinosa's plan.

6 This more than satisfied United's due process rights").  None of his declarations state any objection

7 to or disagreement with the Plan's characterization of the Calabasas Property as community property.

8 The Court ultimately confirmed the Plan containing those characterizations and James Baroni did

9 not appeal.  Case Dkt. 423.  *See, e.g., In re AVC Villa Del Lago at Ocotillo Devco, L.L.C.,* 2009 WL

10 3488369, at *8 (Bankr. D. Ariz. Oct. 27, 2009) ("[Section 1141(a)] is clear and unambiguous.  In

11 addition to the statute, the Ninth Circuit has, on more than one occasion, held that an interested party

12 is bound by the plan, even if the plan contained language which might not have passed a legal

13 challenge.  In other words, if a party has sufficient notice, but elects not to voice an objection, and a

14 plan which is detrimental to that party's rights is confirmed, that party will be legally bound by the

15 plan").

16    Accordingly, the Plan's characterization of the Calabasas Property as community property is

17 res judicata and bars both the Debtor and James Baroni from arguing to the contrary.

18    **B.  The Turnover Order**

19    Following conversion of the case to chapter 7, the Court entered the Turnover Order, which

20 expressly held "the real property located at 3339 Via Verde Ct., Calabasas, California 91302 is

21 property of the estate." Case Dkt. 1148 at 2:12-13. The Baronis now argue that only 50% of the

22 Calabasas Property is property of the estate.  This argument directly contradicts the Turnover Order

23 and related findings, which constitute the settled "law of the case."

24    As a threshold matter, the Court notes that the District Court already has admonished the

25 Debtor for seeking to collaterally attack the holding of the Turnover Order that the Calabasas

26 Property is property of the estate.  After numerous appeals by the Debtor, the Ninth Circuit affirmed

27 the Turnover Order.  *In re Baroni*, 36 F.4th 958 (9th Cir. 2022), *cert. denied sub nom. Baroni v.*

28 *Seror*, 2022 WL 16909177 (U.S. Nov. 14, 2022).  Shortly after the Supreme Court denied the

1  Debtor's petition for certiorari and the Turnover Order became final, the Debtor and her counsel

2  sought an emergency stay from the United States District Court to prevent the Trustee from

3  marketing the Calabasas Property.  Case 2:22-cv-06867-MWF, Dkt. 5.  In denying that request, the

4  District Court rejected the Debtor's arguments regarding James Baroni's ownership in the Calabasas

5  Property as a collateral attack on the Ninth Circuit's decision affirming the Turnover Order:

6  > Appellants seem to be operating under the fantasy that they may

7  > collaterally attack the Ninth Circuit's ruling affirming the earlier

8  > turnover order in this action, which confirmed that the Calabasas

9  > residence was an asset of the estate. *In re Baroni*, 36 F.4th 958, 966

10 > (9th Cir. 2022), *cert. denied sub nom. Baroni v. Seror*, 2022 WL

11 > 16909177 (U.S. Nov. 14, 2022). They may not. And given the

12 > Calabasas residence is part of the estate, Appellant Baroni cannot

13 > claim "irreparable injury" based on its future sale. (See Opposition at

14 > 16) ("Here, the injury—i.e., the Debtor's loss of her house—was the

15 > direct result of the Debtor's defaults under her chapter 11 plan, the

16 > conversion of her chapter 11 to a chapter 7, and the resulting turnover

17 > of the Debtor's assets to the chapter 7 estate. To the extent the Debtor

18 > suffered irreparable injury, it occurred years ago and was the product

19 > of her own malfeasance.").

20 *In re Baroni*, 2022 WL 18277987, at *1,*2 (C.D. Cal. Dec. 9, 2022).

21    Despite the District Court's express holding that the Debtor may not collaterally attack the

22 holding of the Turnover Order that the Calabasas Property is property of the estate, the Baronis have

23 redoubled their attack.  The Baronis now insist that only 50% of the Calabasas Property is property

24 of the estate because the Baronis hold the property as joint tenants.  The Baronis, however, offer no

25 legal justification for why their collateral attack on the Turnover Order is suddenly permissible in

26 connection with the proposed sale of the Calabasas Property, when it was impermissible on the

27 Debtor's emergency motion to stay the marketing of the Calabasas Property.   The Court is not aware

28 of any such legal justification.

1    As the parties will recall, the Trustee's motion for turnover ("Turnover Motion") required the

2   Court to determine what property interests of the Debtor became property of the chapter 7 estate

3   following conversion of the case.  Case Dkt. 991.   The Trustee originally sought an order requiring

4   turnover of the rents collected by the Debtor from the rental properties in Camarillo and Carmel, and

5   the sale proceeds from a third rental property sold by the Baronis on the eve of conversion of the

6   case to chapter 7.  Case Dkt. 991 at 14:11-14.  The Debtor opposed the Turnover Motion, arguing

7   that turnover was improper because none of her property became property of the chapter 7 estate,

8   "including all of her community property."  *Debtor's Opposition to Trustee's Motion [for] Turnover,*

9   *etc.* Case Dkt. 1004 at 6:17-18.  The Court thereafter required supplemental briefing on the issue of

10  whether *any* of the Debtor's property became property of the chapter 7 estate upon conversion.  *See*

11  Hearing Transcript for July 17, 2019, Case Dkt. 1020 at 87:25-89:1.

12    In his supplemental brief, the Trustee expressly argued the chapter 7 estate included, among

13  other things, "the Carmel Property, the Camarillo Property and the Calabasas residence."  *Chapter 7*

14  *Trustee's Supplemental Brief in Support of His Motion for Turnover, etc.*, Case Dkt. 1032 at 16:10-

15  11; *Chapter 7 Trustee's Response to Debtor's Supplemental Brief of the Effect of Conversion on the*

16  *Property of the Estate*, Case Dkt. 1047 at 11:1-2.  The Debtor's supplemental brief argued the "home

17  and two rental properties" remaining on the conversion date never became property of the chapter 7

18  estate.  *Supplemental Brief Addressing Issue of the Effect of Conversion on Property of the Estate*,

19  Case Dkt. 1034 at 4:7-18 & 16:16; 6:20-22; 13:5-6; *Debtor's Reply to Supplemental Brief of the*

20  *Trustee re Turnover, etc.*, Case Dkt. 1046 at 11:14-15 ("As to the Debtor's home, the two rental

21  properties, and the funds in her corporation bank account, those assets are not property of the chapter

22  7 estate").  At no point did the Debtor contend, as she does now, that she and her husband held title

23  to the Calabasas Property as joint tenants, or that his interest in the Calabasas Property therefore

24  could not have become property of the estate.

25    The Court's *Amended Findings of Fact and Conclusions of Law regarding Order Granting*

26  *Trustee's Turnover Motion* (the "Amended F&C re Turnover") found and concluded that the

27  "Calabasas Property, the Camarillo Property (and rents derived therefrom) and the Carmel Property

28  (and the rents derived therefrom) are property of the chapter 7 estate."  Case Dkt. 1158 at 7, ¶ K and

1   at 10, ¶ 12.  Likewise, the final Turnover Order expressly ruled that "the real property located at

2   3339 Via Verde Ct., Calabasas, California 91302 is property of the estate." Case Dkt. 1148 at 2:12-

3   13.   Significantly, the Court ruled that the *Calabasas Property* was property of the estate, not that

4   the *Debtor's interest in* the Calabasas Property was property of the estate.  The latter language might

5   have left open the possibility of the Debtor holding a 50% joint tenancy interest in the Calabasas

6   Property, but that was not the language of the rulings.

7          The Turnover Order is now law of the case.  The law of the case doctrine generally precludes

8   reconsideration of "an issue that has already been decided by the same court, or a higher court in the

9   identical case."  *Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 951 (9th Cir. 2019)

10  *quoting United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) *and Thomas v. Bible*, 983

11  F.2d 152, 154 (9th Cir. 1993).  A "lower court is precluded from reconsidering the issue [decided by

12  a higher court] and abuses its discretion in doing so except in limited circumstances." *Askins v. U.S.*

13  *Dept. of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018).  The doctrine "is grounded in the need

14  for litigation to come to an end" and a recognition that courts cannot operate efficiently "'if a

15  question once considered and decided by it were to be litigated anew in the same case upon any and

16  every subsequent appeal.'" *Disimone v. Browner*, 121 F.3d 1262, 1266 (9th Cir. 1997) *quoting*

17  *Kimball v. Callahan*, 590 F.2d 768, 771 (9th Cir. 1979) *quoting Lehrman v. Gulf Oil Corp.*, 500 F.2d

18  659, 662-63 (5th Cir. 1974).  The doctrine applies to issues "decided explicitly or by necessary

19  implication in the previous disposition." *United States v. Jingles,* 702 F.3d 494, 499 (9th Cir. 2012);

20  *In re Delannoy*, 615 B.R. 572, 583 (B.A.P. 9th Cir. 2020), *aff'd*, 852 F. App'x 279 (9th Cir. 2021).

21         The BAP has already held that the Turnover Order is law of the case.  In connection with the

22  Debtor's appeal from the Court's order approving a sale of the Carmel Property, and prior to the

23  Ninth Circuit's affirmance of the Turnover Order, the Ninth Circuit Bankruptcy Appellate Panel

24  expressly held that the Turnover Order was law of the case on the issue of whether the Carmel

25  Property was property of the chapter 7 estate:

26                  As far as the bankruptcy court is concerned, its finding that the

27                  property at issue belongs to the estate, which was affirmed by the

28                  District Court, is law of the case. This doctrine ordinarily precludes a

1    court "from reexamining an issue previously decided by the same

2    court, or a higher court, in the same case." *Delannoy v. Woodlawn*

3    *Colonial, L.P. (In re Delannoy)*, 615 B.R. 572, 583 (9th Cir. BAP

4    2020) (*quoting Richardson v. United States*, 841 F.2d 993, 996 (9th

5    Cir. 1988) (citations omitted), *amended*, 860 F.2d 357 (9th Cir. 1988)).

6    So we cannot say that the bankruptcy court erred in concluding that

7    Debtor lacked standing to object. At the same time, this is the rare

8    instance where dismissing the appeal for lack of standing does not

9    make sense due to the potential "domino effect" of a future reversal of

10   the Turnover Order.

11   *In re Baroni,* 2021 WL 3011907, at *6 n.8 (B.A.P. 9th Cir. Jul. 13, 2021), *appeal dismissed*, No. 21-

12   60045, 2023 WL 2058699 (9th Cir. Feb. 8, 2023).  Because the Debtor dismissed her Ninth Circuit

13   appeal from the BAP's decision affirming the sale of the Carmel Property, the BAP's opinion is final

14   and binding on this Court.

15        The Baronis' arguments fail to persuade the Court that that there is any distinction between

16   the Court's holding under the Turnover Order with respect to the Carmel Property and its holding

17   under the same order with respect to the Calabasas Property.  Fatally absent from the Baronis'

18   opposition to the Sale Motion or the Abandonment Motion are any legal authorities or analysis on

19   this issue.  The Amended F&C re Turnover found — in a single sentence — that the both the Carmel

20   Property and the Calabasas Property are property of the chapter 7 estate.  Where the BAP has

21   determined that the Turnover Order is "law of the case" with respect to the Carmel Property, the

22   Court can think of no cogent reason or legal principle why the Turnover Order is also not "law of the

23   case" with respect to the Calabasas Property.

24        There is an exception to the "law of the case" doctrine, but the Court does not find that

25   exception applicable here.  "The law of the case doctrine does not apply 'if the court is convinced

26   that its prior decision is clearly erroneous and would work a manifest injustice.'" *Rocky Mountain*

27

28

1    *Farmers Union*, 913 F.3d at 951 *quoting Pepper v. United States*, 562 U.S. 476, 506–07 (2011).[17]

2    As detailed below, the Turnover Order is not clearly erroneous, and it is not manifestly unjust for the

3    Baronis to be bound by the Turnover Order.

4        The holding of the Turnover Order is not clearly erroneous with respect to the Calabasas

5    Property for all the reasons discussed above with respect to the Plan.   The Plan treated the Calabasas

6    property, implicitly and explicitly, as property of the estate, i.e., community property.  The Plan is

7    now res judicata and binding on both the Debtor and James Baroni.  Further, the Turnover Order is

8    consistent with the amended Schedules in effect at the time of Plan confirmation, and the Debtor is

9    judicially estopped from contradicting those Schedules.

10        Likewise, it is not manifestly unjust to treat the Turnover Order as law of the case with

11    respect to the Calabasas Property.  Prior to conversion of the case, the Debtor treated the Calabasas

12    Property as community property when it was advantageous to do so.  She did so explicitly and under

13    penalty of perjury, and also by necessary implication.  It was only after conversion of the case in

14    2019 (and the Trustee assuming control of property of the estate) that the Debtor and James Baroni

15    began to assert that they held the Calabasas Property as joint tenants, arguing that James' alleged

16    50% interest was beyond the reach of the Trustee.  Because the Baronis reaped the benefits of

17    treating the entirety of the Calabasas Property as estate property (i.e., community property), there is

18    no injustice in continuing to do so after conversion of the case. [18]

19    _____

20    [17]   Decisions prior to the Supreme Court decision in *Pepper v. United States* recognized two
      additional exceptions where "intervening controlling authority makes reconsideration appropriate, or

21    . . . substantially different evidence was adduced at a subsequent trial" following remand.  *Gonzales
      v. U.S. Dept. of Homeland Sec.*, 712 F.3d 1271, 1277 (9th Cir. 2013) *quoting Hegler v. Borg*, 50

22    F.3d 1472, 1475 (9th Cir. 1995).  Neither applies here.  There has been no intervening Ninth Circuit
      or Supreme Court authority regarding what constitutes property of the chapter 7 estate following a

23    post-confirmation conversion in a chapter 11 case such that this Court must reconsider the Turnover
      Order.  Additionally, because the Ninth Circuit affirmed the Turnover Order in its entirety, there was

24    no remand of the Turnover Order and thus no different evidence produced regarding the Trustee's
      Turnover Motion.

25    [18]   The Baronis also dramatically changed their assertions regarding the Carmel, Camarillo and
      Henderson rental properties being community property following conversion of the case.  The

26    Debtor confirmed her plan which stripped the liens of four lenders down to the value of the rental
      properties (and, regarding the Henderson rental property, stripped the junior lien off entirely) freeing

27    up a total of $1,078,276 in equity for the benefit of both the Debtor and James Baroni.  Plan, Case
      Dkt. 376 at 17:15-19:6; *Motion for Order (1) Confirming [Plan]; (2) Determining Value of Real*

28    *Property for Purposes of Plan Confirmation, etc.*, Case Dkt. 301 at 17:3-11.  By the express terms of
      section 506(a) and (d), however, the bankruptcy court can only disallow a secured claim (and strip

1    Following confirmation of the Plan, but prior to conversion, the Debtor pursued an adversary

2  proceeding against CIT's predecessor, OneWest, N.A. ("OneWest"), seeking a determination that the

3  note and the deed of trust encumbering the Calabasas Property were not enforceable by OneWest.

4  *See* Adversary Proceeding 1:13-ap-01249-MB (the "OneWest Adversary").  The Debtor litigated this

5  adversary proceeding for six years.  During that litigation, the Debtor never alleged that the

6  Calabasas Property was a joint tenancy property and never sought to join James Baroni as a co-

7  plaintiff.  If the Baronis had owned the property as joint tenants as they now contend, the Debtor's

8  litigation against OneWest would have been a futile pursuit.  The Court would not have had

9  jurisdiction over James Baroni's 50% interest in the Calabasas Property and could not have

10  adjudicated OneWest's rights vis-à-vis James Baroni, a non-party.  Even if the Debtor had prevailed,

11  James Baroni would have remained obligated to OneWest and his interest in the Calabasas Property

12  would have remained fully encumbered in favor of OneWest.

13    Following years of scorched earth litigation in the OneWest Adversary, and appeals to the

14  District Court and Ninth Circuit, this Court awarded OneWest $538,323 in attorneys' fees and costs

15

16  down the corresponding lien) to the extent it encumbers "the estate's interest in such property."  11

17  U.S.C. § 506(a); *United States Internal Revenue Service v. Snyder*, 343 F.3d 1171, 1176-79 (9th Cir.
2003).  If the Debtor had asserted that the Carmel, Camarillo and Henderson rental properties were

18  held in joint tenancies, the proposed lien strip would have been impossible; it was only because the
Plan implied they were community properties that the $1,078,276 in liens could be stripped down.

19  *Compare In re Rodriguez*, 156 B.R. 659, 660 (Bankr. E.D. Cal. 1993) (denying confirmation of
debtor's plan which sought to strip a creditor's lien down to the value of the collateral pursuant to

20  section 506 because the debtor held only a 50% interest in the collateral) *with In re Maynard*, 264
B.R. 209, 214-15 (B.A.P. 9th Cir. 2009) (finding that, because the community property interests of

21  the non-debtor spouse became property of the estate pursuant to section 541(a)(2), the entirety of a
creditor's lien secured by community property could be stripped down to the value of the real

22  property under section 506(a) and (d)).  James Baroni did not object to the plan's implicit
characterization of the rental properties as community properties of the estate.  Following

23  confirmation of the lien stripping plan, the Baronis received $303,248 in net sales proceeds when
they sold the Henderson rental property — equity that existed only because the Debtor previously

24  represented to the Court that the Henderson property was wholly property of her bankruptcy estate
so that the Court could strip the junior deed of trust off entirely and strip the senior deed of trust

25  down to $196,000 from $801,712.  Case Dkt. 376 at 26:16, 34:2-7.  *See also*, July 3, 2019
Declaration of Allana Baroni, Case Dkt. 1004 at 14, ¶ 7 ("The proceeds from the Henderson, NV

26  property were $303,248.43 deposited . . . on or about March 27, 2019").  It was only after the
$1,078,276 in liens were stripped off the rental properties to the benefit of both the Debtor and

27  James Baroni, and after the case was converted on April 29, 2019, that the Debtor and James Baroni
began asserting that the rental properties were held in a joint tenancy and that James' 50% interest

28  was not property of the chapter 7 estate.  Case Dkt. 985 at 5; 988 at 2-4; 1142 at 9; 1478 at 12, ¶ 4;
1484 at 24, ¶ 4.  The Baronis' shifting position regarding the community nature of the Calabasas
Property therefore is nothing new.

based on attorneys' fee provisions in the prepetition loan documents signed by both the Debtor and

James Baroni (the "Attorneys' Fee Award").  Adv. Dkt. 13-01249-MB, Dkt. 395, *aff'd* 2018 WL

6112612 (C.D. Cal., Mar. 30, 2018) *aff'd In re Baroni*, 781 F. App'x 670, 671 (9th Cir. 2019).  In

2018, OneWest moved for an order confirming that the automatic stay did not prevent it from

collecting the Attorneys' Fee Award from James Baroni and lifting the stay as to the Calabasas

Property securing that award in the event he failed to pay (the "RFS Motion").[19]  Case Dkt. 838.  The

Debtor opposed the RFS Motion arguing that the Calabasas Property was protected by the automatic

stay because it was her community property:

> CIT wants to foreclose on the family home. Allana Baroni and James
> Baroni jointly own that home, as tenants in common and under
> California's community property laws. Declaration of Allana Baroni
> (or "Baroni Dec."), at ¶ 2. . . .
>
> The bankruptcy laws deal with this situation. 11 U.S.C. § 541(a)
> provides that the "commencement of a case under section 301, 302 or
> 303 of this title creates an estate." That estate, under § 541 (a) (2),
> includes "All interests of the debtor and the debtor's spouse in
> community property as of the commencement of the case that is—[¶]
> (A) under the sole, equal, or joint management and control of the
> debtor; or [B] liable for an allowable claim against the debtor, or for
> both an allowable claim against the debtor and an allowable claim
> against the debtor's spouse…"
>
> The Baroni home is under the "joint management and control of the
> debtor." Baroni Dec., at ¶ 3. And, CIT argues that it can make a claim

---

[19]   Generally, the automatic stay terminates upon confirmation of a chapter 11 plan when the property of the estate revests in the reorganized debtor and ceases to be property of the estate.  11 U.S.C. § 362(c)(1).  The Debtor's confirmed plan, however, continued the stay "to prohibit collection or enforcement of pre-petition claims against the Debtor or the Debtor's property until the date the Debtor receives a discharge, if any."  Plan, Case Dkt. 376 at 42:2-4.  By treating the Calabasas Property as community property, the Debtor protected it from prepetition creditors even after confirmation.  This benefitted both the Debtor and James Baroni.

1           against James Baroni, the debtor's spouse. MPA, at pages 4-5. Thus,

2           its claim is "allowable…against the debtor's spouse." The home is an

3           asset of the bankruptcy estate. It is protected by the automatic stay. 11

4           U.S.C. § 362 (a). CIT may or may not be able to make a demand

5           against James Baroni, but it can take no action to foreclose on the

6           Baroni home without violating the automatic stay.

7           * * *

8           They [CIT] also did not discuss the impact of 11 U.S.C. § 541(a)(2). If

9           the clear language of section 541(a)(2) is to be honored, the Court

10          must find that the automatic stay protects the Baroni home.

11  *Reorganized Debtor's Opposition to Motion for Relief from the Automatic Stay* ("RFS Opposition"),

12  Dkt. 863 at 3:10-27; 4:4-7.  The Debtor's declaration in support of the RFS Opposition was explicit:

13          2. My husband, James Baroni, and I jointly own the home located at

14          3339 Via Verde Court, Calabasas, California as tenants in common

15          and under California's community property laws (the "Baroni Home").

16          3. The Baroni Home is under the "joint management and control of the

17          debtor."  My husband and I both manage the home and control it.

18  *Id.* at 11. The Debtor's legal arguments regarding section 541(a)(2) (which only applies to

19  community property) and her declaration testimony are unambiguous: the Calabasas Property is

20  community property.  The Debtor made these arguments and offered this testimony—on behalf of

21  herself and her husband— in an effort to shield the Calabasas Property from OneWest's collection

22  efforts on the Attorneys' Fee Award.

23          Now that the Baronis find it convenient to take a different tack, they have abandoned this

24  position, arguing instead that the Calabasas Property is a joint tenancy property, 50% of which is not

25  property of the estate.  Notably, none of the Debtor's declarations in opposition to the Sale Motion or

26  in support of the Abandonment Motion expressly state that the Baronis own the Calabasas Property

27  as joint tenants, despite her pleadings advancing that exact argument.  *See* Case Dkt. 1835-5, 1884 at

28

1   34-35.  Presumably, this is because she previously testified to the contrary, under penalty of perjury,

2   in support of her RFS Opposition.

3          Under the totality of the circumstances, it is not manifestly unjust to apply the "law of the

4   case" doctrine here.  In order to obtain confirmation of the Plan, which benefitted both the Debtor

5   and James Baroni, the Debtor took the position that all the Properties she owned with her husband

6   were held as community property.  The Plan, which is res judicata and binding on them both,

7   implicitly and explicitly states that the Calabasas Property is property of the estate, i.e., community

8   property.  James Baroni not only did not object to the Plan, but he advocated for its confirmation by

9   submitting three declarations in support of it.  Following confirmation, in an effort to insulate the

10  entirety of the Calabasas Property from the Attorneys' Fee Award, the Debtor gave declaration

11  testimony under penalty of perjury expressly stating that the Calabasas Property was community

12  property and therefore protected by the automatic stay.  Notwithstanding their latest effort to argue

13  to the contrary, it is entirely fair to apply the "law of the case" doctrine here.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.  CONCLUSION

Based on the foregoing, the Court will enter orders:

1.      Granting in part and denying in part the Sale Motion as provided above;

2.      Denying the Abandonment Motion in its entirety;

3.      The fourteen-day stay of Federal Rule of Bankruptcy Procedure 6004(h) will apply upon entry of the order on the Sale Motion;

4.      Within 30 days following the closing of the sale, the Trustee shall file the final closing statement, and admissible evidence regarding the amount of CIT's lien at the time of closing;

5.      The Trustee shall promptly lodge orders on the Sale Motion and on the Abandonment Motion consistent with this Memorandum of Decision, and file notices of lodgment; and

6.      Any objection to the form of the orders lodged by the Trustee shall be filed no later than 2 court days following the filing of the notices of lodgment.

# # #

Date: July 21, 2023

_Martin R. Barash_
Martin R Barash
United States Bankruptcy Judge